# DECLARATION OF JAMES R. DICKENS
# EXHIBIT A – PAGES 1-30

Page 1

1                     UNITED STATES DISTRICT COURT

2                        DISTRICT OF ALASKA

3    ─────────────────────────────────────────

4    JAMES BRELAND,                          )
                                             )
5                     Plaintiff,             )
                                             )
6         vs.                                )
                                             )
7    FRED MEYER STORES, INC.,                )
                                             )
8                     Defendant.             )
                                             )
     ─────────────────────────────────────────
9
     Case No. A05-169 CIV
10

11

12   ─────────────────────────────────────────

13              DEPOSITION OF JAMES BRELAND

14   ─────────────────────────────────────────

15
                    TUESDAY, JUNE 27, 2006
16                        9:05 a.m.

17
              Taken by Counsel for Defendants
18                           at
                     GRUENSTEIN & HICKEY
19         1029 West Third Avenue, Suite 510
                     Anchorage, Alaska
20

21

22

23

24

25

BRELAND v FRED MEYERS STORE

Page 6

```
 1        Q.    And they reside with whom?

 2        A.    They reside with their mothers.

 3        Q.    Did you take a plural on that, more than one

 4   mother?

 5        A.    Yes.

 6        Q.    Prior marriage?

 7        A.    No.

 8        Q.    How old are the children?

 9        A.    I have three sons.  One is ten, eight and

10   one.  One daughter who is three.

11        Q.    Where are you currently employed?

12        A.    I am currently employed with State of

13   Alaska, Department of Revenue, and Gottschalks, loss

14   prevention.

15        Q.    How long have you worked for the State of

16   Alaska?

17        A.    Worked for the State of Alaska eight years,

18   three months.

19        Q.    What's your position there?

20        A.    I'm a Child Support Specialist I.

21        Q.    Very briefly, what does that mean?

22        A.    Basically, I am a support specialist that

23   aids custodial parents and non-custodial parents in

24   their cases to get those -- their support and make

25   sure that the father that they have a case against is
```

BRELAND v FRED MEYERS STORE

Page 7

1    paying his support.

2        Q.    Are you paid by the hour there or are you

3    paid on a salary?

4        A.    Salary.

5        Q.    That's what per month?

6        A.    Approximately, I believe, 3,000 a month.

7        Q.    So your W-2 forms would reflect something

8    like 36,000 a year?

9        A.    Yes.

10       Q.    And at Gottschalks, you're working as a

11   security guard?

12       A.    Yes.

13       Q.    Okay.  Is it known as loss prevention at

14   Gottschalks?

15       A.    Loss prevention at Gottschalks.

16       Q.    Right.  And what kind of a schedule do you

17   have in 2006 at Gottschalks?

18       A.    Can you clarify that a little bit?

19       Q.    Sure.  What I'm trying to understand is I

20   assume you're working part time; is that correct?

21       A.    Yes.

22       Q.    How many hours a week are you working?

23       A.    Twenty hours.

24       Q.    And which days are you working?

25       A.    Saturday, Sunday, Wednesdays.

BRELAND v FRED MEYERS STORE

Page 11

```
 1      Q.    And what do you mean by other?

 2      A.    Because I'm mixed with Asian and Black.

 3      Q.    Okay.  Can you explain to me your heritage,

 4  just so I understand that, please?

 5      A.    My mother is Filipino, half Chinese.  My

 6  father is Black.

 7      Q.    Okay.  Where did you go to high school?

 8      A.    Rutherford High School, Panama City,

 9  Florida.

10      Q.    When did you graduate from high school?

11      A.    1998 -- 1988.

12      Q.    Goes by so quickly, it's hard to keep up,

13  doesn't it?

14      A.    Yes.

15      Q.    What's your current age?

16      A.    Thirty-six.

17      Q.    Did you go to any additional education after

18  high school?

19      A.    Yes.  I went to junior college for two

20  years.

21      Q.    Where?

22      A.    It's called a junior college, Gulf Coast

23  Community College.

24      Q.    Did you get an Associate of Arts degree or

25  anything like that?
```

BRELAND v FRED MEYERS STORE                                    JAMES BRELAND
                                                                6/27/2006

Page 14

```
1    advanced training at Fort Jackson?

2        A.    Yes.

3        Q.    All right.  If I understand the timetable

4    correctly then, you must have been released from your

5    military obligations in approximately 1997.

6        A.    1998.

7        Q.    1998.  And you remained in Alaska at that

8    time?

9        A.    Yes.

10       Q.    Okay.  When did you go to work for the State

11   of Alaska?

12       A.    I began working for the State of Alaska

13   April 1998.

14       Q.    How was it you happened to apply at Fred

15   Meyer?

16       A.    Could you clarify the question?

17       Q.    Sure.  Why did you apply for employment at

18   Fred Meyer in December 2001?

19       A.    Needed a second job.

20       Q.    Had you been working a second job anyplace

21   else before you applied at Fred Meyer?

22       A.    Yes.

23       Q.    Where?

24       A.    J. C. Penney's.

25       Q.    And why had you left J. C. Penney?
```

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 15

```
 1        A.    I was terminated for failure to edit
 2   timecard.
 3        Q.    Can you explain that to me?
 4        A.    Arrived at work.  Had a family emergency.
 5   Left.  Did not clock out.  Came back.  Took lunch.
 6   And expressed to the outgoing loss prevention manager
 7   that I needed my timecard edited.  He said he would
 8   take care of it.  Didn't take care of it.   Three days
 9   later, the incoming loss prevention manager called me
10   into the office and asked me what happened.  I
11   explained.  And I was terminated at that point.
12        Q.    Okay.  And who was the person who told you
13   you were terminated?
14        A.    I cannot think of her name.  I didn't
15   really -- I didn't really know her, so --
16        Q.    All right.  And that was when?
17        A.    I believe fall of 2001.
18        Q.    Had you ever been terminated from a job
19   before that?
20        A.    No.
21        Q.    Did you do security work for any other place
22   in the State of Alaska other than J. C. Penney's
23   before you went to work at Fred Meyer?
24        A.    K-Mart.
25        Q.    And when did you work at K-Mart?
```

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 16

```
 1        A.    I want to say November 2001.

 2        Q.    After J. C. Penney and before Fred Meyer?

 3        A.    Yes.

 4        Q.    Okay.

 5        A.    That was your question, correct?

 6        Q.    No.   That answers part of my question.   My

 7   question was actually, had you worked anyplace else

 8   besides J. C. Penney doing security work, not just

 9   after J. C. Penney?

10        A.    Okay.  Yes.

11        Q.    Where else?

12        A.    NANA.

13        Q.    I'm sorry.   Where?

14        A.    NANA.

15        Q.    What is NANA?

16        A.    It's a Native corporation.

17        Q.    All right.   And what had you done for NANA?

18        A.    Just regular security work.

19        Q.    When?

20        A.    I want to say fall of 2000 to fall of 2001.

21              No.  It was actually fall of 2000 to spring

22   of 2001.

23        Q.    Fall of 2000 to the spring of 2001?

24        A.    Yes.

25        Q.    So from that time frame, the fall of 2000 to
```

BRELAND v FRED MEYERS STORE

Page 17

 1   the spring of 2001, were you working at the State of

 2   Alaska and at J. C. Penney and at NANA?

 3       A.   No.  Because I had to think of the dates.

 4   And no.  I was working just at State of Alaska and

 5   NANA.  And then I went to J.C. Penney's.

 6       Q.   Why did you quit working at NANA?

 7       A.   It was hired on at J. C. Penney's at a

 8   higher rate of pay.

 9       Q.   Besides the termination at J.C. Penney and

10   the termination at Fred Meyer, have you ever been

11   terminated from any other employment?

12       A.   No.

13       Q.   Other than the current lawsuit you have

14   against Fred Meyer, have you ever had a lawsuit

15   against any other company?

16       A.   No.

17       Q.   Have you ever been involved in a lawsuit at

18   any other time either as a plaintiff or a defendant?

19       A.   No.

20       Q.   Now, let me follow up on the last answer.  I

21   understood you to say that you were divorced.  Was

22   there a lawsuit on that?

23       A.   No.  It was -- no.  It was a dissolution.

24       Q.   Well, okay.  I guess I consider that a

25   lawsuit.  So there was a dissolution.

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 20

1   you offered a job?

2        A.    I was referred to Fred Becker at that point,

3   I believe.

4        Q.    And at that point in time, who was

5   Mr. Becker?

6        A.    He was the loss prevention manager at

7   Abbott.

8        Q.    And how did the interview with Mr. Becker

9   go?

10       A.    I believe it went well.

11       Q.    Did he offer you a job?

12       A.    Yes.

13       Q.    And what was the position that you were

14   offered?

15       A.    I am not sure what they classified the

16   position as, but it was a temporary security.

17       Q.    And was it going to be at the Abbott store

18   or someplace else?

19       A.    It was at the Abbott store.

20       Q.    Was it temporary because the timing was the

21   holiday season or some other reason, if you know?

22       A.    I do not know.

23       Q.    Okay.  And so what was your understanding as

24   to how long the position would be?

25       A.    Until the store was open fully.

Page 22

1      Q.   In the materials we've seen and been

2   produced in this case, there's a reference to Phase I

3   and Phase II training.  Did you have any of that?

4      A.   I had that after I was hired permanently

5   by -- by Ryan Krieger.

6      Q.   Are you telling me that after the temporary

7   position ended at Abbott when you went to work for

8   Ryan Krieger at some other location, you had the

9   Phase I and Phase II training?

10     A.   Yes.

11     Q.   And so you at some point in time went from a

12   temporary position to a regular position?

13     A.   Yes.

14     Q.   And when was that?

15     A.   Not for certain.  I believe 2002, April.

16     Q.   Did you go to a different location?

17     A.   Yes.

18     Q.   At which store?

19     A.   Dimond location.

20     Q.   And did you say that's with Ryan Krieger?

21     A.   Ryan Krieger, yes.

22     Q.   What was Mr. Krieger's position at that

23   time?

24     A.   At that time he was a loss prevention

25   manager of Dimond.

BRELAND v FRED MEYERS STORE

Page 24

1      A.    No.

2      Q.    Did you have the weekends off during that

3  period of time, though?

4      A.    No.  I work every weekend, mostly.  I would

5  only take a day or two off to spend with my children.

6      Q.    How did you and Ryan Krieger get along?

7      A.    Got along great.

8      Q.    How long did you work for Mr. Krieger?

9      A.    I worked for Mr. Krieger approximately three

10  months, I believe, until I was transferred.

11      Q.    Why were you transferred?

12      A.    According to what I was told, because they

13  did away with the part-time hours at Dimond.

14      Q.    And is that when you were transferred to the

15  Muldoon store?

16      A.    Yes.

17      Q.    Who advised you that you were being

18  transferred?

19      A.    A Ron Huebner.

20      Q.    Do you know what Mr. Huebner's position was

21  at that time?

22      A.    At that time I believe he was a regional

23  loss prevention manager.

24      Q.    Do you know where Mr. Huebner was based?

25      A.    I do not know where he was based.

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 25

1    Q.   Okay.  Had you ever met Mr. Huebner prior to
2  that time?
3    A.   Yes.
4    Q.   Okay.  Anybody else transferred from the
5  Dimond store to the Muldoon store at that time?
6    A.   Not that I can recall.
7    Q.   Anyone else remain at the Dimond store doing
8  part-time work?
9    A.   I believe I was the only part-timer at that
10  store.
11    Q.   When you were at the Dimond store those
12  first few months in 2002, besides Mr. Krieger, who
13  else was in loss prevention at that time?
14    A.   I cannot recall.  I believe it was just me
15  and Mr. Krieger.
16    Q.   And when you transferred to Muldoon, who
17  were the other people working in loss prevention at
18  that time when you initially went over there?
19    A.   When I initially was transferred?
20    Q.   Yes.
21    A.   Bryan Stewart, Tony Bonini, Bonn Kracker,
22  Shane Calt.
23         (Peter Gruenstein enters the room.)
24  BY MR. DICKENS:
25    Q.   What happened to Shane?

BRELAND v FRED MEYERS STORE

Page 27

1       A.    Could you clarify?

2       Q.    Certainly could.  Were you given an annual

3    performance evaluation by your supervisor while

4    working at the Muldoon store?

5       A.    Yes.

6       Q.    And did you have at least two of those done

7    of your performance by Bryan Stewart?

8       A.    I believe so.

9       Q.    And isn't it true that both of those

10   evaluations were quite positive about your

11   performance?

12      A.    Yes.

13      Q.    Okay.  Isn't it true that while you worked

14   under Bryan Stewart at the Muldoon store, he never

15   once called you a racially derogatory name?

16      A.    Personally?

17      Q.    Personally.

18      A.    Yes.

19      Q.    And isn't it true that you told people that

20   Bryan Stewart was a decent man and that you and he got

21   along pretty good?

22      A.    I did express that.

23      Q.    In fact, you expressed that in writing, did

24   you not?

25      A.    Yes.

BRELAND v FRED MEYERS STORE

Page 44

```
 1    mean by "it"?

 2         A.    That the racial remarks that he made, he

 3    didn't mean anything personal by it to me.

 4         Q.    So you mean -- let's see if I understand

 5    that.  As you understood it, when Mr. Stewart called,

 6    he was saying he didn't mean to offend you by any

 7    racial remarks.  They were not directed at you

 8    individually.

 9         A.    Yes.

10         Q.    And how did you respond?

11         A.    My response was I just was offended that he

12    made the remarks in my presence, whether they were

13    directed towards me or not.

14         Q.    Well, as long as we're on that subject, why

15    don't you tell me what racial remarks you heard,

16    personally heard Bryan Stewart make either in your

17    presence or when you would overhear because you're

18    just around the corner?

19         A.    The remarks I heard were "nigger," "field

20    nigger," "fucking spicks," "fucking Native people,"

21    "sweating like a slave."  "I'm tired like a running

22    slave."  He called Asian people "gooks," "slant-eyed

23    fuckers."  And he always made reference to "chicken"

24    and "watermelon" concerning Black employees.

25         Q.    Okay.  Did you ever make notes about the
```

Exhibit _A_ Page _14_ of _64_

BRELAND v FRED MEYERS STORE

Page 93

```
 1    have that wasn't followed.
 2         Q.   All right.  But you raised the issue again
 3    and something was done and Stewart got transferred,
 4    right?
 5         A.   I raised the issue again.  And the only
 6    reason something was done is because I sent it to
 7    Kevin Ruoff's boss.
 8         Q.   Who is that?
 9         A.   Scott Bringhurst.
10         Q.   Did you ever talk to Mr. Bringhurst in
11    person?
12         A.   No.
13         Q.   Have you ever seen Mr. Bringhurst in person?
14         A.   Once.
15         Q.   What was that occasion?
16         A.   When I went to Phase I training down in
17    Oregon.
18         Q.   Did he address the group or something?
19         A.   He was in the area.
20         Q.   Okay.  So other than -- so you raised the
21    issue again.  Isn't it true that you contended to
22    several people that the transfer of Bryan Stewart was
23    not an adequate response, that there should have been
24    something else, like a suspension?
25         A.   Yes.
```

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 97

```
 1        Q.    Okay.  All right.  So from that, you
 2   conclude there was a close personal relationship
 3   between the two of them?
 4        A.    Yes.
 5        Q.    All right.  You just told me that you'd been
 6   out to Bryan Stewart's house on five occasions.  So is
 7   it fair to conclude that you and Bryan Stewart had a
 8   close personal relationship?
 9        A.    Close working relationship.
10        Q.    Well, wait a minute.  These are off-duty
11   things at his house, were they not?
12        A.    They were.
13        Q.    So if your information is correct, you had
14   twice as close a personal relationship outside of work
15   with Bryan Stewart as Mike Johnson did.
16        A.    But we did not violate the policy.  Because
17   loss prevention policy states you cannot have a
18   personal relationship with anyone in the store that
19   you work at except those in the loss prevention
20   section.
21        Q.    Okay.  Let's talk about loss prevention
22   policies.  Did you get copies of the loss prevention
23   policies when you went through your various training
24   phases?
25        A.    Yes.
```

Exhibit _A_ Page _16_ of _64_

BRELAND v FRED MEYERS STORE                                      JAMES BRELAND
                                                                    6/27/2006

Page 110

1    doing your job as a loss prevention specialist?

2         A.    Yes.

3         Q.    In what way?

4         A.    I didn't want to do my job to help him

5    basically bolster his statistics.  It was just one of

6    those situations where his racial views kind of

7    demotivated me.

8         Q.    As I recall the records, though, you still

9    did very well as far as arrests compared to other

10   people, did you not?

11        A.    Yes.

12        Q.    Did you outperform the other loss prevention

13   specialists for the amount of time you worked?

14        A.    Yes.

15        Q.    From looking at just a quantitative review

16   of your performance, did you see anyone else who

17   performed at a higher level than you did even though

18   Bryan Stewart was your supervisor?

19        A.    No.

20        Q.    So whatever reservations you had about

21   working with him, you were able to put those aside and

22   then do your job, after which you were paid by Fred

23   Meyer.

24        A.    Because I was personally motivated to be the

25   best.

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 122

1    A.    Yes.

2    Q.    In your complaint, you are alleging

3  retaliation, are you not?

4    A.    Yes.

5    Q.    What is the retaliation that you were

6  alleging?

7    A.    I'm alleging retaliation that Kevin Ruoff

8  failed to follow up on my first initial complaint.

9  And that the following complaint, it was sent to Scott

10  Bringhurst, his boss.   Kevin Ruoff retaliated against

11  me on a incident that he clearly did not investigate

12  the facts and terminated me based off of the second

13  complaint to his boss.

14    Q.    Don't you see some inconsistency there?

15  Because shortly before Mr. Ruoff made the difficult

16  decision regarding the February 14 incident, he had

17  just named you the loss prevention specialist of the

18  year, hadn't he?

19    A.    I wouldn't say he named me the loss

20  prevention specialist of the year.  It was just he

21  gave me notice, because there -- if you look at what

22  he wrote, it was not saying that I was loss prevention

23  special -- he was just basically saying that two

24  individuals in Alaska were recognized for superior

25  work performance.

BRELAND v FRED MEYERS STORE

Page 129

```
 1   these documents, did you sign and turn one in, then
 2   also get to keep a copy?
 3        A.   No.  Usually, we sign.  And we give it to
 4   loss prevention manager and he would turn it in.  We
 5   would never receive a copy.
 6        Q.   Well, did you ever receive a copy of this
 7   one --
 8        A.   No.
 9        Q.   -- which is Exhibit 3?
10        A.   No.
11             MS. HOLEN:  Exhibit 4.
12             MR. DICKENS:  Exhibit 4.  Thank you.
13        Q.   Did you read Exhibit 4 before you signed it?
14        A.   Yes.
15        Q.   Based upon Exhibits 2, 3 and 4, is it fair
16   to say that you clearly understood Fred Meyer's policy
17   prohibiting harassment because of an individual's race
18   or color?
19        A.   Yes.
20        Q.   And you also clearly understood, based upon
21   Exhibits 2, 3 and 4, what action you were to take if
22   you believe you were being harassed by a supervisor
23   because of your race.
24        A.   Yes.
25             MR. DICKENS:  Okay.  Would you mark that,
```

BRELAND v FRED MEYERS STORE

1    you seen that document prior to today?

2        A.    I do not recall seeing this document.  I did

3    see it through my counselor.

4        Q.    Did you see it while you worked at Fred

5    Meyer?

6        A.    No.

7        Q.    Do you know where this document came from

8    when you signed it?

9        A.    I do not know where it came from.  And looks

10   like Kevin Ruoff signed it.

11       Q.    Under the "Summary" here, it says, quote,

12   "Working w/ several LP, Mr. Breland lost observation

13   of merchandise while concealed," unquote.  That's what

14   you admitted earlier happened, that you lost

15   observation for a short period of time.

16       A.    Yes.

17       Q.    And despite that, you're the one who said

18   let's go ahead and effect the arrest?

19       A.    Yes.

20       Q.    Did you reread Section 400 after this?

21       A.    Yes.

22       Q.    Okay.  Did you have a copy of Section 400 in

23   your own personal possession at home or just the one

24   copy that's in the office, the loss prevention office?

25       A.    I do not -- I don't believe I had a copy of

Exhibit *A* Page 20 of 64

BRELAND v FRED MEYERS STORE

Page 164

```
1    the Section 400 in my own personal.  It was in the

2    office.

3         Q.    Is that a real thick section of the manual

4    or is that a thin section?

5         A.    Don't recall.

6               MR. DICKENS:  Mark that, please.

7               (Exhibit 19 was marked.)

8    BY MR. DICKENS:

9         Q.    Mr. Breland, you've been handed what we've

10   marked as Exhibit 19 to your deposition.  Have you

11   seen that document prior to today?

12        A.    Yes.

13        Q.    In fact, didn't you receive a copy of that

14   one no later than January 31, 2004?

15        A.    I did not receive a copy.

16        Q.    Let me rephrase my question.  Did you

17   receive this document and sign it on January 31, '04?

18        A.    Yes.

19        Q.    Did you read it before you signed it?

20        A.    Yes.

21        Q.    And on the first page under paragraph one,

22   there are five elements, A through E.  Are those the

23   five elements we've been talking about?

24        A.    Correct.

25        Q.    All right.  So you must observe the suspect
```

BRELAND v FRED MEYERS STORE

Page 175

```
 1       A.    Indirectly.

 2       Q.    Answer my question.  Did he directly?

 3       A.    No.  He did not call me a nigger directly.

 4       Q.    Okay.  And he didn't address you personally

 5  in a derogatory manner concerning race, did he?

 6       A.    Could you clarify that?

 7       Q.    I'm just reading what you wrote here.  It

 8  says he has not addressed me "in a derogatory matter

 9  concerning race."

10       A.    Not concerning race.

11       Q.    Now, did Tony Bonini tell you he transferred

12  just because he got tired of the comments that Stewart

13  was making?

14       A.    Tony Bonini expressed that partially -- a

15  partial reason for transferring was because of his

16  comments and working with Mr. Stewart, yes.

17       Q.    What was the other reason?

18       A.    Because he was moving to the other side of

19  town.

20       Q.    He wanted a short commute?

21       A.    Yes.

22       Q.    That's when he took the job over with the

23  Abbott store?

24       A.    Dimond, I believe.

25       Q.    Dimond store.  All right.
```

BRELAND v FRED MEYERS STORE                                  JAMES BRELAND
                                                             6/27/2006

Page 187

1              Is that your thought at that time?

2      A.    That is my thought at the time.

3      Q.    All right.  Now, don't you think that one

4   interpretation of this, a reasonable one, would be

5   that you thought someone should take Mr. Stewart and

6   give him some diversity training or some education in

7   interaction with people of different races and how to

8   comment about matters around them?

9      A.    Could you clarify that for me?  Because I'm

10  not really understanding what you're asking me.

11     Q.    Sure.  Well, what I'm asking you is how you

12  think this would be seen and interpreted by someone

13  like Mr. Ruoff.  Wouldn't it be fair for him to

14  conclude that because you've said Stewart's a decent

15  person and you generally get along that all you're

16  suggesting be done is that Stewart have some education

17  on these topics of inappropriate comments based on

18  race?

19     A.    I can't answer what someone else would

20  assume reading those words.

21     Q.    Well, you wrote them.  What were you trying

22  to tell Mr. Ruoff?

23     A.    I was trying to tell Mr. Ruoff basically

24  Mr. Stewart needed to be educated on how to deal with

25  people other than white people.

Page 188

1    Q.    Is there anything I've missed in Exhibit 20

2  or Exhibit 21 in which you've made a recommendation to

3  Kevin Ruoff beyond educating Bryan Stewart a little

4  more in how to work with people of different races?

5    A.    No.

6         MR. DICKENS:  Mark that, please.

7         (Exhibit 22 was marked.)

8  BY MR. DICKENS:

9    Q.    Mr. Breland, would you take a look please at

10 Exhibit 22?

11        Mr. Breland, have you read Exhibit 22?

12   A.    Yes.

13   Q.    Have you seen that document prior to today?

14   A.    Yes.

15   Q.    Did you ever see that document while you

16 worked at Fred Meyer?

17   A.    No.

18   Q.    Okay.  Well, you saw part of it.  Page two

19 is an e-mail from you to Kevin Ruoff.

20   A.    Yes.  I've seen that part.

21   Q.    Okay.  But the interaction between Mike

22 Johnson, Kevin Ruoff with a cc to Jennifer Carlson you

23 had not seen; is that what I understand?

24   A.    Correct.

25   Q.    Let me ask you a question about the first

BRELAND v FRED MEYERS STORE

Page 197

1    been Saturday.  So you were working Saturdays at that

2    time?

3        A.    Yes.

4        Q.    How long did it take you to prepare this

5    document?

6        A.    About an hour.

7        Q.    Okay.  And what was the purpose of this

8    document?

9        A.    It was a follow-up complaint to my

10    subsequent complaint in March of '04.

11        Q.    Well, I'm a little confused here.  In your

12    opening paragraph, you say, quote, "In April 2004 a

13    complaint of Mr. Stewart making racial slurs,"

14    et cetera, "was sent to you via office vision," end

15    quote.  We've looked at the one of March 22, 2004.  Is

16    that the one you meant or was there another one in

17    April?

18        A.    Actually, I was referring to the March 22nd,

19    2004 complaint.  Just off by a week.

20        Q.    Okay.  Now, something we hadn't discussed

21    earlier, but in your second paragraph, you said

22    Mr. Stewart read the complaint and then called you at

23    your day job to apologize.  Is that the one where you

24    said you were at work and didn't want to talk about

25    it?

BRELAND v FRED MEYERS STORE
JAMES BRELAND
6/27/2006

Page 198

1       A.    Yes.

2       Q.    What exactly did Mr. Stewart say when he

3   called?

4       A.    I can't recall the exact words.  But the

5   gist of it was he was upset about the wording, about

6   the wording concerning disease.  And that he wanted to

7   apologize for making the racial slurs and

8   inappropriate racial comments.

9       Q.    Did he actually say -- admit that he had

10  made racial slurs and inappropriate racial comments to

11  you?

12      A.    Yes.

13      Q.    All right.  And is it your testimony that

14  Mike Johnson talked to you that next day and said that

15  Mr. Stewart had admitted to him he'd made racial slurs

16  and inappropriate racial comments?

17      A.    Yes.

18      Q.    Did you make a note of either your

19  discussion with Bryan Stewart on or about March 23,

20  2004 or your discussion with Mike Johnson about that

21  same time?

22      A.    I did not make any notes concerning the

23  phone call from Bryan Stewart.  And I didn't make any

24  notes concerning a meeting with Mr. Johnson.

25      Q.    What did you and your supervisor at the

BRELAND v FRED MEYERS STORE

Page 204

```
 1      A.    I don't recall telling anyone else.

 2      Q.    All right.  As a result of this letter, what

 3   happened?

 4      A.    As a result of this letter, I had a meeting

 5   with Mike Johnson.  And after the meeting with Mike

 6   Johnson, Kevin Ruoff flew to Alaska.

 7      Q.    When was that?

 8      A.    Don't know -- are you asking me when I had a

 9   meeting with Mike Johnson or when Kevin Ruoff flew to

10   Alaska?

11      Q.    Let's try the latter.  When did Kevin Ruoff

12   fly to Alaska?

13      A.    I believe at the end of November 2004.

14      Q.    Okay.  Now, the next page in this exhibit,

15   page 19 by your stamp number, looks like you got an

16   e-mail from Kevin Ruoff asking you to call him when

17   you got in.  Did you do that on November 3, 2004?

18      A.    Yes.

19      Q.    And what was that about?

20      A.    That he asked me about the complaint, the

21   follow-up complaint I had sent him via e-mail.

22      Q.    Did you and he have a discussion that day?

23      A.    It was a brief discussion of what he -- why

24   he felt the situation wasn't taken care of.

25      Q.    I'm sorry.  I wasn't clear.  That he said --
```

BRELAND v FRED MEYERS STORE                                    JAMES BRELAND
                                                                 6/27/2006

                                                              Page 206

1   you think needed to be addressed once Stewart was out

2   of your store where you were working?

3       A.   That did not stop Mr. Stewart from making

4   the racial remarks and comments in the workplace.

5       Q.   Did you go over to Dimond and listen to him?

6       A.   No.

7       Q.   How do you know that he was doing it?

8       A.   The loss prevention personnel over there

9   spoke with me and stated that Mr. Stewart was still

10  making racist comments.

11      Q.   Okay.  Your issue had been addressed.  You

12  just thought what, something different should have

13  been done with Stewart besides transferring him?

14      A.   I don't believe my issue was addressed.

15      Q.   What was not addressed?

16      A.   Mr. Stewart, racist comments.

17      Q.   All right.  So wasn't that someone else's

18  problem at that point in time at the Dimond store?

19      A.   No, not necessarily.

20      Q.   I thought you said earlier that you weren't

21  going to seek to impose your opinion on what

22  management did in response to your March 22, 2004

23  complaint.

24      A.   When you say "impose my opinion" --

25      Q.   That's what you said.  I asked you if you

BRELAND v FRED MEYERS STORE

Page 210

1      A.    Basically, I expressed to Mike Johnson that

2  he did not take care of the complaint with Mr. Stewart

3  that was filed back in March of 2004.  I expressed to

4  him also that the reason why I felt he did not take

5  care of the complaint about the racial remarks and

6  issues concerning Mr. Stewart, which was the personal

7  relationship.  And although they transferred him to

8  another store, he was still not dealt with in the

9  proper manner.

10     Q.    Well, did you tell him what your opinion was

11 as to the proper manner?

12     A.    I believe I expressed to a degree what I

13 felt should have been done.

14     Q.    What?  What did you tell him should have

15 been done?

16     A.    Suspended.

17     Q.    Suspended.  Okay.  Now we're back to again,

18 I asked earlier:  Do you think that management should

19 be permitted to impose their own penalties?  And you

20 said yes.  Now, you're telling me -- you're

21 interposing your opinion as to what should have been

22 done; is that correct?

23     A.    No.  I'm not interposing my opinion.  He

24 asked my opinion and I gave him my opinion.

25     Q.    I see.  So you're just telling him in

BRELAND v FRED MEYERS STORE

Page 217

```
 1    education.

 2         Q.    Okay.  And he goes on down there and says,

 3    quote, "James also was concerned that Bryan has not

 4    completed Diversity training," unquote.  Is it your

 5    recollection that you did bring up the issue of

 6    diversity training for Bryan Stewart?

 7         A.    In the first initial complaint, yes.

 8         Q.    How about at this time, on November 13,

 9    2004?

10         A.    I inquired to Mr. Johnson if Mr. Stewart

11    took diversity training.

12         Q.    All right.  Mr. Johnson has a different view

13    of your actions that day.  He refers to you as being

14    argumentative and calculating and states that you

15    concluded he could not help you and were of no use to

16    him.  Did you express those views to Mr. Johnson at

17    that time on November 13, 2004?

18         A.    No.

19         Q.    Do you think anything that you said that day

20    would have conveyed such a view to Mr. Johnson?

21         A.    I let Mr. Johnson know that his personal

22    relationship with Stewart was clouding his judgment

23    and that he was not helping me, basically.  That was

24    just -- I didn't say it.  I was not argumentative or

25    calculating.  I was basically just stating that due to
```