James R. Dickens
MILLER NASH LLP
4400 Two Union Square
601 Union Street
Seattle, WA 98101-2352
Telephone: (206) 622-8484
Fax: (206) 622-7485
jim.dickens@millernash.com

Peter Gruenstein
GRUENSTEIN & HICKEY
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage, AK 99501
Telephone: (907) 258-4338
Fax: (907) 258-4350
ghlaw3@gci.net

     Attorneys for Defendant

Hon. Timothy M. Burgess

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

JAMES BRELAND,

     Plaintiff,

    v.

FRED MEYER STORES, INC.,

     Defendant.

Case No. A05-169 CI (TMB)

## DECLARATION OF KEVIN RUOFF (8/24/06)

    I, Kevin Ruoff, make this declaration based upon my personal knowledge.

    1.    I am currently employed by Fred Meyer as a Regional Loss Prevention Manager (RLPM). I have been an RLPM for Fred Meyer since 1988.

    2.    In my position as an RLPM, my offices are in Lynnwood, Washington, and I reside in Everett, Washington. I became the RLPM with the responsibility for Northwest Washington and Alaska in August 2002 and was in that position at the time James Breland was terminated in February 2005.

DECLARATION OF KEVIN RUOFF (8/24/06)
Breland v. Fred Meyer Stores, Inc.
Case No. A05-169 CI (TMB)
Page 1 of 9

3.    I have an AA degree in law enforcement from Shoreline Community College in 1976, and another year of college at Western Washington University. I began at Fred Meyer in June 1976 and remained there for three years. I then took a position in loss prevention with K-Mart stores from 1979 until March 1989, when I returned to Fred Meyer. Since my return to Fred Meyer, I have continued to work solely in the loss prevention area.

4.    From August 2002 until February 2006, my responsibilities for the Puget Sound Region (Northwest Washington and Alaska) included supervising all Loss Prevention Managers (LPM) and, indirectly, the Loss Prevention Specialists (LPS) whom they supervise. For the approximately 20 stores in my region, I worked with the LPM in each store and also with the Store Director, the highest-ranking manager employee at each individual location. I had frequent contact with the LPMs, and also Store Directors. The Store Directors and I shared supervisory responsibility for the LPMs. The Store Directors were responsible for day-to-day supervision, and I supervised the LPMs with regard to loss prevention policy. For the stores in Alaska, my contact with the LPMs was weekly telephone calls and my regular monthly trips. On those trips I would meet with the LPMs and less frequently with the Loss Prevention Specialists, who were the hourly employees reporting to the LPM at each store.

5.    The responsibility of the Loss Prevention Department is to prevent theft or loss of product either by customers or by employees. To fulfill these responsibilities, the loss prevention officers monitor customer and employee activity through cameras and by direct observations on the store floor. The Loss Prevention Department has many policies as to actions that must be confirmed before a customer is approached regarding a possible theft; policies on filing written reports regarding such approaches (which are referred to as "apprehensions"); and policies on advising either the LPM at the particular store or me, as the RLPM, when there is a non-arrest apprehension (this is when a customer is stopped,

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

meaning apprehended, but there is no arrest because the customer does not have the product believed to have been stolen).

6.      In January 2004, our regional office had all loss prevention officers sign acknowledgement of procedures. See Exhibit 1 attached. In brief, they addressed several areas. First, to apprehend a suspect for shoplifting, there are five criteria which must be met. Next, if within 24 months there are two errors in judgment with regard to non-arrest apprehensions, such that they do not result in an arrest, the loss prevention officer is subject to termination of employment. Normally, however, these two errors in judgment within 24 months are reviewed during the Monday conference call between myself and other RLPMs to discuss before action is taken. Third, if there is a non-arrest stop, this must be reported *within one hour* of its occurrence either to the store Loss Prevention Manager, or to me as the Regional Loss Prevention Manager. This one-hour notice is key because we need to know if there is a potential for a claim against the company because of a non-arrest apprehension (i.e., stop) and what are the circumstances. The loss prevention officer then has 24 hours to file the written report of a non-arrest apprehension. See also Exhibit 2 attached, the policy as set forth in the Loss Prevention Policy Manual.

7.      From our human resources department, Fred Meyer also has policies which prohibit discrimination or harassment of employees based on their race or other protected category. As a regional LPM, I make efforts to ensure that there is no improper harassment of employees in the Loss Prevention Department under my direction.

8.      On March 18, 2004, I made a visit to the Fred Meyer Muldoon store in Anchorage. On that trip I met with James Breland, one of our Loss Prevention Specialists who worked part-time in that store. As I understood it, Mr. Breland had a full-time job working with the State of Alaska and worked evenings for Fred Meyer. Mr. Breland and I had a positive discussion about his work as an LPS at the Muldoon store and his possible

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

DECLARATION OF KEVIN RUOFF (8/24/06)
Breland v. Fred Meyer Stores, Inc.
Case No. A05-169 CI (TMB)
Page 3 of 9

transfer to another store.  He did not at any time raise any issues of race involving the Muldoon store LPM, Bryan Stewart.

9.    After my trip to Anchorage in mid-March 2004, I received an e-mail from James Breland.  See Exhibit 3 attached.  In this e-mail he states his opinion that while LPM Stewart is a decent person, he has some issues concerning race, and while LPM Stewart has not addressed Mr. Breland in a derogatory manner, he has made racially derogatory comments.

10.    After receiving Mr. Breland's e-mail of March 22, 2004, I immediately got in touch with the store director, Mike Johnson, to review these claims of racially derogatory comments with Bryan Stewart.  As the senior on-site manager, it was Mr. Johnson's role to take the lead in investigating such allegations and to keep me informed as to his findings and recommendations.  I understood that Mr. Johnson advised Mr. Stewart of the March 22, 2004, e-mail complaint by Mr. Breland, and Mr. Stewart denied making the comments.  I agreed with Mr. Johnson that Mr. Stewart should be directed to attend a diversity training class prior to his next performance review since such a remedy appeared warranted and consistent with Mr. Breland's view that Mr. Stewart was a decent person who needed education.  See Exhibit 4 attached.  I also thought that Mr. Johnson was going to put a formal counseling letter in Mr. Stewart's file but I learned later that there had been a mix-up as to which of us was responsible, and this had not been done.

11.    On August 15, 2004, Bryan Stewart transferred to another Anchorage store, the Dimond store, and a new LPM replaced him at the Muldoon store, Ryan Krieger.  After Mr. Stewart's transfer, he no longer supervised Mr. Breland.  I never had any complaints from Mr. Breland about Mr. Krieger, with whom he seemed to get along quite well.

12.    Late in October 2004, I received a follow-up complaint from Mr. Breland regarding Mr. Stewart.  See Exhibit 5 attached.  In effect, Mr. Breland was

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

complaining that there had been no follow-up on his complaint against Mr. Stewart. I had no problem with Mr. Breland copying my supervisor, Scott Bringhurst, Vice President of Loss Prevention, on the e-mail. I regularly apprise Mr. Bringhurst of significant issues in the workplace. I discussed Mr. Breland's complaints with Mr. Bringhurst, and I did not suffer any adverse consequences as a result of Mr. Breland's actions.

13.     After receiving the October 30, 2004, letter from Mr. Breland, I got in touch with Mike Johnson, the Muldoon store director. Mr. Johnson, with a witness (LPM Ryan Krieger), met with Mr. Breland regarding what he felt needed to be addressed as to Mr. Stewart. See Exhibit 6, the notes of the witness, Ryan Krieger, regarding the meeting with Mike Johnson and James Breland on November 13, 2004.

14.     In late November 2004, I flew to Alaska and investigated further into Mr. Breland's initial complaint and Mr. Stewart's actions since March 2004. I spoke to Mr. Breland in person, and I interviewed other Loss Prevention employees regarding alleged racial remarks by Mr. Stewart. I did not find any evidence of further racial comments by Mr. Stewart after Mr. Breland's March 22, 2004, complaint. Nevertheless, to remedy the prior lapse in documentation, I worked with Jennifer Carlson in Human Resources at Fred Meyer and prepared a "First, Last and Final" warning letter to Mr. Stewart.

15.     A meeting was held with Bryan Stewart and the store director Mike Blewett at the Dimond store on December 2, 2004. At that time Mr. Stewart was given the First, Last and Final warning letter notifying him that if any improper comments were made by him again, he would be terminated. See Exhibit 7 attached. Following his initial complaint on March 22, 2004, Mr. Breland had never complained to me about any subsequent incidents involving racial comments by Mr. Stewart. I felt that as of December 2, 2004, the issues had been addressed and resolved with regard to the complaint of March 22, 2004, by Mr. Breland concerning Mr. Stewart.

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

16.    On February 15, 2005, I received a telephone call from a woman (Mrs. Julie Emms) who said that her daughter (Jennifer) improperly had been stopped and arrested the night before by two security officers at the Muldoon store.  I spoke to the daughter as well.  Jennifer Emms said that it was the "Black male" who did the talking.  My contemporaneous notes are attached as Exhibit 8.  I was not pleased because there had been no telephone call or notice to me that there had been a non-arrest apprehension the evening before until I received the telephone call from the mother, Mrs. Emms.

17.    After my discussion with Mrs. Emms on February 15, 2005, I immediately called the Store Director, Mike Johnson, and the store LPM, Ryan Krieger, and asked them to investigate.  When they called back, they gave me a report as follows:

(a)    First, they had interviewed the two loss prevention officers involved in the non-arrest apprehension the evening before on February 14, 2005, and they were James Breland and Paul Kodiak.  Paul Kodiak is Caucasian.

(b)    Mr. Kodiak said that he and Mr. Breland had been observing two women, one black and one white, and Mr. Breland thought they had been stealing merchandise.  Messrs. Kodiak and Breland were communicating by cell phone, and Mr. Kodiak's statement was that Mr. Breland told him he had all five required elements and to stop the women once they exited the store.  See Exhibit 9 attached.  Mr. Breland's statement, as relayed to me, was that he decided the women should be stopped, and he told Mr. Kodiak to do so.

(c)    Mr. Kodiak stated that the women were stopped just outside the Muldoon store entrance by him, and that within seconds Mr. Breland appeared and took over as the senior officer and asked the women to follow him back to the loss prevention office in the back of the store.  See Exhibit 9.  Mr. Breland denied being in charge of the incident, and also claimed that he did not ask the women to follow him back into the Loss

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

Prevention office. Instead, Mr. Breland claimed that the two women were harassing him and followed him back to the Loss Prevention office on their own.

    (d)  A videotape review of the non-arrest apprehension outside the store, and the subsequent retreat of the two women and Messrs. Kodiak and Breland to the Loss Prevention office, supported Mr. Kodiak's version that Mr. Breland was in charge and the women were following him at his direction.

    (e)  In the Loss Prevention Office the videotape showed one woman giving her purse to Mr. Breland to examine, which he did and handed it back to her.

    (f)  Mr. Kodiak said he asked Mr. Breland who was going to file the report, as Mr. Kodiak had just returned from a military tour in Iraq, and Mr. Breland said he would take care of it. See Exhibit 9.

    (g)  The only incident report filed by Mr. Breland the evening of February 14, 2005, was alleged harassment by two female customers. A copy of Mr. Breland's report is attached as Exhibit 10. There was no report filed regarding non-arrest apprehension.

    18.  After hearing the information relayed to me by Messrs. Johnson and Krieger, and confirming that Mr. Krieger also had not been called the evening before by Mr. Breland about the non-arrest apprehension, I concluded that there was a clear violation of the Loss Prevention policy requiring the reporting of any non-arrest apprehension within one hour of its occurrence. Per Fred Meyer Loss Prevention policy, the failure to do so results in immediate termination of employment.

    19.  Given that the videotape and Jennifer Emms clearly supported Mr. Kodiak's version of events, and that Mr. Breland was responsible for the initial observation and filed the incorrect report, I concluded that Mr. Breland was responsible for the non-arrest stop and for the failure to timely report it. Furthermore, I concluded that Mr. Breland's explanation of the incident to me and others lacked credibility. For example,

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

Mr. Breland told me that the young women had followed him to the Loss Prevention office, but they would have to have entered through two locked doors, and Mr. Breland could have stopped them at any time. Mr. Breland denied searching Ms. Emms' purse, and yet such a search is clearly shown on the videotape.

20.  In a conversation on February 16, 2004, Mr. Breland admitted to me that he wrote up the incident as an harassment report rather than a non-arrest stop in order to avoid being charged with a second non-arrest stop. See my contemporaneous notes attached as Exhibit 11. A second non-arrest stop would have been subject to termination for a second non-arrest apprehension within 24 months, but we did not reach that issue because of the failure to timely report within one hour the non-arrest apprehension.

21.  Reluctant as I was to direct Mr. Krieger in this regard, I told him on February 15, 2006, that per policy, Mr. Breland was to be terminated immediately for failing to report the non-arrest apprehension within one hour of its occurrence the evening before.

22.  The Fred Meyer policy of immediate termination for failing to report a non-arrest apprehension within one hour of its occurrence has been consistently applied to all loss prevention officers. I have been involved in terminating other Loss Prevention employees also for failing to timely report non-arrest apprehensions, including:

Bonnie Young (Caucasian) on December 2, 2003

Harold Rosales (Hispanic) on February 24, 2004

Mike McCartney (Caucasian) on May 24, 2005

I have never had a situation where a Loss Prevention employee who failed to timely report a non-arrest apprehension within one hour was not promptly terminated. I have consistently followed the policy that failure to timely report a non-arrest apprehension results in immediate termination.

23.  Neither James Breland's race, African-American, nor any retaliatory motive, played any role in my decision to terminate him. Mr. Breland had some good

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

DECLARATION OF KEVIN RUOFF (8/24/06)
Breland v. Fred Meyer Stores, Inc.
Case No. A05-169 CI (TMB)
Page 8 of 9

qualities as LPS and I was disappointed in having to make the decision. In fact, just days before the termination I had given Mr. Breland regional accolades for outstanding success in loss prevention efforts. But to be consistent, the decision to terminate him was made for the reasons noted.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 24th day of August, 2006, at Lynnwood, WA.

_Kevin Ruoff_

## Certificate of Service

I hereby certify that on August 25, 2006, a copy of the foregoing was served electronically on:

Lee Holen

s/ *James R. Dickens*

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

DECLARATION OF KEVIN RUOFF (8/24/06)
Breland v. Fred Meyer Stores, Inc.
Case No. A05-169 CI (TMB)
Page 9 of 9

18/LPS

## APPREHENSION OF A SUSPECT

When you apprehend a suspect for shoplifting or any other crime, you are effecting an arrest. An arrest, by definition, is to deprive a person of his liberty by legal authority - taking custody of another for the purpose of holding or detaining him to answer a criminal charge. All that is required for an "arrest" is some act by you indicating your intention to detain or take a person into custody, and thereby, subject that person to your control and will.  No formal declaration of arrest is required.  If you hold a special police commission, you are given legal authority to arrest a person committing a criminal offense on our property.  If you are not commissioned, you may effect an arrest as a private citizen.  **When you have restrained an individual's personal liberty or freedom of movement (however slight), an arrest has taken place.**

1.　　Prior to apprehending a suspect for shoplifting, the following criteria must be met:

　　a.　　<u>You must</u> observe the suspect enter the section.

　　b.　　<u>You must</u> observe the suspect remove the merchandise from the display and know exactly what that item is.

　　c.　　If the item is concealed, <u>you must</u> observe that concealment and know exactly where it is.

　　d.　　<u>You must</u> maintain continuous observation of the suspect and merchandise from the time he/she removes the merchandise from the display until he/she exits the store.  Once concealed, observation of the concealment area must be continuously observed.

　　e.　　<u>You must</u>, for purposes of safety, have another employee follow you out of the store to act as a witness and to provide assistance, if necessary.

## Remember:

The golden rule of shoplifting apprehensions is:

### <u>FOLLOW PROCEDURE, AND "IF IN DOUBT, LET IT OUT"</u>

**Acknowledgement of understanding:**

I have read and understand the policy regarding the required elements to make a shoplift apprehension. I further understand all policies and procedures for making a shoplift apprehension within Fred Meyer as described in section #400 of the Loss Prevention Manual.

Printed Name ___JAMES BRILAND___　　Date ___1/31/04___

Your Signature ___JBriland___　　Date ___1/31/04___

RLPM/LPM Acknowledgment of review:

I have reviewed this policy/procedure with the above listed Loss Prevention employee and am satisfied that the employee understands the policy/procedure.

Printed Name ___BRIAN K. STEWART___　　Date ___1/31/04___

Your Signature ___BKA___　　Date ___1/31/04___



Exhibit __1__ Page __1__ of __3__

*18/LPS*

**To:**      All Loss Prevention Employees

**Subject:**      Review / Discipline of Non-Arrest Apprehensions

<u>Review of Facts</u>:  The Regional Loss Prevention Manager will personally review the circumstances surrounding each non-arrest apprehension and non-policy apprehension, and the Loss Prevention person will be given an opportunity to explain, in their own words, all circumstances.

A.      The RLPM will follow up with each person making a non-arrest apprehension.  This should be in person, but can be done over the phone in remote stores. RLPM will need to review any available video of the non-arrest apprehension.  The Loss Prevention Manager will be involved in the review process if the non-arrest was by a Loss Prevention subordinate within his/her location.

   During this review process, the Loss Prevention employee will not be involved in any type of shoplift surveillance, including use of cameras to aid other Loss Prevention employees in the apprehension or detection of theft.

B.      All non-arrest stops and final disciplinary action, will be discussed by the RLPM's on the next Regional Conference call (typically on Mondays of each week). This will ensure that each region is reacting in a similar fashion to the disciplinary actions taken.

   Loss Prevention Manager (if a subordinate was responsible for the non-arrest) will present the situation to the RLPM's and Corporate LP staff.

C.      RLPM is to complete the RLPM NON-ARREST APPREHENSION REVIEW FORM. A copy of the form is to go into the employee's file with a copy to SXB.

   The Store Director should be involved in the disciplinary process for any LPS or LPM. Follow up needs to occur within 7 days of the non-arrest stop.

<u>Disciplinary Action</u>: As with all disciplinary action, each case needs to be reviewed on a case-by-case basis, and the action taken appropriate for the persons involved and the judgment used.  Length of service, prior disciplinary action and overall judgment used needs to be taken into account.  As always, termination of employment is always an option when the judgment of the individuals involved and their actions, are so grievous and severe, that it places Fred Meyer at increased risk to civil liability.

The Loss Prevention person may appeal the decision for disciplinary action to the Loss Prevention Director or Human Resource Department.

The following disciplinary actions are the minimum that will be taken:

<u>Error in Judgment – Apparent Disregard for Corporate Loss Prevention Policy</u>

**1st within 24 months**:   Written warning including suspension of employment without pay (3 days for LPS / 7 days for LPM).  Re-read section 400 of the LP Manual and document that they have read and understand the policies within.  LPS/LPM will write a report to the RLPM relating the facts of the non-arrest, what went wrong, what should have occurred, and the liability they have put themselves and Fred Meyer in.

**2nd within 24 months**:   Termination of employment

Exhibit __/__  Page _2_ of _3_

18/LPS

## Error in Fact

**1st within 12 months**:  Verbal Warning

**2nd within 12 months**:  Written Warning

**3rd within 12 months**:  Suspension of employment for three days for LPS or First/Last/Final letter of warning for LPM.

**4th within 12 months**:  Termination of employment

Additionally, any of the following actions **will result in immediate termination of employment**:

    A.    The Failure to report any non-arrest stop within 1 hour of its occurrence.

    B.    Any non-arrest stop made before the Loss Prevention person has been released from Phase 2 training.

    C.    Any gross disregard of Policy and or any grave lack of judgment that causes a non-arrest apprehension.

    D.    Any continued or uncorrected lack of judgment / lack of fact which persists after re-training and education have been documented from previous incident.

## Remember:

The golden rule of shoplifting apprehensions is:

## FOLLOW PROCEDURE. AND "IF IN DOUBT, LET IT OUT"

**Acknowledgement of understanding:**

I have read and understand the policy on non-arrest apprehensions and the disciplinary guidelines.  I further understand the policies and procedures for making a shoplift apprehension within Fred Meyer as described in section #400 of the Loss Prevention Manual.

Printed Name _JAMES BRELAND_    Date _1/31/04_

Your Signature _[signature]_    Date _1/31/04_

**RLPM/LPM Acknowledgment of review:**

I have reviewed this policy/procedure with the above listed Loss Prevention employee and am satisfied that the employee understands the policy/procedure.

Printed Name _Brian K. Stewart_    Date _1/31/04_

Your Signature _B K_    Date _1/31/04_

Exhibit _1_ Page _3_ of _3_

## LOSS PREVENTION POLICY MANUAL

<u>Topic:</u>        Non-Arrest and Non-Policy Stops, Disciplinary Guidelines

Fred Meyer views direct and indirect allegations or implications of theft by any personnel as a most serious and potentially damaging act. There is a very specific procedure to be followed by Loss Prevention personnel when effecting apprehension of suspects. That procedure is to be followed.

Appreciating that we live in an imperfect world, on occasion, a customer will be approached who will not have the merchandise where the Loss Prevention Person believes it is located or the customer has paid for the merchandise. In either instance, we courteously apologize to the customer for their inconvenience, patience and any embarrassment, and permit them to continue on their way. This non-arrest apprehension or approach is immediately reported both verbally to your Supervisor and in written statement form as per instruction on Incident Reports.

*Non-arrest apprehensions or approach to a customer is the result of either an "error in judgment" or an "error in fact."*

<u>Error in Judgment :</u>        This type of non-arrest apprehension results from a failure to follow the Loss Prevention Apprehension procedures as outlined in Section #400 of this manual. This includes the apprehension of accomplices, the directing of a non-Loss Prevention employee to approach a Customer outside the store with a request for a receipt and/or proof of purchase, and the detention of a Customer, no matter how slight in duration, by a Loss Prevention employee to determine the ownership of property that does not result in an arrest or admission of theft.

This is the most serious non-arrest infraction and will usually result in serious disciplinary action up to and including termination of employment following examination of all facts surrounding the incident.

<u>Error in Judgment – Disciplinary Guidelines – (Apparent Disregard for Corporate Loss Prevention Policy)</u>

**1st within 24 months**:    Written warning including suspension of employment without pay (3 days for LPS / 7 days for LPM). Re-read section 400 of the LP Manual and document that they have read and understand the policies within. LPS/LPM will write a report to the RLPM relating the facts of the non-arrest, what went wrong, what should have occurred, and the liability they have put themselves and Fred Meyer in.

**2nd within 24 months**:    Termination of employment

Exhibit 2 Page 1 of 4

**Error in Fact:**        This type of non-arrest or approach results from following the Loss Prevention Apprehension procedures, however due to circumstances that you were not aware of at the time of the apprehension, the merchandise was not recovered.  In this instance, the procedures were followed; however it resulted in a non-arrest.  (Some examples:  A customer was directed by an employee to do their own exchange or a customer had prepaid for merchandise and returned to the department to retrieve it).

When it has been determined that an Error in Fact has occurred, verbal counseling and progressive discipline, if necessary, will be administered according to the following guidelines:

**Error in Fact – Disciplinary Guidelines:**

| | |
|---|---|
| **1st within 12 months:** | Verbal Warning |
| **2nd within 12 months:** | Written Warning |
| **3rd within 12 months:** | Suspension of employment for three days for LPS or First/Last/Final letter of warning for LPM. |
| **4th within 12 months:** | Termination of employment. |

**Non-Policy Apprehensions:**        This type of apprehension or approach is the result of failing to follow **ALL** the Loss Prevention Department's apprehension procedures, but does in fact lead to the arrest and admission to theft of a shoplifter. In this instance, one or more elements as described in the Loss Prevention Manual were missing, but the suspect did have unpaid for merchandise and admits to the theft.

While this infraction is less serious than an "Error in Fact" or "Error in Judgment," we must remember that the ends do not justify the means. All non-policy arrests will be reviewed by the Regional Loss Prevention Manager to determine the judgment used prior to making the apprehension and will result in a verbal or written warning. Repeat incidents will result in progressively more severe disciplinary action (suspension and/or termination of employment).

**Review of Facts:**   The Regional Loss Prevention Manager will personally review the circumstances surrounding each non-arrest and non-policy apprehension, and the Loss Prevention person will be given an opportunity to explain, in their own words, all circumstances.

The Loss Prevention person may appeal the decision for disciplinary action to the Loss Prevention Director or Human Resource Department.

A.    The RLPM will follow up with each person making a non-arrest apprehension. This should be in person, but can be done over the phone in remote stores. RLPM will need to review any available video of the non-arrest apprehension. The Loss Prevention Manager will be involved in the

Exhibit _2_ Page _2_ of _4_

(Sec. 406 04/04)                                                                2

review process if the non-arrest was by a Loss Prevention subordinate within his/her location.

During this review process, the Loss Prevention employee will not be involved in any type of shoplift surveillance, including use of cameras to aid other Loss Prevention employees in the apprehension or detection of theft.

B.    All non-arrest stops and final disciplinary action will be discussed by the RLPMs on the next Regional Conference call (typically on Monday of each week). This will ensure that each region is reacting in a similar fashion to the disciplinary actions taken.

Loss Prevention Manager (if a subordinate was responsible for the non-arrest) will present the situation to the RLPMs and Corporate LP staff.

C.    RLPM is to complete the "RLPM NON-ARREST APPREHENSION REVIEW FORM". A copy of the form is to go into the employee's file with a copy to SXB.

The Store Director should be involved in the disciplinary process for any LPS or LPM. Follow up needs to occur within 7 days of the non-arrest stop.

**Disciplinary Action:**   As with all disciplinary action, each case needs to be reviewed on a case-by-case basis, and the action taken appropriate for the persons involved and the judgment used. Length of service, prior disciplinary action and overall judgment used needs to be taken into account. As always, termination of employment is always an option when the judgment of the individuals involved and their actions are so grievous and severe, that it places Fred Meyer at increased risk to civil liability.

The Loss Prevention person may appeal the decision for disciplinary action to the Loss Prevention Director or Human Resource Department.

Additionally, any of the following actions **will result in immediate termination of employment:**

A.    The Failure to report any non-arrest apprehension within 1 hour of its occurrence.

B.    Any non-arrest apprehension made before the Loss Prevention person has been released from Phase 2 training.

C.    Any gross disregard of Policy and or any grave lack of judgment that causes a non-arrest apprehension.

Exhibit _2_ Page _3_ of _4_

D.   Any continued or uncorrected lack of judgment / lack of fact which persists after re-training and education have been documented from previous incident.

## Reporting Requirements:

Verbally report all non-arrest apprehensions or approaches to your Regional Loss Manager immediately. Immediately is defined as the next step to be taken and without delay. There is no reason why this communication should be delayed. If your RLPM is not available, contact your Corporate Director of Loss Prevention.

All **non-arrest apprehensions** or approaches must be documented as described in section #800 of the Loss Prevention Manual within **24** hours of the incident.

All **non-policy apprehensions** must be brought to the attention of the Regional Loss Prevention Manager within twenty-four **(24)** hours by sending to them a copy of the arrest report form and a full statement.

The golden rule of shoplifting apprehension is:

### FOLLOW PROCEDURE. AND "IF IN DOUBT, LET IT OUT"

## Acknowledgement of understanding:

I have read and understand the non-arrest and non-policy apprehension and disciplinary guidelines. I further understand the policies and procedures for making a shoplift apprehension within Fred Meyer as described in section #400 of the Loss Prevention Manual.

Printed Name _____     Date _____

Your Signature _____     Loc _____

Exhibit ___2___ Page ___4___ of ___4___

04/27/04  20:23       User F888508                              Printer AAC9
            NOTE 03/22/04 19:25:33 F888508
      To:  Kevin Ruoff                              F149885  - FMHOST
    From:  James Breland                            F888508  - FMHOST
    Date:  03/22/04
 Subject:  Situation
------------------------------------------------------------------------------
Kevin

   I just wanted to say, during your last visit to Anchorage Ak, I appreciate
you taking a few minutes out of your busy schedule to speak with me.  I did
not really get into any specifics concerning the situation between myself
and LPM Stewart because basically I figured, I'd just transfer and not really
for a lack of a better term have to deal with Mr. Stewart.

I'll do a quick synopsis of my employment with Fred Meyer.  I was hired as a
RTS by LPM Becker on 1/4/2002.  I remained at Store 656/JO shortly before grand
opening during which time LPM Kreiger hired me as a part-time LPS for the Dia-
mond location.  I remained at the Diamond location for several months and
worked every Sunday's at Store #18/AE as they where short handed.  I continued
to work at the Diamond location until then RLPM Hubner notified myself along
with LPM Kreiger that they would be doing away with the part-time position and
be moving the hours along with me (LPS Breland) to the Muldoon/Debarr location.
So basically I had no choice in the matter as the position at Diamond was given
to the Muldoon/Debarr location Store #18.

Hence the working relationship of myself and LPM Stewart.  Before coming to the
Muldoon/Debarr location, I was told by other LPM's as well as LPS's that Mr.
Stewart was a racist.  I decided to give myself a opportunity to get to know
Mr. Stewart and not base my opinion off of what other's had to say concerning
LPM Stewart.  So here I stand as a minority with my views and opinions of work-
ing for and with LPM Stewart.

I'll start with education and knowledge is the key to anything, ignorance is a
disease that can be cured by both education and knowledge.  LPM Stewart lacks
both education and knowledge concerning diversity, equal opportunity, equal
rights and discrimination.  During the span of working for and with LPM Stewart
I find that he's a decent person with some issue's concerning race.  LPM Stewart
has not directly called or address me in a derogatory manner concerning race
but I personally have heard him make on quite a few occassions derogatory/in
appropriate comments concerning onces race with in the work place.

I also will say that, I feel that LPM Stewart tends to take what I say more
personal because, I am a minority.  I really feel that LPM Stewart tries
and he's genuinely a decent person that I do get a long with despite the fact
he's made derogatory/inappropriate comments around me.  I'll clairfy around
me,  LPM Stewart I believe nows what he's doing is wrong and by that I mean
everytime he's made a derogatory/inappropriate remark Mr. Stewart assumed that
I was on the floor at that time or he had no knowledge of me being in the
office during the time he made the derogatory/inappropriate remark.

I also would like to say, that not all people feel the way LPM Stewart may
feel about certain races.  With that being said, I had a co-worker transfer
to another store because of LPM Stewart what I deem to be a poor attitude



Exhibit __3__ Page __1__ of __2__

Plaintiff #0015

```
                         User F888508                          Printer AAC9
              NOTE 03/22/04 21:10:05 F888508
    To: Kevin Ruoff                                   F149885  - FMHOST
  From: James Breland                                 F888508  - FMHOST
  Date: 03/22/04
  Subject: Situation
```
-----------------------------------------------------------------------

my co-worker Tony Bonini who now works at Store 71/DA left because of the
derogatory/inappropriate remarks made by LPM Stewart on a daily basis.  So I
like to say that all though Mr. Bonini is the same race as LPM Stewart he
did not have the same views.  I feel LPM Stewart imposes his views and makes
derogatory/inappropriate remarks in the presents of those of his same race
thinking that they may feel the same way he does.   Mr. Bonini is an example
that not those of the same race feel or have the same views as Mr. Stewart.

I've thought about this situation for sometime, at first I wanted to transfer
but why?  I'm not the one with the problem.Yes, the derogatory/inappropriate
remarks offend me but I shouldn't have to inconvience myself because LPM
Stewart creates a hostile work enviornment for employees with his racial views
and derogatory/inappropriate remarks.  I firemly believe that LPS Bonini would
still be working at Store 18/AE if it was for this type of attitude displayed
by LPM Stewart.  LPM Stewart made it very uncomfortable for LPS Bonini to
work in that type of environment.  I also believe that LPM Becker may have
address this problem in the pass but I'm not sure.

I'll close with this, Mr. Ruoff.  Mr. Stewart has a disease and the type
of disease that Mr. Stewart has for the type of job that we do can be very
detrimental to those who work for him and around him.  As an LPM you are
responsible for training, directing, and molding LPS's.  A new LPS can be
very impressionable and with this job a person's view can be obscured when
being trained, directed or molded by someone with the disease that LPM Stewart
has. In our job we deal with a variety of people from different nationalities
religion, race etc....   This is where LPM Stewart view can be detrimental to
the crew it self which it has already effected, the perception of the store and
the people that work with in it.  The customers that shop at the store etc...
It has a domino effect especially concerning what we do as security.  So I
shouldn't have to be transferred or inconvenience myself in order to have a
pleasant work environment.




                         Sincerely


                         James Breland  LPS AE/18
```

Exhibit __3__ Page __2__ of __2__

**Mike R Johnson**

11/13/2004 06:43 PM

To: James Breland/Stores/FM/KrogerCo@KrogerCo
cc:
Subject: RE: Follow up.

Hello James- I have contacted Jennifer Carlson via email regarding the need for a diversity training class. I have also contacted Mike Blewett via phone asking his help to make certain that Bryan does attend a/another class when set up. I have also sent a recap of our conversation to Kevin Ruoff and noted to him that the matter is now in his hands in regards to Bryan's discipline and/or development. At this time I no longer have any follow up tasks to complete, however should you need me to address any further issues or need me to address any concerns I will make myself available.

Mike Johnson
018-Anchorage East
Store Director

EXHIBIT 4 Page 1 of 1

Plaintiff #0022

James Breland

10/30/2004 02:06 PM

To: Kevin Ruoff/OPS/FM/KrogerCo@KrogerCo, Scott
Bringhurst/OPS/FM/KrogerCo@KrogerCo
cc: Ryan S Krieger/Stores/FM/KrogerCo@KrogerCo
Subject: COMPLAINT FOLLOW UP

To Whom It May Concern:

Mr. Ruoff I'm following up on a complaint/issue that was office vision to you 6 months ago
concerning Mr. Bryan Stewart. In April 2004 a complaint of Mr. Stewart making racial slurs and
inappropriate racial comments in the work environment was sent to you via office vision. At the
time the complaint was filed you informed me you would looked into the situation and decided
you would let this complaint be taken care of at the store level.   The complaint was then
forwarded from you to the Store Director Mike Johnson who in turn forwards the complaint to
Mr. Stewart.

Mr. Stewart after reading the complaint called me at my day job to apologize for making the
racial slurs and inappropriate racial comments at which time he divulged that he and the Store
Director talked.  I then came to Fred Meyer for work as schedule and was invited to the Store
Director office by Mike Johnson.  Once in the office Mr. Johnson stated he had sent the
complaint to inform Mr. Stewart of the situation and that he also talked with Mr. Stewart who
admitted to making the racial slurs and inappropriate racial comments.  Mike Johnson and myself
discussed the situation concerning Mr. Stewart that I thought to be positive.  Mr. Johnson also
stated he would follow up with me about the complaint and the preventative measure to help
with Mr. Stewart.

After 6 months nothing has happened with the complaint and it seems as if everyone has swept
the incident under the carpet.  I believe nothing has happen with this complaint because there is a
serious conflict of interest involved.   The Store Director has knowledge of the complaint as well
as verbal admittance from Mr. Stewart stating he made these racial slurs and comments.  It is in
my observation during the months after the complaint and the months before the August 6, 2004
transfer of Mr. Stewart from store #18 to store #71 that Mr. Johnson had no intention on pursing
the complaint involving the racial slurs and comments from Mr. Stewart.

Once Mr. Johnson became Store Director I observed what I deem to be an inappropriate
relationship between the Store Director and the Loss Prevention Manager.  Mr. Johnson and Mr.
Stewart befriended one another and would hangout on occasions go house hunting or fishing
which in turn distorted Mr. Johnson's ability to be impartial concerning this complaint, which is
a huge disservice.  Also between the time of the complaint and Mr. Stewart transfer I observed
several other injustices, during the remodel Mr. Stewart would silicate the help of the RTS but on
every occasion would only ask the same two males which happen to be minorities (Hispanic and
Samoan) to paint, move, and clean the LP office among other things.  It's very disturbing as this
could be viewed as institutional discrimination as he never once ask a non-minority to do these
task. Also both these individuals showed interested in the open unbudgeted position that was
never posted Mr. Stewart never once offered or asked the minority workers to apply for the
position but told a non-minority RTS to apply which the individual was offered and accepted the



Exhibit 5 Page 1 of 2

Plaintiff #0017

job.

I find all these actions very disturbing and feel that an independent agency should look into my complaint among other issues since the Store Director could not be an impartial party and conduct an investigation to take the appropriate action necessary.   In Security/Loss Prevention especially a management position an individual with these tendencies and personal views on other races can do a lot of harm than good and when an egregious act like this done especially in a sensitive position as a Loss Prevention Manager it is very important for someone to be proactive in making sure that this type of behavior is not tolerated and some type of punishment is incorporated.  This issue will be forwarded to an impartial party or agency to investigate since the issue at store level was not pursued and resolved in an appropriate manner.


                                        James Breland
                                        Loss Prevention

                                                            Fred Meyer

Store #18


Exhibit _5_ Page _2_ of _2_.

Plaintiff #0018



**Ryan S Krieger**
11/14/2004 05:12 PM

To: Kevin Ruoff/OPS/FM/KrogerCo@KrogerCo, Mike R Johnson/Stores/FM/KrogerCo@KrogerCo
cc: James Breland/Stores/FM/KrogerCo@KrogerCo
Subject: Meeting

Gentlemen,

   Below is a witness statement completed by myself in regards to a meeting between AE/18 Store Director Mr Mike Johnson and AE/18 LPS Mr James Breland.

   This meeting occurred at 1500Hrs on Saturday November 13th 2004. The following employees were in attendance: Director Mike Johnson, LPS James Breland, and LPM Ryan Krieger.

Mr Breland and Mr Krieger were invited into the Directors Office by Mr Johnson in order to discuss a solution for an open complaint which was generated by Mr Breland. The nature of this complaint was use of improper (derogatory and racially charged,) language by the former Store LPM (Bryan Stewart.) Mr Johnson first asked Mr Breland if he was comfortable with Mr Krieger acting as a witness. Mr Breland stated that this was fine.
   Mr Johnson started by stating that he was unsure why Mr Breland was upset with how this incident was handled. Mr Johnson stated that he had involved Mr Breland in the investigation, and that he had personally met with Mr Breland twice to ensure that the matter was being handled to his satisfaction. At that time Mr Breland disagreed, stating that Mr Johnson had spoken to him 1 time, for a period of 1 hour. Mr Breland stated that he felt that his complaint was not dealt with in a fair and unbiased manner due to the fact that a personal relationship existed between Mr Johnson and Mr Stewart. Mr Johnson asked Mr Breland what action he was looking for in this matter. Mr Breland inquired if any action had been taken at all, to which Mr Johnson replied that all facets of this incident had been documented and placed into Mr Stewarts file. Mr Johnson also stated that Mr Stewart will also be required to take a Diversity training class prior to his next performance review.
   Mr Johnson then asked Mr Breland what action should have been taken in this situation, Mr Breland stated that it was not his job to assign a punishment to his supervisor, however, he felt something should have been done. Mr Johnson again stated what actions had been taken. At which time Mr Breland stated that he knew for a fact that Mr Stewart had not taken any Diversity training. Mr Johnson replied that the class had to be scheduled and that he did not play a role in that matter anymore as Mr Stewart no longer worked a this location. Mr Johnson stated that Mr Stewart had been re-located in part to satisfy this complaint, and that he felt that Mr Stewarts behavior was a product of stress brought on by his work environment. Mr Breland then stated that he knew that Mr Stewart was continuing to make racial slurs even though he had been moved to a less stressful location. Mr Breland felt that more action should have been taken in this incident since the punishment was not working. Mr Breland went on to state that at the very least Mr Stewart should have been suspended. Mr Johnson then stated that to much time had passed and that suspension was not possible at this point. Mr Breland said that there was no reason to be discussing the incident if no punishment could be metered out.
   Mr Breland made a point that a supervisor should be held to higher standards then other employees, and that the standards for an LPM should be even higher. Mr Breland stated that having an LPM who is racist could be a problem for a store such as this. At that point Mr Johnson stopped Mr Breland and stated that it was not fair to be calling Mr Stewart names. Mr Breland stated that Mr Stewart did exhibit racist behavior while working around Mr Breland. Mr Johnson then made the statement that he did not believe Mr Stewart to be a racist person. Mr Johnson stated that Mr Stewart simply took part in racist activities. At that point Mr Breland stated that he felt that he needed to speak with Kevin Ruoff regarding this incident due to the fact he didn't feel Mr Johnson could help him. Mr Johnson stated that he would pass this information on to Mr Ruoff.
   This marked the ending of the meeting. Total time was approximately 26 minutes.

Respectfully submitted,



Exhibit _6_ Page _1_ of _2_

Plaintiff #0023

Ryan S. Krieger
Loss Prevention Manager
Anchorage East Fred Meyer (18)

Exhibit _6_ Page _2_ of _2_

Plaintiff #0024

To:         Bryan Stewart, DA 00071/LPM
            CC: Mike Blewett, DA 00071/DIR
            Mike Johnson, AE 00018/DIR
            Personnel File

From:       Kevin R. Ruoff, Z4 Regional Loss Prevention Supervisor

Date:       November 22, 2004

Subject:    First, Last and Final notice – Harassment


Bryan

This letter is to follow up on our conversation that we had with Mike Blewett on November 10, 2004.
That conversation was a conclusion to the investigation that began on or about March 24, 2004 with a
complaint from AE/LPS James Breland regarding racial slurs and remarks you have made in the
workplace.

My investigation included interviewing several LPM's and LPS's in the Anchorage market. The result
of the investigation showed that improper remarks of both racial and sexual nature may have been
made by Mr. Stewart, comments that are inappropriate in the workplace.

Attached to this letter, please find a copy of the Fred Meyer policy regarding Sexual Harassment and
Other forms of Harassment (FM Policy 4.2 dated 04/01) consisting of 4 pages (pages 4-13 through 4-
16). I highly recommend you re-read and fully understand this policy, and discuss with either Mr.
Blewett or myself if you have questions or need clarification. It will be assumed you understand and
agree to adhere to this policy when you sign this document.

It is our desire that you be successful as an employee and a manger, and that you maintain a highly
professional demeanor while at work. As discussed on November 10, 2004, this letter is your First,
Last and Final notice regarding any violation of the Policy regarding Harassment. If you fail to
comply with this policy it will result in termination of your employment.

Kevin R. Ruoff


I have received a copy of this letter, and I fully understand its contents and ramifications if I fail to
comply with the Fred Meyer Policy regarding Harassment.


Refused to Sign
Bryan Stewart – Signature                          12/2/04
                                                   Date

Mike Blewett – Signature                           12/2/04
                                                   Date


Exhibit 7 Page 1 of 1

From: FRED MEYER ZONE 4        425 672 5256        04/14/2005 10:39 #375 P.035

2/15/05

Jennifer Enis -                               2:30 pm

Walking around Store -
lip Gloss -
held in hand - walked around -
Changed mind - End caps near
make up -

Went to PFM - then outside - off
Sidewalk -

2 guys bumped into her - went
to talk about the lip Gloss in
purse - she said she put
it down - (B/m did talking)

Escorted into Office -
Danelle walked in back - to
Office - took off Jacket - pulled
pockets out of coat & Jeans -
looked in purse -

8 - 10 pm - home at 9:30
in Office 5 min
Just her & 2 LP

Exhibit __8__ Page __1__ of __1__

No name - Address -

From:FRED MEYER ZONE 4                425 672 5256                04/14/2005 10:39 #375 P.041

15 FEB 05

I Paul J. Kodiak Loss Prevention Specialist for
Fred Meyer (Muldoon) was party and witness to the
following incident during my shift (not exactly sure time) 2
females 1 black/1 white observed circling junior dept.
was asked by LPS Breeland to take up observation. Continued
to take observation of females. white female picked up
Cosmetics. LPS Breeland came out to floor to take up
observation of females I proceeded to the shoe department LPS
LPS Breeland and I were on cell phone communicating. LPS
Breeland said that he had concealment of make up. LPS
Breeland told me to go ahead & make the stop. I
approached females outside of the store Identified
myself as Loss Prevention to the white female and asked
her to accompany back into the store to discuss the
merchandise that she had. She stated she did not
have anything. LPS Breeland took over at this point
and asked her to come back to office (LP) Bace back
to the office LPS Breeland looked through her bag. did
not recover what he stated that she had. LPS Breeland
Apologized to female. He told me he was going to take
care of the report.

Last Item

Exhibit ___9___ Page _1_ of _1_

# FRED MEYER INCIDENT REPORT

INCIDENT#:0959479033              TYPE: I-HARASSMENT OF CUSTOMER/EMP.    PAGE:01

STORE LOC: ANCHORAGE EAST        REPORTING PERSON: BRELAND, JAMES L
                                 RECORDING PERSON: BRELAND, JAMES L

DATE: 2005-02-14                 TIME: 21.04.30

DAMAGE AMT:           LOSS AMT:                    RECOVERY:

SUMMARY DESCRIPTION:
LPS OBSERVES 2 F/A IN STORE FROM PRIOR LOSS, 1 F/A
STARTS FOLLOWING LP MAKING REMARKS AND THEN GIVES LP THE FINGER.  F/A
CONTINUES FOLLOWING LP, LP EXIT STORE FEMALE FOLLOWS  LP HAS CHOICE WORDS.

INJURY DESCRIPTION:
none.

### PERSON INVOLVED

INVOLVEMENT: RECORDING EMPLOYEE
LAST NAME: BRELAND            FIRST: JAMES         MI: L  DOB:
ADDRESS: 7701 DEBARR ROAD     CITY: ANCHORAGE           STATE: AK
ZIP:      99504-1872          PHONE: 907 269-1700
VEHICLE:                      IDENTIFICATION: FMID 00888508

### PERSON INVOLVED

INVOLVEMENT: REPORTING PERSON
LAST NAME: BRELAND            FIRST: JAMES         MI: L  DOB:
ADDRESS: 7701 DEBARR ROAD     CITY: ANCHORAGE           STATE: AK
ZIP:      99504-1872          PHONE: 907 269-1700
VEHICLE:                      IDENTIFICATION: FMID 00888508

Exhibit _10_ Page _1_ of _1_

2-16-04
10:45 AM

Rcvd call from Breland -

Stated he was driving to Kodiak
on cell phone said "I am going
to make contact" - he went
out & Kodiak had already
mi initiated contact -

Stated girls were just going
out when he driving to Kodiak -
he was 10 seconds behind -

Once they said they had wo thing -
he told them to go - they became
irate and insisted on showing
they had wo thing - Followed
them to LP office.

Says the (J. Ems) opened purse he
did not search -

Did not know Kodiak was in
training / could not make 5 too

Exhibit 11 Page 1 of 2

Does not want to be scape goat
for non arrest -

From:FRED MEYER ZONE 4          425 672 5256          04/14/2005 10:40 #375 P.044

Breland said he wrote report
the way he did because he
did not want to be stuck
w/ non arrest, was going
to talk w/ Ryan when he came
into work - could not answer
why he did not call Ryan or
I after stop - said wanted to
get his report in before he
left - was in hurry -

Exhibit _11_ Page _2_ of _2_