LEE HOLEN LAW OFFICE
608 W. 4th Avenue, Suite 21
Anchorage, Alaska  99501
leeholen@gci.net
(907) 278-0298 ph
(907) 278-0247 fax

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| JAMES BRELAND, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. A05-169 CI (TMB) |
| | ) | |
| vs. | ) | |
| | ) | |
| FRED MEYER STORE, INC., | ) | **PLAINTIFF'S OPPOSITION TO** |
| | ) | **DEFENDANT'S MOTION FOR** |
| Defendant. | ) | **SUMMARY JUDGMENT** |
| _____ | ) | |

## INTRODUCTION

Plaintiff James Breland, a former employee of Fred Meyer in Anchorage, brings claims against the Defendant company for hostile environment-race discrimination and retaliatory discharge under Title VII, 42 U.S.C. § 1981, and Alaska common law. Defendant Fred Meyer has moved to dismiss all Plaintiff's claims, but the grounds are not well-founded, legally or factually, for the following reasons:

1.    The Defendant's use of the *Faragher/Ellerth* defense fails, since Breland made numerous attempts to utilize the company harassment policy and complain about his supervisor's conduct, to no avail; in addition, the employer did not promptly investigate, prevent, and correct the racially hostile behavior. Among other things, Fred Meyer's investigation was derailed for almost seven months, and Breland's manager who was responsible for the hostile environment was allowed to continue the harassment for almost two years until the company finally terminated him in March of

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

2006.  Decisions on the validity of an employer's *Faragher/Ellerth* defense should be left to the jury, which in Breland's case easily could find in his favor.

2.    The Defendant incorrectly analyzes the manner in which a Title VII plaintiff may prove disparate treatment.  He can do so by showing either pretext or the employer's retaliatory animus.

3.    The company misstates the law in arguing that Plaintiff must show <u>direct</u> evidence of any element of his claims.  The U.S. Supreme Court made it clear in *Costa*, that either direct <u>or</u> circumstantial evidence will suffice in a Title VII claim.

4.    There is ample evidence of causation and pretext to establish retaliation against Breland by Fred Meyer:  Kevin Ruoff, the Regional Loss Prevention Manager (RLPM) failed to investigate and correct clear violations of Title VII by Breland's supervisor; further, Ruoff knew about Plaintiff's harassment complaints, and when Breland filed a second complaint, he was forced to admit he had "dropped the ball" on the investigation; Ruoff retaliated by terminating Breland for a customer stop made by another employee, a clear violation of Fred Meyer policy; he initially provided a false reason for the decision to hold Breland responsible for the other employee's stop; the Caucasian employee responsible for the stop was not punished; Ruoff falsified Plaintiff's past discipline record to make it seem worse; and he treated Breland more harshly than similarly situated Caucasian employees.  These genuine issues of material fact regarding whether Fred Meyer's legitimate business reason was pretextual or motivated by retaliation for Breland's protected activity, preclude summary judgment for Fred Meyer.

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

## FACTS

**I.**     **The *Faragher/Ellerth* Defense Should Not Be Available To Fred Meyer, Given Plaintiff's Efforts to Follow Policy and Defendant's Failure To Promptly Investigate and Stop The Harassment**

A.     Company Policy

The Fred Meyer Harassment Policy advised employees to do the following, if they were being harassed:

- Firmly and clearly tell the person who is harassing you that the behavior is unwelcome and should stop at once.

- If that does not work, report to another member of management.  (Ex. 2.)[1]

The company promises its employees that all claims of harassment will be investigated promptly.  (Ex. 4.)[2]

B.     Breland Availed Himself Of The Company Harassment Policy In An Attempt To Avoid Harm and End The Hostile Environment

Bryan Stewart, the Loss Prevention Manager (LPM) at the Fred Meyer Muldoon Store, was Breland's immediate supervisor from July of 2002 to the summer of 2004.  (Appendix I at 26.)  He frequently used racial epithets and slurs about African-Americans and other minorities in front of Breland, who is Black and Asian, and also to other Caucasians when Breland overheard these remarks.  (Appendix I at

---

[1]   Numbered exhibits were used by both parties at the depositions in this action; citations to Appendix I and II are excerpts from the depositions of James Breland on June 27, 2006, and Bryan Stewart on July 31, 2006, respectively.

[2] There is a separate complaint resolution process for "misunderstandings or conflicts" that requires certain time frames for reporting, but there is no time frame for harassment complaints.  (Ex. 2.)  The Harassment Form that individual Fred Meyer employees were required to read and sign, provided for the same steps set out above, with no time frames required.  (Ex. 4.)

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

44-47, 56-57.)  Fred Meyer employees Tony Bonini, Paul Kodiak, and Ryan Krieger also confirmed Stewart's conduct.[3]

Trying to resolve the matter with the harasser is the first step of Fred Meyer's anti-harassment policy.  (Exs. 2-4.)  Breland, following company policy, spoke to Stewart about his racist language on approximately four occasions, beginning about six months after he began working for Stewart, and continuing until March 2004. These conversations were an attempt by Breland to try to resolve the issue with Stewart himself, to no avail.  (Appendix I at 49-50, 52-53, 67-69, 119-121, 174.)

Filing a complaint with management is the second step of Fred Meyer's anti-harassment policy, and Breland clearly followed policy.  (Exs. 2-4, 21.)  On March 22, 2004, Breland filed a formal written complaint with Fred Meyer management, specifically Kevin Ruoff, the Regional Loss Prevention Manager (RLPM) for the region that included Alaska.  (Ex. 20.)  In his first written complaint, Breland pointed out that even before his transfer, he had heard from other Fred Meyer employees that Stewart was racist.  He noted that Stewart assumed other Caucasian employees felt as he did, so he made derogatory/inappropriate remarks even more freely in front of them.  He reported that one co-worker (Tony Bonini) had transferred to another store, in part because of Stewart's derogatory/inappropriate remarks; Bonini confirmed this.

---

[3] For purposes of this motion practice, Defendant Fred Meyer concedes that Breland has met his *prima facie* case to show hostile environment.  But Defendant suggests the hostile environment problem is minimal because the racial slurs by Breland's supervisor were not directed at him.   It should be noted that among the things Breland overheard were African-American customers and employees referred to as "field niggers,"  Black customers or employees were referenced with "watermelon and chicken,"  Black customers were called "them bastards."   Stewart would say, "I am sweating like a runaway slave," or "I am tired like a rented slave."   Latinos were referred to as "fucking wetbacks and spics"; Asians as "slant eyed fuckers"; Blacks as "fucking niggers."   He also made ongoing comments about how "the white men are the ones discriminated against because we have to hire the fucking minorities." (Appendix I at 44-45, 56-59; Affidavit of James Breland.)

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

(Affidavit of James Breland.)  Breland openly admitted he had considered simply transferring away from that store, but he did not believe he should have to do so when it was Stewart who violated policy and law and created the hostile environment.  (*Id*.)

Breland made it clear to Fred Meyer management during the complaint process that Stewart's racism and hostile environment polluted his workplace, made it more difficult to do his job, and affected his work environment.  He pointed out the detrimental effect of a person in Stewart's position being allowed to make racial slurs and other statements while he is training, directing, and molding LPSs to have the same views he has.  (*Id*.)  An attitude like Stewart's affected the store, employees, and customers, especially considering he was the head of security in that store.  He also complained about Stewart's surveillance of minorities, adverse treatment of minority employees, and training of Loss Prevention Specialists (LPS) for whom he should have been setting an example.  (Ex. 20; Appendix I at 109-110, 176-177, 249.)

In response to the first complaint, Ruoff criticized Breland for not telling him about the matter personally, and offered Breland a voluntary transfer.  (Ex. 21.)  In his response, Breland suggested that Ruoff follow up with specific Fred Meyer employees, LPS Bonini and LPM Becker, who could confirm Stewart's behavior.  (Ex. 21.)

C.   <u>Fred Meyer Did Nothing on Breland's First Complaint</u>

Fred Meyer contends that Breland's first complaint was "effectively addressed," and suggests that an investigation was conducted and remedial steps taken.  (Defendant's Br. at 3, 14.)  This simply is not true.  The extent of any action taken by Fred Meyer on Breland's first complaint consisted of Kevin Ruoff forwarding the initial email complaint to Store Manager Mike Johnson to handle.  There was some email between Johnson and Ruoff, and two employee interviews by Johnson that went nowhere.  Johnson's reply email to Ruoff about Breland's complaint, before any interviews, defends Stewart and appears to be predisposed to rejecting Breland's

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

claim.   For example, Johnson indicated he believed Breland's motivation for complaining was to obtain a transfer, while he went on to defend Stewart noting his "offensive" style, but claiming he displayed no racist tendencies.  (Ex. 22.)

During the one meeting Stewart and Johnson had about the Breland complaint, Johnson first let Stewart read the entire written complaint, and then simply interviewed him about the allegations, which he denied.  Johnson told Stewart he would talk to Breland, and Stewart believed that was the "end of it"; he never heard another thing about the complaint between March and November.  (Ex. 20; Appendix II at 14, 28, 53-54, 79.)   Later that same evening, Johnson interviewed Breland, after which there were a few email exchanges between Ruoff and Johnson on March 23, 2004 that did nothing to advance the investigation.[4]  (Appendix I at 92, 215-216; Ex. 22; Ex. 35.)

When Mike Johnson let Stewart read Breland's entire complaint, Stewart became angry that Breland had called him a racist who had a disease.  He essentially admitted to the racial comments to Breland when he told Breland the word "nigger" did not apply to him.  (Fred Meyer calls this conversation an "apology.")  (Appendix I at 68, 72-73, 198; Defendant's Br. at 7.)

After Johnson's initial interviews with Stewart and Breland regarding the complaint of March 22, 2004, no further action or investigation ever was taken on Breland's complaint between March and the end of October.[5]  No other individuals were interviewed, despite the fact that names of other employees who were aware of Stewart's conduct were provided in Breland's complaint.  (Ex. 21.)  Between the time

---

[4] Although Johnson and Stewart denied it, Breland states that Johnson told him Stewart admitted making the racial slurs.  (Ex. 25.)

[5] Fred Meyer suggests Johnson directed Stewart to take a diversity class after Breland's March complaint.  (Defendant's Br. at 7.)  But Defendant's own records show that Johnson did not look into diversity classes until November 13, 2004, after Breland's second complaint.  (Ruoff Affidavit, Ex. 4.)

of the initial complaint in March and into November of 2004, there were no notations made in Stewart's file or any documentation whatsoever; Stewart did not receive any discipline or attend any diversity training until after Breland's second complaint. (Affidavit of James Breland; Appendix II at 68, 78-79.)  Significantly, Ruoff admitted to Breland he had "dropped the ball" on the first investigation, and that there was no documentation of the incident; he had assumed Stewart would be disciplined, but it did not happen.  (Appendix I at 250; Affidavit of Lee Holen.)

Fred Meyer contends Ruoff and Johnson had a mix-up as to which one of them would document the matter in Stewart's personnel file, as a result of a dual reporting structure.  But Ruoff admitted dropping the ball; he traveled to Anchorage monthly or every other month, and one of his purposes in coming here was to handle personnel problems.  In fact, after the initial complaint of March 22, 2004, Ruoff visited the Muldoon Fred Meyer store at least twice; once in June or July of 2004, and again in August 2004, both visits were after the complaint and before Stewart's transfer. (Appendix II at 9-10; 30; Affidavit of Lee Holen.)

In August of 2004, Stewart was transferred to the Dimond Store for two reasons:  (1) due to his relationship with Mike Johnson, Muldoon Store Manager, and (2) because of his performance and stress during the Muldoon Store remodel.  His transfer was <u>not</u> related to Breland's harassment complaint.  (Appendix II at 9-14; Affidavit of Lee Holen.)

> D.   <u>Breland's Second Complaint Alerted Management That The Racist Conduct by Stewart Continued</u>

On October 30, 2004, Breland filed another complaint about Stewart with Ruoff, and he also sent a copy to Ruoff's supervisor, Scott Bringhurst, Fred Meyer Director of Loss Prevention.  (Ex. 25.)  Fred Meyer characterized this complaint as nothing more than a "follow up" to Breland's earlier complaint, and Breland's disagreement that Stewart had not been punished, suggesting that there was no

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

<u>additional</u> racist or inappropriate conduct by Stewart; there also is the suggestion that even if Stewart <u>did</u> continue his remarks, they were not directed at Breland so there was no harm.

But Breland made ongoing conduct clear.  In his October 30 complaint, Breland summarized the course of the inadequate investigation to date, including store manager Johnson's failure to do anything but show Stewart his complaint, and Johnson's failure to let Breland know about preventive measures taken.  (Ex. 25.)  He also complained about additional racist behavior by Stewart, including his not considering or interviewing any minorities for an open Loss Prevention position.  (Ex. 25.)

Breland pointed out the conflict of interest and violation of company policy inherent in the relationship between Johnson and Stewart, due to Fred Meyer's no fraternization policy.  The purpose of the policy was to avoid potential compromises and conflicts, and allowed no fraternizing between security personnel and store employees.  He asked for an independent review of the issues, given this relationship. (*Id.*)

On November 3, 2004, Ruoff emailed Breland to call him, which he did that very day.  Breland again informed Ruoff that the issue of Stewart's racism had not been taken care of, due to the relationship between Stewart and Johnson, and he told Ruoff that Stewart continued making racist remarks <u>both before and after</u> his transfer to Dimond in August.  He also gave Ruoff the name of a Fred Meyer Dimond Store employee, Dave Davis, who had told Breland that Stewart made racist remarks in his presence at the Dimond store.  (Appendix I at 204-210; Affidavit of James Breland.)

Ruoff directed Johnson, Breland, and Ryan Krieger, LPM at the Muldoon Store and Breland's immediate supervisor, to meet and discuss the complaint; they did so on November 13, 2004.  Both Johnson and Krieger prepared memos of the event after the meeting.  (Exs. 27 and 28.)  Johnson's tone clearly defends Stewart and is critical toward Breland.  For example, he accused Breland of being "argumentative and

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

calculating," with an "unknown agenda" and no "clear expectations." On the other hand, he defended Stewart, claiming he was not a racist, he "simply took part in racist activities."[6] Further, Johnson did not accurately recount the facts in the meeting when he insisted he had follow up meetings on Breland's initial complaint; both Breland and Stewart agree there was no follow up whatsoever, and there is no documentary evidence of any. Johnson also insisted the Breland complaint had been documented in Stewart's file, but that too is false. (Ex. 27; § I.C., Appendix I and II, *supra*.) Finally, Johnson, a Caucasian, improperly put the onus on Breland to dictate what action the company should take about Stewart, noting sarcastically, "James deems himself as an expert in diversity." (Ex. 27.)

Ryan Krieger's memo of the same meeting paints a different picture. (Ex. 28.) He correctly noted the disagreement between Johnson and Breland about whether there was follow up or documentation. Krieger pointed out that Breland told Johnson it was not his job to decide Stewart's punishment, but he felt something should have been done, and obviously, "the punishment was not working." (Ex. 28.) Certainly this should have alerted Johnson that the conduct by Stewart continued. He states Johnson tried to explain Stewart's behavior as "stress" from being LPM at the Muldoon store, while Breland pointed out that Stewart continued to make racial slurs at the store to which he was transferred; Breland again discussed the problems inherent with allowing a racist LPM to continue the conduct, no matter where he worked. (Exs. 27 and 28.)

---

[6] At his deposition, Johnson denied this statement, but Krieger and Breland contend he so stated.

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

E.    Ruoff's Investigation on Breland's Second Complaint Was Inadequate

About a month after Breland's second complaint, Ruoff flew to Alaska and met with Breland on November 30, 2004.  For the third time, Breland told Ruoff he believed Stewart had not been punished because of the relationship with store manager Johnson in violation of company policy.  He again pointed out that Stewart still continued to make racial slurs, both before and after his transfer, and that Dave Davis, a Dimond Store employee, witnessed Stewart making racial slurs in his presence. (Affidavit of James Breland.)  Ruoff informed Breland that he was going to do an investigation, and if Stewart was found to be making racial slurs, he would be terminated immediately.  (*Id*.)

Thereafter, Ruoff conducted the only investigation ever performed regarding either of Breland's complaints.[7]  At his deposition, Ruoff was unclear about exactly what he had done to investigate or to whom he had spoken, and he kept no notes.  In fact, Fred Meyer never produced any notes of any interviews from any alleged investigation concerning Breland's initial complaint or the follow-up complaint. (Affidavit of Lee Holen; Affidavit of James Breland.)  Ruoff admitted that in November of 2004, he questioned two Anchorage employees about Stewart, a Mr. Peace and a female LPS, whom he could not recall.  He apparently did not follow up on any of the names Breland had given him, *e.g.*, Bonini, Becker, or Davis.  (Affidavit of Lee Holen.)

It was not until November 10, 2004, that Ruoff finally spoke to Stewart about his racial slurs and remarks.  (Ex. 57 [Same as Ex. 79 to Bryan Stewart deposition].)

---

[7] Fred Meyer states that in response to Breland's second complaint, Ruoff conducted an "additional investigation and administered additional discipline," but there is absolutely no evidence that there was a first investigation or any discipline initially. (Defendant's Br. at 3; *supra*, § I.C.)

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Then, on December 2, 2004, Stewart was given a last chance final warning letter.  (*Id.*)
Interestingly, two versions of Ruoff's letter were provided to Plaintiff pursuant to
discovery requests.  The first, dated November 15, 2004 states:

> My investigation included interviewing several LPM's and
> LPS's in the Anchorage market <u>and the complaint that Mr.
> Breland made was supported</u>.  The specifics of the allegations
> are that you have used the term "<u>field nigger</u>" in referring to
> people of color, as well as making <u>sexually suggestive
> remarks</u> about women you were observing on CCTV, and
> <u>sexually demeaning remarks</u> about other women, some of
> whom you work with.  (Ex. 68 at 2; emphasis added.)

This letter was transmitted to the store Director where Stewart worked, with directions
on a cover sheet that Ruoff identified as his own handwriting.  The manager was
directed by Ruoff to cover the matter with Stewart, sign, and give him copies.  (Ex. 68
at 1; Affidavit of Lee Holen.)  But apparently this version of the letter, more specific
as to Ruoff's finding Stewart's racist conduct established, never was given to him.
(Ex. 68.)  The letter that actually went to Stewart, dated November 22, 2004, was
written approximately one week later and was much less specific about Stewart's
conduct:

> My investigation included interviewing several LPM's and
> LPS's in the Anchorage market.  The result of the
> investigation showed that improper remarks of both racial and
> sexual nature <u>may have been made</u> by Mr. Stewart, comments
> that are inappropriate in the workplace.  (Ex. 57; BS 79;
> emphasis added.)

This watering down the disciplinary letter to Stewart shows Ruoff's motive to protect
Stewart and avoid Breland's complaints.

**II.**    **There is Substantial Evidence That Breland Was Terminated In Retaliation For His Complaints About Stewart, Sufficient To Establish Causation, Pretext, and Retaliatory Motivation**

A.    <u>Fred Meyer Policy On Customer Stops</u>

One of Fred Meyer's policies was that if a stop were made, the LPS in charge had to enlist the assistance of someone else, preferably another LPS. The purpose of having assistance was for safety and assistance. At all times, however, the person who had observed all elements of the theft was required to be the arresting officer, to make the stop. The second LPS was present for purposes of safety, to act as a witness, and to provide assistance, if necessary. (Ex. 19 1.(e); Ex. 60; Affidavit of Lee Holen; Affidavit of James Breland.) In Fred Meyer Loss Prevention training, LPSs learn that when working with another employee at a stop, there is no designated senior officer; each loss prevention person is responsible for his or her own actions and decisions based on required training, Phases 1, 2, and signed policies, which all LPS employees were charged with understanding. Further, only a designated floor trainer or loss prevention manager could order an LPS to violate policy and make a stop on someone else's behalf without the elements. But to do this would be a violation of the rule requiring the individual with the five elements to make the arrest. (Affidavit of James Breland; Exs. 33 and 60.)[8]

The policy of one person having all five elements was in effect from at least the beginning of 2003 so as to make clear who was at fault when a non-arrest apprehension occurs. The policy clearly states:

> Our current policy requires that one individual have all five
> elements in a shoplift before an apprehension is allowed.

---

[8] In a letter to Ruoff, Krieger pointed out the policy did not allow the officer with the elements to order the other to make the stop. Krieger stated that even if his own boss ordered him to make an arrest based on the boss's observations, he would not do so because it would be a violation of policy. (Ex. 46 at 2.)

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

This policy does not allow for any of the elements to be witnessed by one individual, then reacted to by a different individual.[9]

B.  Breland Was Terminated For Another Employee's Customer Stop, Contrary to Company Policy

On February 14, 2005, Breland had two encounters with certain female customers. The first encounter involved several women Breland was observing who realized he was with security and began to harass him. (Appendix I at 231-233.) The second encounter later that same shift involved Paul Kodiak, another Fred Meyer LPS, and two of the same female customers whom Breland had encountered earlier that shift. Kodiak's stop of the women violated policy and constituted a non-arrest apprehension for which Breland was terminated. (Appendix I at 233-237.)

There is no dispute that Kodiak made the stop since he specifically admitted it and asked the customer to accompany him back into store to discuss the merchandise that she had. (Ex. 47.) After the stop had been made, Breland joined the two customers and Kodiak; when one of the women noticed him from the earlier incident and became angry. (Ex. 32.) A review of the videotape of the non-arrest apprehension outside the store supports this order of arrival:  Kodiak first, Kodiak making identification and stop of customers, then Breland's arrival. (Affidavit of James Breland.) This clearly violated the rule that the officer with the elements had to make the stop. (Ex. 60.)

Despite having made the stop improperly, Kodiak did not file a non-arrest apprehension or place a call, in violation of policy. (Ex. 33 at 3; Ex. 60.) Based on the statements, it is clear that the five elements to make a successful shoplift apprehension within policy were questionable. By going forward with the stop, Kodiak clearly

---

[9] Ruoff agreed a policy change allowing sharing of elements was made at select stores, but not Muldoon. (Ex. 60; Affidavit of James Breland; Affidavit of Lee Holen.)

violated loss prevention policy, yet he suffered no consequences, and in fact received a raise approximately three months later. (Exs. 33, 60 and 70.)

There is no dispute that company rules require any non-arrest apprehension to be reported within one hour. (Ex. 19 at 3.) Breland agrees he did not file a report regarding Kodiak's non-arrest apprehension on February 14, 2005, <u>because he did not make the stop</u>. He expected Kodiak to call in the report; then, he planned to talk to Krieger the very next evening at the beginning of his shift. (Appendix I at 233-237.) An individual involved in an incident has 24 hours to file a report, but Breland was fired before the 24 hours even passed. (Ex. 32.)

C.    There Is Evidence Of Retaliatory Motive Against Breland As Shown By Ruoff's Handling Of The February 14, 2005, Incident

In making his decision to terminate Breland for Kodiak's stop, Ruoff acted unreasonably, given company policy that provided the individual with the arrest elements was the only one who could make the stop. (Ex. 60.) It is a violation of company policy for the LPS who is assisting another LPS to make the customer stop; it is the individual with the elements for the arrest who must stop the customer, but Ruoff nevertheless punished Breland for Kodiak's stop and violation of policy. (Ex. 60; Affidavit of James Breland.) Kodiak's statement clearly shows he made the stop and violated policy; and the video does not support any particular allegation, other than to confirm Kodiak made the stop before Breland arrived. (Exs. 32, 46, and 47; Affidavit of James Breland.)

Initially, Ruoff gave a pretextual reason as to why Breland somehow was responsible for Kodiak's illegal stop. Immediately after the event, he insisted it was because Kodiak was in training, and Breland was his trainer and therefore responsible. Unfortunately, neither Krieger, Breland, nor Kodiak ever had been told about Kodiak's training status or Breland's responsibility for Kodiak. (Appendix I at 237; Ex. 46.) At the time of his deposition, Ruoff admitted this reason for putting the responsibility for

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

the stop on Breland was not valid, because no one knew Kodiak was in training. (Affidavit of Lee Holen.) Fred Meyer still considers Breland responsible, but its reasoning requires condoning policy violations by Kodiak. (Affidavit of James Breland; Defendant's Br. at 21.)

On the day of the termination, Breland filed an incident report regarding Harassment of Customer/Employee, describing the earlier incident he had with the two female customers, described above. (Ex. 49; Appendix I at 231-233.) The incident report he filed was a Minor Customer Complaint/Incident, and Breland pointed this out in his statements to Ruoff. (Exs. 32 and 45.) But Ruoff took Breland's incident report and altered it to reflect the stop was a non-arrest apprehension by Breland, not mentioning that clearly it was Kodiak who actually made the stop. (Ex. 59.). He also added narrative on the stop, suggesting it was Breland who made the stop Kodiak made on February 14. (*Id*.)

Breland worked for Fred Meyer Loss Prevention for three years, he effected 366 successful shoplifts with one non-arrest apprehension. Out of all 366 shoplifts, Breland never directed anyone to make a stop for him, including the non-arrest apprehension that actually was Kodiak's. He had one non-arrest apprehension in 2003, but he did not direct anyone to make the apprehension for him. (Exs. 31, 46 at 2.) He made his stops by the book and would never have directed another officer to violate policy and make a stop when he had the elements. (Affidavit of James Breland.)

Further, Ruoff only reviewed and retained the tape of the Kodiak stop at the end of the shift, the incident for which he terminated Breland. Yet Breland's statement and the report he filed indicated there was an earlier incident with the same two women whom Kodiak stopped. (Exs. 32 and 45.) But no one bothered to go back an hour and a half on the tape to verify the customer incident; no one bothered to retain the tape. (Affidavit of Lee Holen.) The usual Fred Meyer procedure was to retain any tapes

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

where there was an ongoing issue, either customer or employee, for 60 days. Then if there was a dispute, the tape still would be available. (Affidavit of Lee Holen; Affidavit of James Breland.)

Ruoff decided to not only terminate Breland for Kodiak's stop, he also took affirmative steps to make Breland's record look worse than it was. (Ex. 31.) In Ruoff's RLPM Non-Arrest Apprehension Review Form for Breland's termination incident dated February 16, 2005, he stated that Breland had had a suspension for the April 9, 2003, non-arrest apprehension, when he did not. (Exs. 18 and 31.) He also claimed there was a disciplinary incident on July 24, 2002, regarding improper conduct with a customer, when there was, in fact, no prior recorded discipline. Worse, Ruoff mischaracterized the non-arrest apprehension, claiming in the altered incident report that Breland stopped the customer, when in fact there is no dispute Kodiak stopped her.[10] (Ex. 31.)

On February 19, 2005, Ryan Krieger wrote to Ruoff requesting that he reconsider the action he took against Breland, and pointing out the bias involved in accepting Kodiak's statement without considering Breland's. (Ex. 46.) Krieger pointed out that it was Kodiak who exited and initiated contact, and that Breland's claim there had been a series of mishaps with these same two female customers should have been considered. Krieger also pointed out the fallacy of Ruoff's initial reasoning – that Kodiak was in training, and Ruoff now agrees. But this was the original explanation relied upon by Fred Meyer to explain why Breland was responsible for Kodiak's stop. (Ex. 46; Affidavit of Lee Holen.)

---

[10] In contrast to the form dated February 16, 2005, is the RLPM Non-Arrest Apprehension Form, dated May 19, 2003, on which Ruoff indicated correctly that Breland had no prior recorded disciplinary write-ups and gave him a warning, not a suspension. Compare and contrast Exs. 18 and 31, prepared after Breland had made his discrimination complaints.

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

Krieger also pointed out Breland had not been given the opportunity to report on his return to work the next evening, because he was fired immediately upon arrival, and the disparity in treatment between Kodiak [Caucasian] and Breland [Black]).  He questioned how Kodiak could escape any discipline, when he had violated policy by making a stop with few or no elements.  (Ex. 46.)

> D.  <u>Similarly Situated Caucasian Employees Were Treated Differently Than Breland</u>

In discovery, Defendant produced almost 400 pages of non-arrest apprehension records for Fred Meyer in Alaska for the years 2002 to 2006.[11]  All non-arrest apprehensions in the Fred Meyer records have two important factors in common:  in all cases except Breland's, the Loss Prevention Specialist actually making the apprehension is the one who made the phone call within the hour and wrote the report; further, <u>only</u> the individuals who had the elements would make the stop.  (Affidavit of James Breland.)

Defendant claims that its policy to require a report of all non-arrest apprehensions is consistently applied to all LPSs; Defendant argues there never was a situation where the employee failed to report and was not terminated.  (Defendant's Br. at 11.)  But Defendant ignores the fact that this rule has been uniformly applied

---

[11] Plaintiff's Second Set of Interrogatories and Requests for Production to Defendant; Request for Production No. 39 asked as follows**:**  Please produce all non-arrest apprehensions and attempted arrest forms and reports from all Fred Meyer Anchorage stores, for the year 2000 to the present; for each non-arrest apprehension or attempted arrest, include all documents, memos, disciplinary actions, warnings, suspensions or terminations resulting from the non-arrest apprehensions or attempted arrests. Defendant objected to the request on various grounds, but Fred Meyer did produce almost 400 confidential documents in response.  Plaintiff has not attached these documents as exhibits to this motion practice, due to an agreement with Fred Meyer counsel that they should remain confidential.  Statements regarding the documents are based on Breland's review of same.  (Affidavit of James Breland.)

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

<u>only to the individual who makes the actual stop</u>.  (Affidavit of James Breland.)  The issue in Breland's termination is whether or not the person making the arrest is responsible for the stop and the call.  In all stops but Kodiak's, this was the case.[12]

Fred Meyer apparently claims Breland also would have been terminated due to two non-arrest apprehensions in a 24-month period.[13]  But Defendant failed to apply the two non-arrest apprehensions within a 24-month policy equally to Caucasian employees in similar situations to Breland's.  Jimmie Brown, a Caucasian Fred Meyer employee, had a non-arrest apprehension in November of 2004 and then again in April of 2005.  With Ruoff's permission, however, Brown filled out his own paperwork, did not fully reveal his disciplinary record, and was allowed to call a clear non-arrest apprehension an "attempted arrest" so he would not have serious discipline or termination facing him.[14]  What should have been a non-arrest apprehension was classified as an "attempted arrest" to avoid his termination.  Thus, the records show

---

[12] This defense and testimony about other employees being terminated for failure to report is subject to Plaintiff's Motion to Strike or Compel Production of Documents, Docket No. 39, due to Fred Meyer's failure to provide discovery or fully disclose this defense.

[13] That claim is questionable, given that at his deposition, Ruoff indicated that the issue of Breland's two non-arrest apprehensions was never reached, since it still was being reviewed.  (Affidavit of Lee Holen.)

[14] The incident report Brown filed on 4/22/05 was characterized as a "C-Attempted Arrest."  But the narrative of the incident clearly sets out a non-arrest apprehension. (Ex. 34; Affidavit of James Breland.)  Brown's stop was not "slight in duration," as he detained the customer and had a fairly detailed conversation with her, including her showing him her purse twice and discussing whether she had merchandise up her sleeve; and Brown found no merchandise.  The stop was to determine ownership of property, but did not result in an arrest, so therefore it is a non-arrest apprehension. (*Id.*)

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Brown, a Caucasian, had a history of non-policy stops, but was given breaks by Ruoff so his record would not reflect them so as to require termination.[15]

      E.    <u>Bryan Stewart Was Not Terminated Until March of 2006, Despite Ongoing Violations of Title VII</u>

Bryan Stewart was terminated on March 23, 2006, two years after Breland's first complaint.  There is evidence that he continued to make racial slurs throughout that time both at the Muldoon and Dimond Stores, and that Fred Meyer management knew or should have known about the conduct.  He finally was terminated due to additional employee complaints about his making racial and sexual slurs in the workplace.[16]  (Exs. 78, 80, 81.)

## **LEGAL**

I.    **Summary of Argument**

    A.    <u>Defendant's *Faragher/Ellerth* Defense Must Fail</u>

To utilize the *Faragher/Ellerth* defense, an employer must prove each prong: (1) the employee did not follow policy, (2) the employer exercised reasonable care to prevent harassment, and (3) it promptly corrected any harassing behavior.  There are genuine issues of material fact as to whether Breland availed himself of the company policy, considering he made four oral complaints to the offending supervisor, two written complaints to management, along with follow up conversations with Kevin Ruoff, RLPM.  Further, there are genuine issues of material fact as to whether Fred

---

[15] It appears Brown had three non-arrest apprehensions in less than two years, if Ruoff would have required an accurate description of events; as well, there also was a "bathroom stop" in violation of policy for which there were no consequences to Brown. (Affidavit of James Breland.)

[16] This evidence is subject to Plaintiff's motion to admit evidence of Stewart's termination, Docket No. 35.  Since Defendant seeks to use *Faragher/Ellerth* to show it promptly corrected the matter, it is relevant for Breland to show it took two years from his first complaint to finally terminate Stewart and stop the harassment.

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Meyer promptly investigated Breland's complaints, adequately investigated Breland's complaints, or corrected the illegal conduct by Breland's supervisor, Bryan Stewart.

> B.    Defendant's Incorrect Interpretation Of The Applicable Law Precludes Summary Judgment

(1)    A Title VII employee may choose the framework with which to prove disparate treatment, by showing either (1) the company's legitimate explanation is pretextual or unworthy of belief, or (2) that the company was motivated by retaliatory animus.

(2)    There is no requirement that a Title VII plaintiff provide direct evidence of any part of the case, as Defendant contends.    Case law is clear that both circumstantial and direct evidence are acceptable, since violators of Title VII rarely admit it.

## II.    Standard of Review

In evaluating Fred Meyer's motion for summary judgment, the court must draw all reasonable inferences in the light most favorable to Breland, the non-moving party, and then decide if any genuine issues of material fact exist.    Fed. R. Civ. P. 56. Plaintiff agrees with Fred Meyer that a fact issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[17]

An important concept that Defendant did <u>not</u> include in its Standard of Review discussion is that in employment discrimination cases, a court must zealously guard the employee's right to a trial, since discrimination claims frequently are difficult to prove without a full airing of the evidence and an opportunity to evaluate credibility of the witnesses.    "The question of an employer's intent to discriminate is a pure question of fact," and very little evidence is required to survive summary judgment, because the ultimate question is one that can be answered only through "searching inquiry," most

---

[17] *Villiarimo v. Aloha Island Air, Inc.,* 281 F. 3d 1054, 1061 (9th Cir. 2002).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

appropriately conducted by a fact finder on a full record.[18]  "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed."[19]

Because an employer's true intent is difficult to ascertain, the employee "must be given a full and fair opportunity to demonstrate by competent evidence that the presumptively valid reasons for his [termination] were in fact a cover up for a racially discriminatory decision."  Motivation, intent, and circumstances are important, and require a full record.[20]  The Supreme Court has stated, "All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult … There will seldom be 'eyewitness' testimony as to the employer's mental processes."[21]

### III.     There Are Genuine Issues of Fact With Regard to Defendant's Affirmative Defense

#### A.     Hostile Work Environment Is Clearly Established

In this motion, Fred Meyer does not dispute the fact that the remarks of Breland's supervisor constituted a hostile environment.  (Defendant's Br. at 13.)  Yet despite this concession, Defendant appears to suggest that because the racist comments by Stewart were not directed to Breland, then he has no cause for complaint.[22]  Surely,

---

[18] *Sischo-Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1111 (9th Cir. 1991) (citations omitted).

[19] *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 81-82 (1998).

[20] *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

[21] *United States Postal Service Board of Governors v. Aikens,* 460 U.S. 711, 716 (1983); *Grano v. Department of Development*, 647 F.2d 1073, 1081 n.7 (6th Cir. 1986).

[22] In its summary of facts, Defendant points out in apparent defense that the "inappropriate racial remarks," although made in Breland's presence, did not refer

Fred Meyer cannot argue the hostile environment did not exist because Bryan Stewart did not directly call Breland a "nigger," only other African-Americans.

A work environment is sufficiently hostile to violate Title VII if, in light of all the circumstances, the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. It is enough if the hostile conduct pollutes the victim's workplace, making it more difficult for him to do his job, to take pride in his work, and to desire to stay on in his position.[23]

> With the "environment" of workplace hostility, and whatever the contours of one's environment, they surely may exceed the individual dynamic between the complainant and his supervisor … Far more than a "mere offensive utterance," the word "nigger" is pure anathema to African-Americans. Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as "nigger" by a supervisor in the presence of his subordinates." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 184 (4th Cir. 2001).

directly to Breland. (Defendant's Br. at 12.) In fact, the statements of Stewart arguably are direct evidence of discrimination. The Ninth Circuit has stated,

> When the evidence in question is of an employer's statements that do not directly concern the plaintiff, it is true that *some* inference is necessary to establish discrimination with regard to the plaintiff. Indeed, strictly speaking, little other than an employer's own admission could establish discriminatory intent without any inference whatsoever. Nevertheless, when evidence establishes the employer's animus toward the class to which the plaintiff belongs, the inference to the fact of discrimination against the plaintiff is sufficiently small that we have treated the evidence as direct. *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 n.6 (9th Cir. 2005).

[23] *McGinest v. GTE Service Corp.,* 360 F.3d 1103, 1112-1113; 1116-1117 (9th Cir. 2004).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: lecholen@gci.net

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Allegations of a racially hostile work-place must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff. *McGinest* at 1115. Obviously, the use of the word "nigger" is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination. This word is "perhaps the most offensive and inflammatory racial slur in English … a word expressive of racial hatred and bigotry." Further, while racially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group, in reality it may be intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group. *McGinest* at 1116.

In the Ninth Circuit, if racial hostility pervades a workplace, the plaintiff may establish a violation of Title VII, <u>even if such hostility was not directly targeted at the plaintiff</u>.[24] In addition, Breland also clearly tied his concerns about Stewart to his work environment, the security function, and the power and influence Stewart had in training other security employees, while displaying conduct in violation of company harassment policy and Title VII. Thus, it was the environment he worked in that Breland complained about, and courts agree that hostility directed at others in the workplace should be considered in such a case.

---

[24] *Id.* at 1117, *citing Woods v. Graphic Communications*, 925 F.2d 1195, 1202 (9th Cir. 1991)*; Stingley v. Arizona,* 796 F. Supp. 424, 426, 428 (finding racial and sexual harassment based in part on use of racist nicknames and slurs about another worker in presence of plaintiff); *Kishaba v. Hilton Hotels Corp.*, 737 F. Supp. 549, 554 (D. Haw. 1990). Likewise, *Dominguez-Curry v. Nevada Trans. Dept.*, 424 F.3d 1027, 1038 (9th Cir. 2005) (sexist remarks probative of discriminatory intent even if not directed at plaintiff).

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: lecholen@gci.net

B.    There Is a Genuine and Material Dispute of Fact Regarding Fred
Meyer's Use of the *Faragher/Ellerth* Affirmative Defense

Defendant asserts that it satisfies the *Faragher/Ellerth* affirmative defense; *i.e.*, that it exercised reasonable care to prevent and promptly correct the racially harassing behavior, <u>and</u> that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or unreasonably failed to otherwise avoid harm.[25]

In order to successfully assert this defense, Fred Meyer must establish <u>all</u> the requirements:  that Breland unreasonably failed to take advantage of the preventative measures or otherwise failed to avoid harm, <u>and</u> that it "exercised reasonable care to prevent and correct promptly any [racially] harassing behavior."  The Ninth Circuit has construed this standard to require both preventive and remedial measures.[26] Investigation is a key step in the employer's response to a harassment complaint, and the court should consider "the overall picture" to determine whether the employer's response was appropriate.[27]  Fred Meyer fails on all three prongs:  (1) the employee reasonably used the policy, (2) the employer did not take effective action to prevent the harassment, and (3) the employer did not promptly correct the problem.[28]

---

[25] *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 764-65 (1988), *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998) and *Swinton v. Potomac Corporation,* 270 F.3d 794, 802 (9th Cir. 2001), *cert denied*, 535 U.S. 1018 (2002).

[26] *Hardage v. CBS Broadcasting, Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005).

[27] *Swenson v. Potter,* 271 F.3d 1184 (9th Cir. 2001).

[28] *Ogden v. Wax Works, Inc.*, 214 F.3d 999 (8th Cir. 2000); Defendant cites *Montero v. Agco,* 192 F.3d 856, 862-63 (9th Cir. 1999), but that is a case in which the employee failed to complain for nearly two years.

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

1.      Fred Meyer Cannot Show That Breland Failed to Utilize
        Company Policy to Complain or Failed to Avoid Harm

Although there is no evidence for the assertion, Defendant contends that Breland failed to utilize the company's internal complaint process. (Defendant's Br. at 13.) But the facts are clear that Breland first made four informal attempts with Stewart to get him to stop the hostile environment; when that failed, he made a formal complaint to management; after nothing was done and Stewart's conduct continued, he complained again, including a copy to Ruoff's supervisor in the chain of command.

In *Ogden v. Wax Works, Inc.,* the employee complained to management and on several occasions directly told the harasser to stop; this was sufficient to support a finding that she reasonably took advantage of corrective opportunities or to otherwise avoid harm. Thus, Fred Meyer cannot show, as it must pursuant to *Faragher/Ellerth*, that Breland unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm.

2.      Fred Meyer Clearly Did Not Exercise Reasonable Care to
        Promptly Prevent and Correct the Harassment

Defendant arguably took *preventative* measures by "adopting and promoting awareness of its anti-harassment policy." Unfortunately, this measure appears to have been ineffective, since it certainly did not deter Stewart's conduct.[29] Thus, Fred Meyer did have an anti-harassment policy, but it was ineffective. Further, Fred Meyer took no action on Breland's first complaint in March 2004, and inadequately investigated the October 30 complaint. Kevin Ruoff never followed up on Breland's complaint by talking to employees he knew had information about Stewart's conduct.

It also is clear that Breland has presented sufficient evidence to establish disputed issues of material fact with regard to the adequacy of the remedial measures

---

[29] See *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1180 (9th Cir. 2001).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

taken by Fred Meyer. The reasonableness of the remedy depends upon its ability to: (1) stop harassment by the person who engaged in the offending conduct, and (2) persuade potential harassers to refrain from unlawful conduct.[30] Remedial measures must include some form of disciplinary action proportionate to the seriousness of the offense.[31]

The court should consider "the overall picture" to determine whether the employer's response was appropriate, and further, a determination of whether the employer's efforts were sufficient to meet the *Faragher/Ellerth* test is best left to the finder of fact.[32] *Ogden* is a case that looked at the *Faragher/Ellerth* defense, and it is instructive here.[33] There was evidence, as in Breland's case, that Wax Works neither conducted the necessary "thorough investigation" nor took the "appropriate action" promised by its harassment policy. Not surprisingly, this was found to belie its claim to have exercised reasonable care to "prevent and correct promptly" harassing behavior. Wax Works minimized Ogden's complaints, performed a cursory investigation, and forced her to resign while there was no discipline to the harasser. It is significant if, as here, the harasser was not punished; in this case, Stewart was not disciplined or reprimanded at all after Breland's first complaint.[34]

Fred Meyer is required to promptly correct and prevent any harassment. Here, Defendant clearly failed in its inadequate investigation and its failure to promptly

---

[30] *McGinest* at 1121. The Ninth Circuit has made it clear that in order to be adequate, remedial actions must be designed to prevent future conduct by the harasser.

[31] *Id.* at 1120 (citations omitted).

[32] *Phillips v. Taco Bell Corp.*, 156 F.3d 884 (8th Cir. 1998).

[33] *Supra* at 1007 (8th Cir. 2000).

[34] See *Baty v. Willamette Indus., Inc.*, 172 F.3d 1232, 1242-43 (10th Cir. 1999) (finding the lack of disciplinary action against a harassing employee relevant to an analysis of the employer's response).

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

*correct* the harassing behavior.[35]    Notice of the harassing conduct triggers an employer's duty to take prompt corrective action that is "reasonably calculated to end the harassment."[36]    Here, Ruoff's and Fred Meyer's failure to fully investigate Breland's complaint, to follow up with employees who had knowledge of the conduct, to provide an effective remedy, or to discipline Stewart, is fatal to Fred Meyer's use of the *Faragher/Ellerth* defense to achieve summary judgment.   In fact, it took Fred Meyer until March of 2006, two years from Breland's first complaint, to fire Stewart, despite reports to management that the conduct continued at the Dimond Store where Stewart was transferred in August of 2004.

Defendant Fred Meyer suggests the remedy was adequate because Stewart was transferred to another store, inferring this was action it took in response to Breland's complaint.  (Defendant's Br. at 14.)  But there is no evidence that is true – witnesses uniformly testified, even Ruoff, that there were two reasons for Stewart's transfer:  (1) performance and (2) violation of the non-fraternization policy with the store manager. Further, it is not true that Breland never again complained to Fred Meyer about additional comments in his presence or elsewhere; the second complaint was about additional and ongoing discrimination, as was his telephone conversation on November 3 and in person meeting on November 30, 2004, not just the same incidents Breland reported in March.  (Defendant's Br. at 14.)  The fact that Fred Meyer seeks to minimize Breland's complaints and to feign a lack of understanding about ongoing complaints about Stewart to justify not doing anything about his conduct, is evidence that must be fully aired before a jury.

---

[35] *See Kohler* at 1181; *see also Montero v. AGCO Corp.*, 192 F.3d 856, 862 (9th Cir. 1999) (case cited by Defendant, but in *Montero*, once the employee complained, investigation through termination of the offending employee took only 11 days, not two years, as with Breland's case.)

[36] *Swenson v. Potter*, 271 F.3d 1184 (9th Cir. 2001).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

C.    The Issue of Retaliation Causing Breland's Termination Is One For The Jury

The *McDonnell Douglas* burden-shifting analysis is the evidentiary framework used in ruling on motions for summary judgment in retaliatory discharge cases.[37]  To survive summary judgment, a plaintiff first must establish a case of retaliatory discharge; as noted above, very little evidence is required to create a *prima facie* case. Once that *prima facie* case is established, the burden then shifts to the employer to provide a legitimate business reason for the adverse employment action, which the employee has a chance to rebut with evidence of pretext.[38]

1.    Due to Genuine Disputes of Fact, the Issue of Causal Connection Must Go to the Jury

In this motion, Fred Meyer does not contest that Breland has met the first two prongs of his *prima facie* retaliation case.[39]  (Defendant's Br. at 15.)  But Defendant contends Breland cannot establish a causal connection between his protected activity and the termination of his employment, for lack of temporal proximity and any other evidence of causation.

---

[37] *Derendinger v. Kiewit Construction Co.*, 272 F. Supp. 2d 850, 854 (D. Alaska 2003).

[38] *Id.*

[39] The parties agree that to establish a *prima facie* case of retaliation under Title VII, Breland must show: 1) he engaged in protected activity; 2) there was an adverse employment action taken against him; and 3) a causal link existed between the two events.  *McGinest* at 1124; *see also*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

a.    <u>Temporal Proximity Is Clear in Breland's Case</u>

It is important to note that causality is not dependent on temporal proximity as a matter of law. The Ninth Circuit has stated:

> It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn. The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific. When there may be valid reasons why the adverse employment action was not taken immediately, the absence of immediacy between the cause and effect does not disprove causation.[40]

In the *Porter* case, the district court concluded that the employee could not show a causal link between the protected activity and the adverse employment action <u>because of</u> the temporal gap between these events, citing *Clark County School District v. Breeden,* 532 U.S. 268, 121 S. Ct. 1508 (2001). In reversing summary judgment for the employer, the Ninth Circuit pointed out that this holding misinterpreted *Breeden* on the lapse of time between reports of harassment and alleged retaliatory acts, <u>which spanned several years</u>. The court noted that while a lack of temporal proximity may make it more difficult to show causation, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference."[41]

The Defendant cites numerous cases that supposedly indicate the time frames in Breland's case are too remote to establish temporal proximity. (Defendant's Br. at 16.) These cases are easily distinguished, however. In *Hughes*, the plaintiff argued he met his burden of establishing a causal connection by showing that the issuance of two

---

[40] *Porter v. Cal. Dept. of Corrections*, 383 F.3d 1018, 1029-30, (9th Cir. 2004), *citing Kachmar v. SunGard Data Sys., Inc.,* 109 F.3d 173, 177 (3rd Cir. 1997) (citation omitted).

[41] *Id*.

disciplinary letters followed his formal discrimination complaint.[42]  Although only four months elapsed between the Hughes complaint and the first disciplinary letter, three years passed before receipt of the second disciplinary letter.  Thus, the court held that the temporal proximity, standing by itself, was insufficient to defeat summary judgment, in that case.[43]

The Ninth Circuit has held that causation can be inferred from timing alone, where an adverse employment action follows on the heels of protected activity.[44]  In this case, Breland was terminated less than four months after his follow up complaint and Kevin Ruoff's admission he had dropped the ball on the investigation of his complaint.  But in fact, this case need not be decided on proximity alone – Breland has both proximity and additional facts.

b.    Breland Has Shown Ample Evidence of Causation

In addition, whatever the court decides regarding proximity, Breland presents ample evidence of a causal connection between his protected activity and termination.  First, Breland has shown that the Fred Meyer policy required the arresting LPS to have all five essential elements for the stop; the officer with the elements was the one who had to make the actual stop of the customer.  (Ex. 60.)  The other individual was available for safety and assistance.  There can be no dispute that Kodiak, not Breland,

---

[42] *Hughes v. Derwinski*, 967 F.2d 1168 (7th Cir. 1992) (four month period insufficient to establish causation).  (Defendant's Br. at 16.)

[43] In *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001), cited by Defendant at 16, the court did not decide the proximity issue, because there was other evidence of causation.  Another case Defendant cites, *Richmond v. Oneok, Inc.*, 120 F.3d 205 (10th Cir. 1997), involved FLSA and FMLA claims in the Tenth Circuit.  The other cases cited by Defendant for close proximity, simply involve cases where the retaliation by the employer swiftly followed the employee's protected activity; they certainly are not dispositive here.  (*Kinzel, Veco, Miller, Love* – Defendant's Br. at 16.)

[44] *Villiarimo* at 1065.

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

made the stop; but Kodiak never was disciplined for not filing a report or for making a non-policy stop without the required elements. The initial explanation for making Breland responsible for Kodiak's stop is invalid, and Ruoff recently admitted that. Further, Ruoff exaggerated Breland's prior discipline history to make the termination appear justified, he failed to review the facts or the video on the initial encounter Breland had with the same customers, and he changed Breland's incident report about that earlier incident.

Further, Ruoff, the person making the termination decision, was well aware Breland had engaged in protected activity, an additional factor to be considered, along with temporal proximity. In fact, Ruoff only took action after Breland reported the matter to his boss. And when the second Breland complaint went to Ruoff's supervisor, Ruoff was forced to admit he had "dropped the ball" on the Stewart investigation.[45]

Fred Meyer suggests that since Ruoff "suffered no consequences" as a result of Breland's going over his head, there was no reason for him to retaliate. But certainly, he must have been embarrassed that he failed to investigate a serious complaint of race discrimination/hostile environment, and was forced to admit he had dropped the ball on it for over seven months. Certainly, the question is one for the jury. Temporal proximity, coupled with the facts and circumstances that show pretext and retaliatory animus, establish material issues of fact regarding the causal connection.

---

[45] Knowledge of the protected activity was significant in a case cited by Defendant. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727 (9th Cir. 1986).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

D.    A Title VII Plaintiff Need Not Provide Direct Evidence At Any
      Stage Of The Proceeding

1.    Direct Evidence Is Not Necessary To Show Causation

After its discussion of temporal proximity on causation for the retaliation claim, Defendant's analysis veers off from established law, to its contention that alternatively, a plaintiff can prove causation, "by providing <u>direct</u> evidence of retaliatory motive." (Defendant's Br. at 15, quoting *Miller,* 797 F.2d at 731; emphasis added.)  There clearly is no requirement for direct evidence, and Defendant incorrectly states Title VII law as clearly set out by the U.S. Supreme Court and followed by the Ninth Circuit.

In its brief the Defendant did not recognize the full procedural history of the *Miller* case and only cited the initial 1986 case.[46]  After remand and appeal in *Miller*, the Ninth Circuit Court held that retaliatory motivation could be inferred from <u>circumstantial</u> evidence that management personnel who participated in layoff decisions were aware appellants had filed EEOC charges, had attended the EEOC fact-finding conference, and were the very people whose actions had prompted the appellants' complaints.[47]

> Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time

---

[46] *Miller v. Fairchild Industries,* 797 F.2d 727 (9th Cir. 1986), *appeal after remand,* 876 F.2d 718 (9th Cir. 1989), *amended en banc rehearing denied,* 885 F.2d 498 (9th Cir. 1989), *certiori denied* at 494 U.S. 1065 (1990).

[47] 885 F.2d 498 (9th Cir. 1989).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

between the protected action and the allegedly retaliatory employment decision.[48]

In Breland's case, there is no question at all that management was aware Plaintiff engaged in protected activity. In fact, Ruoff also was forced to admit that he "dropped the ball" on Breland's first complaint against Stewart, which ultimately led to Breland's going over Ruoff's head and forwarding his complaints directly to Ruoff's boss. Ruoff terminated Breland at the first opportunity, less than four months later (October 30 through February 15), ostensibly for another employee's customer stop. The first rationale advanced for holding Breland responsible was found to be false (Kodiak's "training"), and Ruoff admitted this.

2.    <u>Direct Evidence is Not Necessary to Prove Pretext</u>

If a *prima facie* case of retaliation is established, the burden then shifts to the employer to proffer an alternative explanation for its action, which the employee may attempt to rebut by showing pretext for impermissible retaliation.[49] Defendant goes on to assert that even if Breland could establish his *prima facie* case and show causation, he cannot show that Fred Meyer's "legitimate, non-discriminatory" reason for the termination is pretextual. Again, Defendant incorrectly contends that Breland must provide "<u>direct evidence</u> to show that his protected activity <u>actually motivated</u> Fred Meyer to terminate him," citing *Woodson v. Scott Paper Co.,* 109 F.3d 913, 932 (3rd Cir. 1997). (Defendant's Br. at 17; emphasis in Defendant's Br.) It is unclear just how the *Woodson* case stands for this inaccurate statement of Title VII evidentiary requirements; the discussion of direct evidence involved a fact situation with graffiti,

---

[48] *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987); likewise, *Cohen v. Fred Meyer, Inc.,* 686 F.2d 793, 796 (9th Cir. 1982) ("essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity").

[49] *McGinest* at 1124.

Opposition to Motion for Summary Judgment
Case No. A05-169 CI (TMB)
Page 33 of 43

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

irrelevant here; the page Defendant cited involved the plaintiff's burden to show pretext at trial, not summary judgment. Further, the *Woodson* case discusses jury instructions, not summary judgment standards, where the standard of proof required of the employee in a discrimination case is much less. Finally, the Ninth Circuit has held that establishing pretext does not necessarily require any evidence beyond the *prima facie* case:

> In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000), the Court held that the factfinder may infer "the ultimate fact of intentional discrimination" without additional proof once the plaintiff has made out her *prima facie* case if the factfinder rejects the employer's proffered nondiscriminatory reasons as unbelievable. *Accord Chang v. University of Cal. Davis,* 225 F.3d 1115, 1127 (9th Cir. 2000) ("[A] disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons."). *Raad v. Fairbanks N. Star Borough*, 323 F.3d 1185, 1194 (9th Cir. 2003).

Defendant's assertion that the Plaintiff must present direct evidence is inexplicable and flies in the face of clearly established law that pretext can be established by <u>either</u> direct or circumstantial evidence, while the standard of proof varies with the nature of the evidence.[50]  A plaintiff is not required to produce direct evidence of a retaliatory motive in <u>any</u> phase of a Title VII case.  The U. S. Supreme Court held that a plaintiff need only demonstrate, by a preponderance of the evidence, <u>either direct or circumstantial,</u> that an employer used a forbidden consideration with respect to any employment practice.[51]

---

[50] *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221-22 (9th Cir. 1998).

[51] *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003).

The reasoning is clear – in *Cornwell v. Electra Cent. Credit Union,* the court explained that although some plaintiffs might discover direct evidence that a defendant's nondiscriminatory justification for an employment decision is a pretext, <u>most will not</u>.[52] Defendants who articulate a nondiscriminatory explanation for a challenged employment decision may have been careful to construct an explanation that is not contradicted by known direct evidence.

In *Costa, supra*, the U.S. Supreme Court stated:

> For instance, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), we recognized that evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of circumstantial evidence that is probative of intentional discrimination." The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: "<u>Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence</u>." (Citations omitted; emphasis added.)

Circumstantial evidence tends to show that the employer's proffered legitimate business reason "is unworthy of credence because it is internally inconsistent or otherwise not believable." Direct evidence tends to show that the employer was more likely motivated by retaliation than the employer's proffered reasons.[53] Thus, to establish that a defendant's nondiscriminatory explanation is a pretext for discrimination, plaintiffs clearly may rely on either circumstantial or direct evidence.

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

---

[52] 439 F.3d 1018, 1028 (9th Cir. 2006).

[53] *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000); *see also Derendinger v. Kiewit Construction,* 272 F. Supp. 2d 850, 858-59 (D. Alaska 2003).

E.    Plaintiff Can Prove His Title VII Claims Using Several Methods of Proof

The Defendant also confuses requirements for a plaintiff to show pretext in a Title VII case. On the one hand, it appears to state Breland must show pretext; on the other, it claims he must show the protected activity actually motivated Fred Meyer to terminate him. (Defendant's Br. at 17.) In fact, a disparate treatment plaintiff may offer evidence, direct or circumstantial, to show either mixed motive or pretext.[54] In fact, the Ninth Circuit, discussing *Reeves*, has made it clear plaintiffs can choose either method of proof to show disparate treatment:

> The Supreme Court has identified two methods by which a disparate treatment plaintiff can meet the standard of proof required by Fed. R. Civ. P. 56(c). First, a disparate treatment plaintiff may offer evidence, direct or circumstantial, "that a discriminatory reason more likely motivated the employer" to make the challenged employment decision. *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 256 (1981). Alternatively, a disparate treatment plaintiff may offer evidence "that the employer's proffered explanation is unworthy of credence." *Id.* Referring to the second method, many of our cases state that a plaintiff may defeat a defendant's motion for summary judgment by offering proof that the employer's legitimate, nondiscriminatory reason is actually a pretext for racial discrimination.[55]

As Plaintiff as shown above, there is ample evidence of pretext regarding the employer's reason for the termination to require a jury trial. There is internal inconsistency in that Plaintiff was terminated for Kodiak's stop, while Kodiak was not punished for violations of policy. The very premise that Breland was responsible for Kodiak's stop violates policy. Defendant's contention that Plaintiff must have direct

---

[54] *See also Cornwell, id.,* at 1028.

[55] *Raad* at 1194.

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 · Fax (907) 278-0247
E-Mail: leeholen@gci.net

evidence of discrimination for either type of analysis, mixed motive or pretextual, should be rejected out of hand and the motion denied.

F.     Wrongful Discharge

In moving to dismiss Breland's wrongful discharge claim, Defendant argues a very restrictive view of the covenant of good faith and fair dealing in Alaska, contending that the breach of an at-will contract occurs only where (a) the employee is deprived of a benefit of the employment contract, or (b) in violation of public policy. (Defendant's Br. at 17.)  Further, Defendant argues that the subjective aspect of the covenant occurs only where the employee is deprived of a benefit of the contract, and that the objective aspect occurs solely where there is a violation of public policy, citing *Chijide v. Maniilaq Assoc. of Kotzebue*, 972 P.2d 167, 172 (Alaska 1999) (Defendant's Br. at 18.)  This is far too narrow a view.

1.     Employers Must Treat Similarly Situated Employees Similarly

Apart from any public policy violation based on the violations of Title VII, Alaska courts also have held the covenant of good faith and fair dealing "requires that an employer treat like employees alike."[56]   Plus, the parties must act in a manner which a reasonable person would regard as fair, and an employer's discretion must be exercised reasonably and in good faith; all the employer's decisions must be made fairly and in good faith.[57]

Fred Meyer focuses mainly on the breach of covenant depending upon the employer's intent, the subjective aspect.  Yet, in *Luedtke v. Nabors Alaska Drilling (Luedtke II),* 834 P.2d 1220 (Alaska 1992), the Alaska court explained that a breach of

---

[56] *Luedtke v. Nabors Alaska Drilling,* 834 P.2d 1220, 1224 (Alaska 1992) (citing *Jones v. Central Peninsula Gen. Hosp.,* 779 P.2d 783, 789 (Alaska 1989)).

[57] *Id.*, citing *ARCO Alaska, Inc. v. Akers,* 753 P.2d 1150, 1156 (Alaska 1988).

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

the covenant is <u>not</u> limited to a subjective breach, where an employer intends to deprive the employee of a benefit of the contract. Rather than focusing on the intent of the employer, the covenant of good faith and fair dealing also requires the parties to act in a manner which a reasonable person would regard as fair. *Luedtke II* at 1224. The Alaska Supreme Court has held that examples of objective breaches of the covenant would include disparate employee treatment, as well as the grounds argued by Fred Meyer – unconstitutional terminations and firings that violate public policy.[58]

The facts that show the reasons advanced by Fred Meyer for the termination are pretextual also support an objective breach of the covenant in this case. Fred Meyer treated similarly situated employees differently. Breland, who had filed harassment complaints, was fired for another employee's stop while the other employee never was punished; in addition, other employees were treated more leniently by Ruoff with regard to non-arrest apprehensions.

2. Plaintiff's Contract Claim Also States a Public Policy Violation

The Defendant's argument on the wrongful discharge claim assumes it is one for violation of policy, and Breland does state that claim here, as well. But Defendant's entire argument depends, again, on its assertion that Breland can show no proof of a retaliatory motive by Ruoff. (Defendant's Br. at 19.) Breland has shown that his allegations regarding retaliatory motive raise genuine issues of fact and that a jury could rule in his favor on the retaliation claim. Therefore, Plaintiff's wrongful discharge claim is valid on two grounds: (1) public policy violation, and (2) treating

---

[58] *Charles v. Interior Reg'l Housing Auth.*, 55 P.3d 57, 62 (Alaska 2002) (citations omitted). *See also Holland v. Union Oil Co. of California, Inc.*, 993 P.2d 1026, 1036 (Alaska 1999) (it is possible for an employer to rightfully terminate an employee but to do so in a way that violates the covenant of good faith and fair dealing).

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Plaintiff differently than similarly situated Caucasian employees who did not engage in protected activity.

G.    42 U.S.C. § 1981 (Disparate Treatment)

Plaintiff agrees that analysis of an employment discrimination claim under § 1981 follows the same legal principles as those applicable in a Title VII disparate treatment case. Both require proof of discriminatory treatment and the same set of facts can give rise to both claims.[59] For purposes of this motion, Defendant concedes Plaintiff has established his *prima facie* case. (Defendant's Br. at 20.) However, Defendant contends it terminated Breland for a legitimate, non-discriminatory reason, failure to report a non-arrest, and that he has produced no admissible evidence that its reason was a pretext for discrimination. But as Breland has shown, there is ample evidence of pretext.

Retaliation claims are covered by 42 U.S.C. § 1981. If an employer retaliates against the former employee with the intent to perpetuate the original act of discrimination, or with some other racially discriminatory motive in mind, then interference with rights protected by § 1981 has occurred, and that section must come into play.[60]

---

[59] *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 850 (9th Cir. 2004). *See Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 503 (9th Cir. 1998) (because facts sufficient to give rise to a Title VII claim may also support a Section 1981 claim, an employee may seek relief for a retaliatory discharge under both provisions).

[60] *Manatt v. Bank of America*, 339 F.3d 792, 800 (9th Cir. 2003). Other circuits are in accord. *See, e.g., Foley v. Univ. of Houston Sys.*, 324 F.3d 310, 316 (5th Cir. 2003) (holding that "an employee's claim that he was subjected to retaliation because he complained of race discrimination is a cognizable claim under § 1981(b)"); *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2nd Cir. 1998) ("We remain of the view, in light of the broad sweep of § 1981(b), that a retaliation claim may be brought under § 1981(b)."); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 (11th Cir. 1998) (noting that the legislative history for the 1991 Civil Rights Act supports the conclusion that Congress intended retaliation claims to be cognizable under §

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

Further, a plaintiff does not have to produce additional evidence beyond his *prima facie* case if the employer's "reason" is "unbelievable." As Breland has shown, the reasons for his termination are "unbelievable," so as to create enough of an inference of pretext to defeat summary judgment. Here, Fred Meyer has shifting reasons for the discharge, Breland was fired for a Caucasian employee's stop contrary to policy (an employee with no harassment complaints pending), the explanation that Kodiak was "in training" was false, the finding that Breland filed a false report was made without any investigation; all these facts and those set out above raise an inference of retaliation sufficient that a jury could reject Fred Meyer's explanation and find for the Plaintiff on his § 1981 claim.[61]

Defendant also cites *Chapman v. AI Transport,* 229 F.3d 1012 (11th Cir. 2000), for the proposition that if the employer's proffered reason might motivate a reasonable employer, the employee must directly rebut it. The court in *Chapman* basically reiterated the premise that courts do not second-guess employers' business decisions because a plaintiff is not allowed to substitute his business judgment for that of the employer, and the employee cannot succeed in establishing a *prima facie* case by simply quarreling with the wisdom of the proffered reason. But in this case, Breland is not simply questioning the employer's proffered reason for his termination. Fred Meyer's proffered reason would not motivate a reasonable employer, because it involved clear violations of policy to charge Breland for Kodiak's stop and to fail to discipline Kodiak. Further, he has provided ample evidence of the employer's illegal motivation and established that there are genuine disputes of material fact regarding

---

1981(b)); *see also O'Neal v. Ferguson Constr. Co.,* 237 F.3d 1248, 1258 (10th Cir. 2001); *Kim v. Nash Finch Co.,* 123 F.3d 1046, 1059 (8th Cir. 1997).

61 *Porter v. Cal. Dept. of Corrections,* 383 F.3d 1018, 1031, (9th Cir. 2004) (irregularities in employer's process permit an inference of pretext).

Lee Holen Law Office
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

the pretextual nature of Defendant's explanation; thus the court should not grant summary judgment.

The other cases cited by Defendant regarding the extent of the evidence required to defeat summary judgment were decided before the 1991 amendments, pre-Godwin and pre-Reeves and can be distinguished on the facts.[62]  Defendant also contends that the Plaintiff has to do more than show by his own standards he should have been treated better.[63]

Defendant argues that a business mistake is not pretext.[64]  But there is no indication here that Fred Meyer made a "business mistake" in choosing to blame and terminate Breland for something another employee did.  The false reason Ruoff first advanced (Kodiak's training), his exaggerating Breland's past record and ignoring his explanations, and all facts set forth on pretext issue distinguish this case from "business mistakes."

## CONCLUSION

### I.    Genuine Issues of Fact Preclude Summary Judgment

(1)    Can Fred Meyer use the Faragher/Ellerth defense, considering that Breland followed policy in making his complaints about racial harassment, the

---

[62] *Schuler v. Chronicle Broadcasting Co.*, 793 F.2d 1010, 1011 (9th Cir. 1986) (employer's legitimate business reason involved employees' relative qualifications, plaintiff had lesser qualifications, and plaintiff presented no evidence); *Steckle v. Motorola, Inc.*, 703 F.2d 392 (9th Cir. 1983) (employer's legitimate business reason involved employees' relative qualifications, plaintiff had lesser qualifications, and plaintiff presented no evidence).  (Defendant's brief at 21.)

[63] *Kuhn v. Ball St. Univ.*, 78 F.3d 330, 332 (7th Cir. 1996) (again involved discretionary promotion, plaintiff had lesser qualifications and presented no evidence). (Defendant's Br. at 21.)

[64] *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.), cert. denied, 512 U.S. 1205 (1994); *Mister v. Illinois Cent. Gulf R.R. C.*, 832 F.2d 1427, 1435 (7th Cir. 1987) (Defendant's brief at 22.)

company "dropped the ball" in its investigation, Kevin Ruoff never followed up on talking to employees who had knowledge of Stewart's racist remarks, and it took almost two years to correct the problem by finally firing Stewart?

(2)     Was Kevin Ruoff motivated to retaliate against Breland when he made his second complaint about Stewart, sent it to Ruoff's boss, and Ruoff was forced to admit he dropped the ball on the investigation?

(3)     What was Kevin Ruoff's motivation when he fired Breland for another employee's non-arrest apprehension, a clear violation of company rules?

(4)     Why did Kevin Ruoff not punish the employee who made the stop since it was a clear violation of the five elements rule?

(5)     In the termination papers, did Kevin Ruoff deliberately exaggerate Breland's prior discipline record to make him look worse?

(6)     Did Kevin Ruoff treat similarly situated Caucasian employees similarly to Breland with regard to non-arrest apprehensions?

(7)     Given company policy and the fact that the rationale Ruoff gave for firing Breland for Kodiak's stop was false, was there any reason, other than retaliation, to find Breland liable for Kodiak's actions?

## II.     Legal Issues Preclude Summary Judgment

### A.     The *Faragher/Ellerth* Defense Is Not Available Here Because Defendant Must Show All Requirements

Fred Meyer has not and cannot show that Breland unreasonably failed to utilize company policy; that company efforts to deter harassment were successful; and that the specific harassment by Stewart was promptly corrected.

### B.     Title VII Plaintiffs Are Not Required To Present Direct Evidence Of Discrimination or Retaliation At Any Stage Of The Case

It is unclear why Defendant argued this issue, but it clearly is wrong. Plaintiff can use either direct or circumstantial evidence to prove his case.

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net

For these reasons, Defendant's Motion for Summary Judgment should be denied in its entirety.

DATED this 25th day of September, 2006.

LEE HOLEN LAW OFFICE
Attorney for Plaintiff

By: s/Lee Holen
608 W. 4th Avenue, Suite 21
Anchorage, Alaska 99501
Phone: (907) 278-0298
Fax: (907) 278-0247
E-mail: leeholen@gci.net
Alaska Bar No. 7810071

Certificate of Service

I hereby certify that on the 25th day of September, 2006, a copy of the foregoing Opposition to Defendant's Motion for Summary Judgment was served electronically on James R. Dickens and Peter E. Gruenstein.

s/Lee Holen
Lee Holen Law Office

**Lee Holen Law Office**
608 West Fourth Avenue, Suite 21
Anchorage, Alaska 99501
Tel. (907) 278-0298 - Fax (907) 278-0247
E-Mail: leeholen@gci.net