# Table of Exhibits

Appendix I          Excerpts from Deposition of James Breland, 6/27/06

Appendix II         Excerpts from Deposition of Bryan Stewart, 7/31/06

Exhibits:

2          Fred Meyer Handbook, Harassment policy, pages 6, 21, 22, 23

3          Employee Handbook, Harassment policy, pages 32-35

4          Fred Meyer Sexual Harassment and Other Forms of Harassment policy (employee to read and sign)

17          Employee Warning Notice, 5/30/03 (Breland)

18          RLPM Non-Arrest Apprehension Review Form, 5/19/03

19          Training procedure of Non-Arrest Apprehension, 1/31/04

20          Internal email to Kevin Ruoff from James Breland, 3/22/04

21          Internal email exchange between Kevin Ruoff and James Breland, 3/23-24/04

22          Internal email exchange between Mike Johnson and Kevin Ruoff, 3/23/04

25          Letter from James Breland to Kevin Ruoff, Scott Bringhurst re: complaint follow-up, 10/30/04; email responses from Kevin Ruoff, 11/3/04; Mike Johnson, 11/11/04; Ryan S. Krieger, 11/12/04

27          Memo from Mike Johnson to Kevin Ruoff, 11/13/04, re: Breland/Stewart incident

28          Memo from Ryan Krieger to Kevin Ruoff and Mike Johnson, 11/14/04, re: Meeting on Breland/Stewart incident

31          RLPM Non-Arrest Apprehension Review Form (Breland), 2/16/05

32          Letter from James Breland to "To Whom It May Concern," 2/15/05 re: Non-Arrest Apprehension incident of 2/14/05 (to Ruoff via Krieger)

33          Fred Meyer Loss Prevention Policy Manual (Sec. 406 04/04)

34          Fred Meyer Loss Prevention Policy Manual (Sec. 407 09/00)

35          Email exchange between Kevin Ruoff and Mike Johnson, 3/24/04

45          Fred Meyer Incident Report (Breland), 7/2/02

46          Letter from Ryan Krieger to Kevin Ruoff re: Breland, 2/19/05

47          Handwritten statement of Paul Kodiak of 2/15/05

49          Fred Meyer Incident Report, 2/14/05

57          Letter from Kevin Ruoff to Bryan Stewart, 11/22/04, First, Last, and Final Notice of Harassment

59          Fred Meyer Incident Report (Breland), 2/14/05

60          Letter of 3/3/05 re: policy change in Anchorage stores re: non-arrest apprehension and necessity of five arrest elements

68          Handwritten note from Kevin Ruoff to Mike Johnson with attachments regarding Harassment, to be discussed with Bryan Stewart

70          State Change Requests, Pay Increase for Paul Kodiak, 5/11/05

78          Statement of Paul Kodiak to Devin W. Lilly regarding Bryan Stewart remarks, 3/20/06

80          Statement of Devin W. Lilly to Jodi Gorman regarding Bryan Stewart, 4/3/06

81          Statement of Michelle Skommesa regarding Bryan Stewart, 4/10/06

Affidavit of James Breland (filed separately)

Affidavit of Lee Holen (filed separately)

**APPENDIX I**

**EXCERPTS FROM DEPOSITION OF JAMES BRELAND**

Page 1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF ALASKA

3

4    JAMES BRELAND,                    )
                                       )
5                   Plaintiff,         )    COPY
                                       )
6        vs.                           )
                                       )
7    FRED MEYER STORES, INC.,          )
                                       )
8                   Defendant.         )
                                       )
9
     Case No. A05-169 CIV
10

11

12

13           DEPOSITION OF JAMES BRELAND

14

15
              TUESDAY, JUNE 27, 2006
16                 9:05 a.m.

17
           Taken by Counsel for Defendants
18                      at
                 GRUENSTEIN & HICKEY
19       1029 West Third Avenue, Suite 510
                 Anchorage, Alaska
20

21

22

23

24

25

BRELAND v FRED MEYERS STORE

Page 25

1    Q.  Okay.  Had you ever met Mr. Huebner prior to
2  that time?
3    A.  Yes.
4    Q.  Okay.  Anybody else transferred from the
5  Dimond store to the Muldoon store at that time?
6    A.  Not that I can recall.
7    Q.  Anyone else remain at the Dimond store doing
8  part-time work?
9    A.  I believe I was the only part-timer at that
10  store.
11    Q.  When you were at the Dimond store those
12  first few months in 2002, besides Mr. Krieger, who
13  else was in loss prevention at that time?
14    A.  I cannot recall.  I believe it was just me
15  and Mr. Krieger.
16    Q.  And when you transferred to Muldoon, who
17  were the other people working in loss prevention at
18  that time when you initially went over there?
19    A.  When I initially was transferred?
20    Q.  Yes.
21    A.  Bryan Stewart, Tony Bonini, Bonn Kracker,
22  Shane Calt.
23    (Peter Gruenstein enters the room.)
24  BY MR. DICKENS:
25    Q.  What happened to Shane?

Page 26

1    A.  Shane was transferred over to Abbott Fred
2  Meyer under Fred Becker.
3    Q.  Do you believe that was voluntary or
4  involuntary?
5    A.  I'm not sure.
6    Q.  Did you ever ask to be transferred to
7  Abbott?
8    A.  No.
9    Q.  Okay.  What happened to Bonn Kracker?
10    A.  I believe he quit.
11    Q.  What happened to Tony Bonini?
12    A.  I believe at that time Tony Bonini quit.
13    Q.  You say "at that time."  Does that suggest
14  he came back at some time?
15    A.  Yes.
16    Q.  Okay.  And who was the supervisor of that
17  group?
18    A.  Bryan Stewart.
19    Q.  So you worked under the supervision of Bryan
20  Stewart for how long?
21    A.  I believe a little over two and a half
22  years.
23    Q.  And during that two and a half years, did
24  you get at least two annual evaluations by
25  Mr. Stewart?

Page 27

1    A.  Could you clarify?
2    Q.  Certainly could.  Were you given an annual
3  performance evaluation by your supervisor while
4  working at the Muldoon store?
5    A.  Yes.
6    Q.  And did you have at least two of those done
7  of your performance by Bryan Stewart?
8    A.  I believe so.
9    Q.  And isn't it true that both of those
10  evaluations were quite positive about your
11  performance?
12    A.  Yes.
13    Q.  Okay.  Isn't it true that while you worked
14  under Bryan Stewart at the Muldoon store, he never
15  once called you a racially derogatory name?
16    A.  Personally?
17    Q.  Personally.
18    A.  Yes.
19    Q.  And isn't it true that you told people that
20  Bryan Stewart was a decent man and that you and he got
21  along pretty good?
22    A.  I did express that.
23    Q.  In fact, you expressed that in writing, did
24  you not?
25    A.  Yes.

Page 28

1    Q.  And at some point in time, though, you made
2  a complaint about comments that you thought
3  Mr. Stewart was making at the store of a racially
4  derogatory nature, did you not?
5    A.  Yes.
6    Q.  And as a result of those complaints by you,
7  Mr. Stewart was transferred to another store, wasn't
8  he?
9    A.  That's what I was told.
10    Q.  Well, did he remain at the Muldoon store?
11    A.  He remained at the Muldoon store five to six
12  months after I filed that complaint, yes.
13    Q.  Well, I guess we'll get into that.  I
14  thought that after you filed the complaint, he was
15  transferred at some point in time and Ryan Krieger
16  replaced him.
17    A.  He was transferred five to six months after
18  I filed the complaint.
19    Q.  With whom did you file the complaint?
20    A.  Kevin Ruoff.
21    Q.  All right.  We're going to come back to that
22  in a little bit.
23    Mr. Breland, have you seen a doctor in the
24  last five years?
25    A.  Yes.

10 (Pages 25 to 28)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 41

1    A.  He worked for Kim Pheiffer at Lamont's.
2    Q.  Tell me exactly what Kim Pheiffer said that
3  Mr. Stewart said to her.
4    A.  I can't articulate exactly what was said to
5  me.
6    Q.  Well, give me your best recollection of what
7  you recall Kim Pheiffer saying to you that Bryan
8  Stewart said to her.
9    A.  My best recollection was that Bryan stated
10  to her that it's my fault that he was terminated from
11  Fred Meyer and that he's going to kill me, my children
12  and my wife. And according to Kim, he called me a
13  couple of names, but she didn't state what they were.
14  But she did say they were racial in nature.
15    Q.  Did she say anything about the state of
16  intoxication, if any, of Mr. Stewart as she surmised
17  it when she talked to him on the phone?
18    A.  She stated that he seemed intoxicated.
19    Q.  Okay. Anything else you can recall from
20  your discussion with Kim Pheiffer about Bryan Stewart,
21  any threats he made?
22    A.  The only thing I can recall is that she said
23  that she spoke with him on, I believe, three
24  occasions. And every time she spoke with him, he did
25  make threats of killing me. And that he asked Kim did

Page 42

1  he ever make racial remarks. And that if she would,
2  you know, vouch for him. And she stated to me when
3  she was talking to me that she couldn't vouch for him,
4  because she has heard him make racial remarks.
5    Q.  All right. Anything else that Kim Pheiffer
6  passed on to you about any discussions she had with
7  Bryan Stewart in the last several months of 2006?
8    A.  Could you clarify it?
9    Q.  Sure. I'm asking is there anything else
10  that Kim Pheiffer has said to you that was told to her
11  by Bryan Stewart in 2006?
12    A.  No. Just the threats.
13    Q.  Okay. Any threats beyond what you've
14  already told me?
15    A.  He made the same threats through Tony
16  Bonini.
17    Q.  Let's stay with Kim. We'll come to Tony in
18  a minute.
19    A.  Okay.
20    Q.  Beyond what you already told me that Kim
21  Pheiffer said to you, did Kim Pheiffer saying anything
22  else to you about her discussions with Bryan Stewart?
23    A.  That she just believed he's mental, and that
24  was it.
25    Q.  Has Bryan Stewart called you at all since --

Page 43

1  at any time in 2006?
2    A.  No.
3    Q.  So you haven't picked up your phone and
4  you've got Bryan Stewart on the other end?
5    A.  No.
6    Q.  During the time that you worked at Fred
7  Meyer and after Mr. Stewart was transferred from the
8  Muldoon store to the Dimond store, did he ever call
9  and threaten you at that time?
10    A.  He called on two occasions to speak with me
11  about the complaint.
12    Q.  And did you speak with him?
13    A.  Yes.
14    Q.  And tell me when the first one occurred.
15    A.  First phone call?
16    Q.  First phone call, yes.
17    A.  In September, late September of 2004.
18    Q.  Do you recall the gist of that discussion?
19    A.  He basically called to state that he didn't
20  mean anything by it and that that's just how he was
21  raised. That's how they do it in Ohio. And that he
22  didn't think I was -- I shouldn't -- he didn't think
23  that of me.
24    Q.  Well, Mr. Breland, that's fairly general.
25  Did he say anything more specific about what he didn't

Page 44

1  mean by "it"?
2    A.  That the racial remarks that he made, he
3  didn't mean anything personal by it to me.
4    Q.  So you mean -- let's see if I understand
5  that. As you understood it, when Mr. Stewart called,
6  he was saying he didn't mean to offend you by any
7  racial remarks. They were not directed at you
8  individually.
9    A.  Yes.
10    Q.  And how did you respond?
11    A.  My response was I just was offended that he
12  made the remarks in my presence, whether they were
13  directed towards me or not.
14    Q.  Well, as long as we're on that subject, why
15  don't you tell me what racial remarks you heard,
16  personally heard Bryan Stewart make either in your
17  presence or when you would overhear because you're
18  just around the corner?
19    A.  The remarks I heard were "nigger," "field
20  nigger," "fucking spicks," "fucking Native people,"
21  "sweating like a slave." "I'm tired like a running
22  slave." He called Asian people "gooks," "slant-eyed
23  fuckers." And he always made reference to "chicken"
24  and "watermelon" concerning Black employees.
25    Q.  Okay. Did you ever make notes about the

14 (Pages 41 to 44)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 45
1  timing of these comments and the circumstances?
2     A. I made notes about the comments concerning
3  "nigger" and "field nigger."
4     Q. And did you make them contemporaneous with
5  the comments by Mr. Stewart?
6     A. Could you clarify that for me?
7     Q. Sure. I'll pick an example. On Wednesday,
8  March 22, 2004, if you heard Mr. Stewart make a
9  comment that you felt was inappropriate that day, did
10 you that day write something down to confirm what you
11 recalled him saying?
12    A. Yes.
13    Q. Okay. And in what form are those notes, if
14 they still exist?
15    A. Piece of paper.
16    Q. Where is that piece of paper?
17    A. I believe my attorney has that.
18    Q. The only piece of paper I recall being
19 produced on your behalf is a summary sheet recently
20 produced, which has a list of some of the comments
21 you've just made here. It has dates, but it doesn't
22 appear as if it was a diary or a calendar or any other
23 type of journal contemporaneously kept and recorded at
24 the time. Is there something else?
25    A. I'm not clear what you're saying.

Page 46
1     Q. Sure. That's all right. Let me try it
2  again. Did you ever keep a journal while you worked
3  at Fred Meyer, which you on a regular and daily basis
4  recorded events that occurred at Fred Meyer?
5     A. No.
6     Q. Did you ever keep a diary for any reason for
7  anything that occurred in your life?
8     A. No.
9     Q. The comments you claim Mr. Stewart made, how
10 and when did you record those comments?
11    A. I had a piece of paper on me while working
12 every day to record those comments.
13    Q. And did you just retain that one piece of
14 paper?
15    A. Yes.
16    Q. And did you record those comments
17 contemporaneously on the -- the day they occurred?
18    A. Yes.
19    Q. Okay. And is there just that one piece of
20 paper?
21    A. Yes. Concerning what I recorded, yes.
22    Q. All right. I'll come back to that. I
23 thought I saw it this morning.
24       Mr. Stewart (sic), I wanted to show you a
25 document that your counsel provided us. It has

Page 47
1  plaintiff's number 0069 on the bottom, which has at
2  the top, LPM Stewart Comments. Is this the document
3  you're just referencing?
4     A. Yes.
5     Q. And are you telling me that you kept this
6  document with you and on August 17, 2002, you made
7  this comment about Mr. Stewart:  Stewart says he's
8  sweating like a run-away slave?
9     A. Yes.
10    Q. And that you kept this document on you from
11 August 2002 through at least February 2004 and just
12 made notes when things arose?
13    A. Yes.
14    Q. Where did you keep the document, in your
15 back pocket?
16    A. Wallet.
17    Q. Wallet? Where is the original?
18    A. I believe my counsel has it.
19    Q. Now, we had been discussing threats by
20 Mr. Stewart, which apparently, as I understand it,
21 have occurred in the last couple of months. Do I
22 understand that correctly?
23    A. Yes.
24    Q. These are threats by an ex-Fred Meyer
25 employee over a year after you left your employment

Page 48
1  with Fred Meyer; is that correct?
2     A. Yes.
3     Q. What other threats have you heard from any
4  other source?
5     A. Tony Bonini conveyed those same threats that
6  Kim discussed with me.
7     Q. When did Mr. Bonini convey those threats?
8     A. I don't recall the exact day or time. We
9  discussed it over the phone.
10    Q. Did you, by the way, during your discussion
11 with Kim Pheiffer, make notes of anything she was
12 telling you about the alleged threats by Mr. Stewart?
13    A. No.
14    Q. Did you during any of your telephone
15 discussions with Tony Bonini make notes about the
16 alleged threats from Mr. Stewart that he was telling
17 you?
18    A. No.
19    Q. Have you gone to the police regarding the
20 threats by Mr. Stewart?
21    A. No.
22    Q. Why not?
23    A. Because Mr. Stewart didn't physically attack
24 me yet for me to go to the police.
25    Q. Anybody else with whom you've had telephone

15 (Pages 45 to 48)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 49

1 discussions in 2006 that have indicated that
2 Mr. Stewart has made any threats against you?
3     A.  Those are the only two people.
4     Q.  Have you seen Mr. Stewart in person any time
5 since March 1, 2006?
6     A.  No.
7     Q.  When's the last time you saw Mr. Stewart in
8 person?
9     A.  I can't recall the last time I seen
10 Mr. Stewart.
11     Q.  We went a little sideways here on an earlier
12 question.  You had told me that you had two telephone
13 conversations with Mr. Stewart after he transferred
14 from the Muldoon store to the Dimond store; is that
15 correct?
16     A.  Correct.
17     Q.  I think we had discussed the first telephone
18 conversation you had with Mr. Stewart.  Anything else
19 you want to add to that beyond what you've already
20 told me?
21     A.  There's nothing that I want to add.  He just
22 tried to clarify his position that he didn't mean
23 anything towards me when he made those comments.
24     Q.  At the time you heard Mr. Stewart make those
25 comments, did you ever personally approach him and

Page 50

1 say: Stew, I'm offended by your comments; I want you
2 to knock it off; I think that's totally inappropriate?
3     A.  Yes.
4     Q.  You want to tell me when that occurred and
5 what was said between the two of you?
6     A.  I can't pinpoint when I approached
7 Mr. Stewart, but it was on four occasions during the
8 time I was under his supervision.  And I expressed to
9 Mr. Stewart how I felt about his comments.  And that I
10 believe that it should be done in a private area, not
11 at work.
12     Q.  What should be done in a private area?
13     A.  Displaying his -- displaying his behavior.
14 I told him it should be done at home.  If you want to
15 do those, you know, display how you feel about certain
16 races, that's fine.  But do it at home, not at work.
17 And we got into several discussions about that on
18 those four occasions and arguments on two of those
19 occasions.
20     Q.  Were those arguments at work?
21     A.  Yes.
22     Q.  Anybody else hear those arguments?
23     A.  Just me and Mr. Stewart.
24     Q.  Where were you?
25     A.  In the office, loss prevention camera room.

Page 51

1     Q.  You want to describe for the record what the
2 loss prevention offices are like at the Muldoon store?
3     A.  At the time I was under his supervision, it
4 was two rooms.  One was where the computer was
5 located.  And the other was the camera -- camera room,
6 two separate rooms.
7     Q.  Were they a long ways apart or are they
8 close together or what?
9     A.  They were close together, basically side by
10 side.  Wall separated two rooms.
11     Q.  Okay.  Doorway between them?
12     A.  Yes.
13     Q.  Was there a door on it or just a doorway?
14     A.  Door was on it.
15     Q.  So when you go into the loss prevention
16 offices there, which is the room you first come into
17 from the hallway?
18     A.  The computer room.
19     Q.  And then behind the computer room is the
20 camera room?
21     A.  Yes.  Or in front of.
22     Q.  Well, you've got to go through the computer
23 room to get to the camera room, right?
24     A.  Right.
25     Q.  Okay.  And so those discussions were in the

Page 52

1 camera room.
2     A.  Yes.
3     Q.  What's in the camera room?
4     A.  Videos, video, CCTV.
5     Q.  How many videos?
6     A.  I don't know the exact number.
7     Q.  Can you recall anything about those
8 discussions and arguments with Mr. Stewart?
9     A.  Mr. Stewart felt that my attitude had
10 changed towards him.  And he wanted to know why my
11 attitude changed towards him.  And I expressed because
12 of his comments being made in the workplace.
13     Q.  When was this first discussion?
14     A.  I'd say probably six months into working for
15 Mr. Stewart.
16     Q.  Okay.  And beyond arguing with Mr. Stewart
17 over it, did you talk to anyone else about that
18 situation and that discussion with Bryan Stewart?
19     A.  I believe I talked to Tony Bonini about the
20 situation.
21     Q.  Tony Bonini's position at that time was
22 what?
23     A.  Loss prevention specialist.
24     Q.  Same as you?
25     A.  Yes.  Full time.

16 (Pages 49 to 52)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 53

1    Q.  He was full time and you were part time?
2    A.  Yes.
3    Q.  Did you document that discussion in any way?
4    A.  No.
5    Q.  All right.  When was the second argument
6    with Mr. Stewart?
7    A.  I believe it was in the summer of 2003.
8    Q.  Where did that one take place?
9    A.  Same exact place.
10   Q.  Anybody else present?
11   A.  No.
12   Q.  What was that discussion?
13   A.  Same discussion about his offensive
14   language.
15   Q.  Was the discussion and his response pretty
16   much a mirror reflection of the prior discussion and
17   response?
18   A.  Yes.
19   Q.  Does anything stand out in your mind about
20   that discussion that you can recall at this time?
21   A.  Just we got into a debate.  And he tried to
22   express that he doesn't feel that way, but that's just
23   how he was raised.  It was just basically the same
24   thing.
25   Q.  Did you report either one of those

Page 54

1    arguments, discussions with Bryan Stewart to anyone at
2    a higher level in the Fred Meyer management chain?
3    A.  Not at that time.
4    Q.  Why not?
5    A.  Because I figured we could work it out.
6    Q.  Now, as of the summer of 2003, you'd been
7    working for Bryan Stewart for what, approximately a
8    year as your supervisor?
9    A.  Yes.
10   Q.  During that period of time, had you done
11   anything with him socially outside of Fred Meyer?
12   A.  He invited me to a Christmas party that he
13   was holding.
14   Q.  Was that the one at his house?
15   A.  Yes.
16   Q.  Did you attend?
17   A.  I did.
18   Q.  And did you have a good time?
19   A.  I'd say so.
20   Q.  Anything unusual about his house or the
21   party?
22   A.  He had a -- in the garage a very large rebel
23   flag that presumably was the state flag of Georgia.
24   Q.  Was that like a replica of the confederate
25   flag or was that a replica of the Georgia state flag

Page 55

1    at that time?
2    A.  I believe that it was a -- could you tell me
3    the difference?
4    Q.  Well, no.  I can't.  But I understand there
5    is a difference, that the confederate flag, I think
6    was -- as I understood it, was part of the Georgia
7    state flag, but it was different, a little bit, than
8    the confederate flag.
9    A.  Okay.  I would -- I would estimate it was
10   the confederate flag.
11   Q.  Did you discuss that with Mr. Stewart at the
12   time or thereafter?
13   A.  Yes.
14   Q.  Which time, at the party or thereafter?
15   A.  Both.
16   Q.  Okay.  At the time of the party, at the
17   Christmas party at his house, what did Mr. Stewart say
18   about the flag?
19   A.  He basically chalked it up to being a
20   southern boy and how it constituted the war.
21   Q.  Which war?
22   A.  The -- he didn't really state what war.  He
23   just said the war, Civil War.
24   Q.  I thought you said he was from Ohio.
25   A.  He is.

Page 56

1    Q.  That's not the south.  They weren't on the
2    south in the Civil War.  Did you point that out to
3    him?
4    A.  No.
5    Q.  Was the discussion at the Christmas party
6    sort of a light, bantering discussion?
7    A.  Yeah.
8    Q.  And was the discussion about the flag later
9    at work, was it somewhat of a light, kind of
10   give-and-take, why do you think that way type
11   discussion?
12   A.  It -- it was a discussion of -- concerning
13   race and that flag.
14   Q.  Tell me about that.
15   A.  We discussed his thoughts of certain Black
16   people, because he would always make a comment when
17   Black males would walk in the store, they are wearing
18   90-day shitters.
19   Q.  What is that?
20   A.  That is where when you observe a Black male
21   who is wearing his pants halfway down his butt, he
22   called those 90-day shitters.  And he would state that
23   anybody who wore 90-day shitters are bad.
24   Q.  Well, from just a personal observation,
25   there seems to be an awful lot of young men wearing

17 (Pages 53 to 56)

BRELAND v FRED MEYERS STORE

Page 57

1  very low pants, of all races.
2      A.  I discerned that.  But his classification
3  was towards only Blacks.
4      Q.  All right.  Anything else you discussed
5  about race and the flag when you had the discussion
6  later at Fred Meyer with Mr. Stewart?
7      A.  It was just his overall view of what -- why
8  he thought, you know, certain races that wore certain
9  things were bad.  And the fact that he felt that the
10  flag represented country boys and --
11     Q.  Now, during this time frame when you were
12  being supervised by Mr. Stewart, was there anything in
13  the assignments you were given that you felt was
14  inappropriate and was given to you because of your
15  race?
16     A.  Could you clarify?
17     Q.  Well, I'm trying to understand if the
18  assignments you felt you were given as far as loss
19  prevention, who you were to watch, who you were to
20  apprehend was any different than the assignments given
21  to any other loss prevention specialist.
22     A.  No.
23     Q.  Mr. Breland, what did you do on a daily
24  basis when you were working part time at Fred Meyer
25  and being supervised by Bryan Stewart?  And what I'm

Page 58

1  trying to understand is, what was your responsibility?
2  What actions did you take?  How did your hours go?
3      A.  My responsibility was to apprehend external
4  theft from the time I arrived to work.
5      Q.  Now, by "external theft," what do you mean?
6      A.  Customers who were shoplifting within the
7  store.
8      Q.  And can you explain, please, what tools and
9  techniques you used to do that?
10     A.  Tools and techniques were the CCTV camera
11  system and the training from Phase I, Phase II.
12     Q.  Well, that tells me the type of -- the
13  characterization of your training.  But tell me what
14  you did.  What did you do on a daily basis is what I'm
15  trying to understand.
16     A.  Are you -- are you asking what I do when I
17  go out and stop people or --
18     Q.  Why don't you just do this:  Why don't you
19  take a typical day, when you come in, tell me what
20  your schedule is, what you do once you arrive at work
21  at Fred Meyer.
22     A.  I would come in, clock in, go to the office,
23  open up the e-mail system, read what notes may have
24  been sent to the store concerning our loss prevention
25  department.  I would then go sit on the cameras and

Page 59

1  view the floor for, you know -- I don't give an
2  estimated time -- just until I seen someone do
3  something that strike me as being strange that could
4  be a possible theft.  Then I would go out on the floor
5  and observe these individuals until either they exit
6  the store or they bought the merchandise or stole the
7  merchandise.  That was the norm for my days.
8      Q.  So you used both cameras and personal
9  observation to try and see if someone was stealing
10  products?
11     A.  Yes.
12     Q.  Okay.  When you're on the floor, how did you
13  do that, just peak around the corner or get up real
14  close or -- I'm just trying to understand what
15  techniques you used.
16     A.  Can't really describe my technique, because
17  we all have a different way of approaching an
18  individual that we may think is stealing.  But we use
19  close observation or distance observation.
20         MR. DICKENS:  Let's go off the record.
21         (Discussion off the record.)
22  BY MR. DICKENS:
23     Q.  Go back on the record.  Mr. Breland,
24  resuming here, is there any other court-related
25  litigation to which you're a party that we haven't

Page 60

1  discussed so far, such as bankruptcy?
2      A.  That's the only court.
3      Q.  Tell me, did you file for bankruptcy?
4      A.  Yes.
5      Q.  When?
6      A.  2002.  Summer, I believe.
7      Q.  Chapter XI or Chapter XIII, Chapter VII?
8  What was it, do you know?
9      A.  I'm not sure.  I believe it was Chapter --
10  whatever chapter where all the debts are discharged.
11     Q.  Was there a final adjudication of the
12  bankruptcy?
13     A.  Yes.
14     Q.  When?
15     A.  2003 sometime.  I'm not really sure when.
16     Q.  Was that before or after your divorce?
17     A.  It was before my divorce.
18     Q.  I don't want to go into great detail.  But
19  was there some particular large debt that prompted the
20  bankruptcy finally?
21     A.  Yes.  I had a home and a second mortgage on
22  it.
23     Q.  I'm not quite clear how that translates into
24  a big debt, other than people have second mortgages.
25  Could you not make the payment or what?

18 (Pages 57 to 60)

Page 65

1    Q.  Without names, et cetera, just numbers?
2    A.  Actually, it had names. It was a running
3  tally for each individual name of how many arrests
4  they got for that month.
5    Q.  I didn't express that correctly. The names
6  of the loss prevention people, but not the names of
7  the people arrested.
8    A.  Correct.
9    Q.  Now, we were talking earlier about the two
10  times when you got into discussions with Mr. Stewart
11  with regard to his attitude about racial matters. Do
12  you remember that discussion?
13    A.  Yes.
14    Q.  As I understood what you said earlier, you
15  never reported that to the store director or to anyone
16  higher up in loss prevention.
17    A.  Yes.
18    Q.  Is that correct?
19    A.  Yes.
20    Q.  Why not?
21    A.  Because he was a manager. And I felt that
22  being in a position, he should be able to understand
23  that his subordinates, when they're offended, be able
24  to correct his attitude. And I wanted, as a
25  subordinate, to give him the opportunity to do that.

Page 66

1    Q.  And who -- to whom did Mr. Stewart report
2  during the time he was your supervisor?
3    A.  He would report to the store director and
4  the regional loss prevention manager.
5    Q.  Who was the store director at that time?
6    A.  Had his name on the tip of my tongue. I
7  can't recall. It was -- have it at the tip of my
8  brain, but I can't think of his name at this point.
9    Q.  It was a he, not a she?
10    A.  It was a he.
11    Q.  Mike Blewett?
12    A.  Mike Blewett, yes.
13    Q.  Anybody else who was store director over
14  there?
15    A.  Dan Lanyon. Then Mike Johnson.
16    Q.  This is all at the Muldoon store?
17    A.  Yes.
18    Q.  How long was Mike Blewett the store
19  director?
20    A.  I don't even remember the exact -- the
21  length of time he was store director.
22    Q.  Was it just weeks or months after you got
23  there or years?
24    A.  I believe he was there, I want to say a year
25  or a little more than a year.

Page 67

1    Q.  And who replaced him?
2    A.  Dan Lanyon.
3    Q.  How long was he the store director?
4    A.  I don't really recall.
5    Q.  Okay. Who replaced him?
6    A.  I believe Mike Johnson.
7    Q.  Right. Who was the store director when your
8  employment ended at Fred Meyer at Muldoon?
9    A.  Mike Johnson.
10    Q.  Had the issues with Mr. Stewart changed
11  during the tenure of different store directors, such
12  as from Mike Blewett to Dan Lanyon to Mike Johnson?
13    A.  Could you clarify that?
14    Q.  Sure. With regard to your interaction with
15  Mr. Stewart and his comments, did that situation
16  change when the store directors changed? I mean, did
17  it get worse, did it get better or was it just the
18  same through all three store directors?
19    A.  To me, it basically stayed the same for a
20  bit, then got worse.
21    Q.  When did it get worse?
22    A.  Me and Mr. Stewart started going at each
23  other consistently around summer of 2004.
24    Q.  Is there anything that accelerated that
25  situation?

Page 68

1    A.  He called the office a couple of times while
2  intoxicated and made some racial comments, such as he
3  basically said that, you know, I don't think of you as
4  a nigger. I think that you're a good person. He said
5  discussions that were always about, you know, the
6  comments he made at work, how he felt about me. And
7  he didn't think I was a nigger. And that he would
8  never refer to me as a nigger. Then we got in some
9  profanity-laced arguments.
10    Q.  So he's not at work. He's out away from
11  work, drinking and calling in?
12    A.  Yes.
13    Q.  Did you report that to anyone at Fred Meyer,
14  like the store director or the regional loss
15  prevention manager?
16    A.  Not at that time.
17    Q.  Why not?
18    A.  Because it was a discussion I felt that we
19  had ironed out on top of, you know, that he was
20  intoxicated, too.
21    Q.  Now, on these occasions when Mr. Stewart was
22  calling in and was intoxicated, was he supposed to be
23  at work or was it his day off, as you understood it?
24    A.  He was at work that day. He would call
25  later on that night, around 7:00, 8:00 o'clock.

20 (Pages 65 to 68)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 69

1    Q.   After his shift had ended?
2    A.   Yes.
3    Q.   Were there any occasions when he was
4  supposed to be at work and he was not and he would
5  call in?
6    A.   Not that I can recall.
7    Q.   So how many times did you get these
8  intoxicated phone calls from Bryan Stewart?
9    A.   Three occasions.
10   Q.   Did you make any notes about any of those?
11   A.   I did not.
12   Q.   And they all were in the summer of 2004?
13   A.   No.  One was in the summer of 2004.  The
14  latter one -- the second one occurred in winter of
15  2004.  And then the last one occurred in February of
16  2005.
17   Q.   Okay.  Let's get our definitions down.  When
18  you say "winter of 2004," you mean what time frame?
19   A.   Actually, let me go back and correct that.
20   Q.   Sure.
21   A.   Both happened -- you know, I'm -- let me
22  recant those dates.  It was two thousand -- it was two
23  thousand -- summer of 2004.  One was in winter of
24  2004.  And the other was probably just before 2005.
25   Q.   So late 2004?

Page 70

1    A.   Yes.
2    Q.   All right.  Mr. Breland, what do you mean
3  when you say the winter of 2004?  Do you mean January,
4  February, March or some other time?
5    A.   Yes, January, February, March.
6    Q.   Okay.  Did you ever go out drinking with
7  Mr. Stewart?
8    A.   No.
9    Q.   Did you ever have a drink with him at all --
10   A.   Yes.
11   Q.   -- after work?  How many times?
12   A.   I can't recall.
13   Q.   More than once?
14   A.   More than once.
15   Q.   More than five times?
16   A.   About five times, maybe.
17   Q.   All right.  Where would you guys go?
18   A.   He would invite several LPs, that included
19  myself, over to his home.
20   Q.   How many times were you in Mr. Stewart's
21  house?
22   A.   I'd say probably about three or four times.
23   Q.   Any other time when you went to a local
24  tavern with him?
25   A.   No.  We never went out and had a drink.

Page 71

1    Q.   Okay.  Any other loss prevention employees
2  at the Muldoon store who were racial minorities other
3  than yourself?
4    A.   I was the only one.  Now, can you clarify
5  that?  Just during my whole tenure at --
6    Q.   No.  During the time you worked at Muldoon
7  and were supervised by Bryan Stewart, were there any
8  other loss prevention employees who were
9  non-Caucasian?
10   A.   Not that I can recall.
11   Q.   With regard to the Muldoon store during the
12  time that you worked there, were there other employees
13  who were non-Caucasian, whichever department they may
14  have been?
15   A.   They had several Black employees at Muldoon
16  store that worked in different departments, yes.
17   Q.   Had several employees who were Native
18  Alaskans, too, did you not, at the Muldoon store?
19   A.   Are you asking me what races we had at the
20  Muldoon store?
21   Q.   Yes, I am.
22   A.   Oh, okay.  Had several -- several, yeah.
23  Several Asians, several Natives, several Blacks,
24  several Hispanics.  I don't know the exact numbers.
25   Q.   Right.  But would you say as a general

Page 72

1  characterization, it was a very diverse store racially
2  for the employees at Fred Meyer at Muldoon?
3    A.   For that area, yes.
4    Q.   Tell me why you finally made a complaint
5  about Mr. Stewart and to whom you made it and when.
6    A.   I finally made a complaint because talking
7  with Mr. Stewart wasn't helping.  And I made the
8  complaint to Kevin Ruoff.
9    Q.   And how did you make it, orally or in
10  writing?
11   A.   In writing.
12   Q.   Did you talk to anyone first about that and
13  get any advice on how to make it, any help with
14  writing the complaint?
15   A.   No.
16   Q.   Were you married at that time?
17   A.   No.
18   Q.   How did you submit it to Mr. Ruoff then?
19   A.   At that time it was called Office Vision,
20  which is basically e-mail.
21   Q.   So you e-mailed Mr. Ruoff?
22   A.   Yes.
23   Q.   And did he respond?
24   A.   I believe he did respond.
25   Q.   Do you recall what the response said?

21 (Pages 69 to 72)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 73

1    A.  No, I can't recall.
2    Q.  And what did you -- go ahead.
3    A.  I think he just basically said thank you for
4  letting me know.
5    Q.  All right.  What happened at that time, if
6  anything, with regard to your OV to Mr. Ruoff?
7    A.  Are you stating the day that I sent it or --
8    Q.  After you sent it.
9    A.  After I sent it?
10    Q.  Yes.
11    A.  I was called the following day at my day job
12  by Mr. Stewart, who informed me that Mike Johnson let
13  him read the complaint word for word and that he was
14  kind of upset with the wording I used in my complaint,
15  that he basically wanted to reiterate his thoughts of
16  making the nigger comments did not apply to me, and
17  that he was sorry.
18    Q.  Was it a fairly short conversation like you
19  just related it?
20    A.  Yes.
21    Q.  And how did you respond?
22    A.  Basically, I just told him I didn't want to
23  discuss it at work.
24    Q.  Did you go to work that evening?
25    A.  Yes.

Page 74

1    Q.  Did you see Mr. Stewart?
2    A.  I believe Mr. Stewart was gone when I got
3  there.
4    Q.  Okay.  Did you at any time after that, after
5  the call from Mr. Stewart when you were working at
6  your State job, talk to him about the complaint in
7  person?
8    A.  No.  We didn't discuss the complaint.  He
9  mentioned it, that he just was -- didn't like the
10  wording of it.
11    Q.  Did he say what in the wording it was that
12  he did not like?
13    A.  That it's a disease.  He feels that he
14  doesn't have a disease.
15    Q.  Did you ever tell him you thought he had a
16  disease?
17    A.  I told him he did have a disease.
18    Q.  Did you tell him in the telephone
19  conversation or at some later time?
20    A.  It was, I want to say, a couple days after.
21    Q.  So a couple days after you two were together
22  in person at the office?
23    A.  Yes.
24    Q.  Okay.  Tell me about that discussion, as
25  best you can.

Page 75

1    A.  It was a short, sweet conversation.
2  Basically, he expressed he did not have a disease.  I
3  said:  You do have a disease.  I said:  You're -- you
4  discriminate by making the comments.  And he felt I
5  was wrong.  Got upset.  He left.
6    Q.  Any discussion with Mr. Stewart ever about
7  any disease in his family?
8    A.  No.
9    Q.  Any discussion with Mr. Stewart about his
10  father?
11    A.  The only thing that I know about his father
12  is that he kicked him out.  And basically, they were
13  having issues.
14    Q.  Well, let's clarify that.  Who kicked whom
15  out?
16    A.  Bryan Stewart kicked his father out.
17    Q.  The father was living with Mr. Stewart?
18    A.  Yes.
19    Q.  Where, in Anchorage?
20    A.  Yes.
21    Q.  Was Bryan Stewart married at the time that
22  you worked with him at the Muldoon store?
23    A.  No.
24    Q.  Did he have a woman that lived with him?
25    A.  Yes.

Page 76

1    Q.  Do you know who that was?
2    A.  I remember her first name as being Shannon.
3    Q.  Did she work at Fred Meyer?
4    A.  Yes.
5    Q.  Do you know where?
6    A.  I believe the Abbott location.
7    Q.  Any other discussions with Mr. Stewart after
8  you filed a complaint with Mr. Ruoff?
9    A.  When you say "discussions," with Mr. Stewart
10  or with anyone?
11    Q.  Let's just stick right now to Mr. Stewart.
12    A.  No.  Just the phone calls after he was
13  transferred.
14    Q.  All right.  Let's talk about those.  You
15  mean after he transferred to Dimond or after he left
16  Fred Meyer?
17    A.  After he transferred to Dimond.
18    Q.  After he transferred to Dimond.  When was
19  that?
20    A.  I believe they transferred Mr. Stewart in
21  August of 2004.
22    Q.  When did you file your complaint with
23  Mr. Ruoff?
24    A.  In March of 2004.
25    Q.  Had you done any follow-up review with

22 (Pages 73 to 76)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 89

1    Q.  It's not a very big office, is it?
2    A.  Correct.
3    Q.  Was there anything that you asked
4  Mr. Krieger to say to Mr. Ruoff that was not said?
5    A.  Not that I can recall.
6    Q.  Okay.  Did you hear the comments by
7  Mr. Ruoff because they were on the speaker phone or
8  were they not on a speaker phone?
9    A.  They was not on a speaker phone.
10    Q.  So let's make sure I understand the
11  scenario.  You're in the store director's office.
12  Mike Johnson's there.  Ryan Krieger's there.  And
13  you're there.  And Ryan Krieger calls Kevin Ruoff,
14  correct?
15    A.  Yes.
16    Q.  And in that office, you hear Mr. Krieger
17  explain to Mr. Ruoff what has occurred with regard to
18  the incident that happened on February 14, 2005,
19  correct?
20    A.  Correct.
21    Q.  And did you at any time tell Mr. Krieger
22  that there had been telling some additional information he should
23  have been telling Kevin Ruoff before Kevin Ruoff made
24  any decision regarding your situation?
25    A.  Not that I can recall.

Page 90

1    Q.  Had you already talked to Mr. Krieger about
2  your view of what had occurred?
3    A.  Mr. Krieger asked me about what happened.
4    Q.  And you had told him your version of what
5  had happened, correct?
6    A.  Yes.
7    Q.  So as a result of your talking with Kevin
8  Krieger and telling him your version of what happened,
9  do you know if Mr. Krieger talked to anybody else?
10    A.  Not sure.
11    Q.  Was the other person involved Paul Kodiak?
12    A.  Yes.
13    Q.  Do you know, did Mr. Krieger tell you he
14  talked to Paul Kodiak?
15    A.  He did not explain that he talked to Paul
16  Kodiak.
17    Q.  Did Mr. Krieger tell you any other
18  investigation he had done with regard to the incidents
19  that occurred on February 14th, 2005?
20    A.  The only thing, he told me that he had a
21  video.
22    Q.  So how was your relationship with Paul --
23  with Ryan Krieger?
24    A.  I believe our relationship was pretty good.
25    Q.  All right.  So you've got a supervisor with

Page 91

1  whom you have a good relationship.  He's done an
2  investigation.  He calls Kevin Ruoff.  And as a result
3  of that call or at the end of that, you're advised
4  that your employment was terminated.
5    A.  Correct.
6    Q.  Right?  And as I hear what you've told me,
7  your contention is that Kevin Ruoff should have done
8  something additional in the way of the investigation.
9    A.  I felt that way, yes.
10    Q.  And what do you think he should have done in
11  addition to what was done?
12    A.  Well, after I was terminated, I spoke with
13  Mr. Krieger.  He stated that he will send the copy of
14  the video and my statement to Kevin Ruoff in
15  Washington.  And if Kevin Ruoff would have viewed the
16  video and did an investigation into the matter, he
17  would have known that that incident was not my fault.
18    Q.  Okay.  Are you then faulting Kevin Ruoff for
19  not taking additional time to either review the video
20  and your statement or even if he did, simply not
21  agreeing with you?
22    A.  I wouldn't say that I'm faulting him.
23    Q.  You just think his decision wasn't that
24  correct in view of the evidence as you saw it.
25    A.  Yes.

Page 92

1    Q.  Had you had any prior issues with Kevin
2  Ruoff?
3    A.  No.
4    Q.  In fact, you and he had gotten along fairly
5  well from what you could ascertain, given your
6  position and his, did you not?
7    A.  I couldn't say that we got along.  I
8  disagreed with Kevin's Ruoff's investigation into
9  Bryan Stewart and the complaint.
10    Q.  Do you have any reason to believe that the
11  Bryan Stewart situation played any role in Kevin
12  Ruoff's decision to terminate you on February 15th,
13  2005?
14    A.  Yes.
15    Q.  Why?
16    A.  The first filing of the complaint was not
17  properly investigated.
18    Q.  In what sense was it not properly
19  investigated, not timely or not properly or not
20  completely or what?
21    A.  All of the above.
22    Q.  Well, tell me what you think should have
23  been done.
24    A.  It's not my place to say what I think could
25  have been done.  There are policies that Fred Meyers

26 (Pages 89 to 92)

BRELAND v FRED MEYERS STORE                                JAMES BRELAND
                                                              6/27/2006

Page 109

1 the line above your date of birth. Do you see that?
2     A. I see Apprentice Credit Hours, yes.
3     Q. I can't tell if it's 4,000 or 4600. But
4 whatever it is, do you understand what that
5 represents?
6     A. No, I do not.
7        MR. DICKENS: Let's stop for a minute here.
8     (Lunch recess, 11:36 a.m. - 12:56 p.m.)
9     (Exhibit 2 was marked.)
10 BY MR. DICKENS:
11    Q. Mr. Breland, when you were working at the
12 Muldoon store and Bryan Stewart was your supervisor,
13 were you still able to do your job?
14    A. To a degree, yes.
15    Q. Well, to a degree. To a degree were you not
16 able to do your job?
17    A. I would say that in a -- in the everyday
18 transaction of doing my job, just the difficulty of
19 dealing with Mr. Stewart kind of got to me a little
20 bit.
21    Q. You mean just your reaction to Mr. Stewart?
22    A. My reaction to Mr. Stewart, my mental
23 thought.
24    Q. Okay. However, did the issues of
25 Mr. Stewart prevent you from fully and completely

Page 110

1 doing your job as a loss prevention specialist?
2     A. Yes.
3     Q. In what way?
4     A. I didn't want to do my job to help him
5 basically bolster his statistics. It was just one of
6 those situations where his racial views kind of
7 demotivated me.
8     Q. As I recall the records, though, you still
9 did very well as far as arrests compared to other
10 people, did you not?
11    A. Yes.
12    Q. Did you outperform the other loss prevention
13 specialists for the amount of time you worked?
14    A. Yes.
15    Q. From looking at just a quantitative review
16 of your performance, did you see anyone else who
17 performed at a higher level than you did even though
18 Bryan Stewart was your supervisor?
19    A. No.
20    Q. So whatever reservations you had about
21 working with him, you were able to put those aside and
22 then do your job, after which you were paid by Fred
23 Meyer.
24    A. Because I was personally motivated to be the
25 best.

Page 111

1     Q. All right. We talked about this briefly
2 earlier. But looking at some of your evaluations, you
3 said that you didn't want a long-term career with Fred
4 Meyer.
5     A. As a full-time loss prevention specialist,
6 no.
7     Q. Okay. Have you taken any action to find a
8 full-time position other than your current position
9 with the State?
10    A. I'm not clear on the question.
11    Q. Sure. Let's just do it this way: Since
12 January 1, 2005, have you looked or applied with any
13 other employer for a full-time position?
14    A. As far as State of Alaska?
15    Q. No. Anyplace. I mean, any employer outside
16 the State of Alaska, your current employer.
17    A. No.
18    Q. So you haven't gone to Exxon and applied.
19 You haven't gone to BP and applied or anyplace else
20 like that.
21    A. No.
22    Q. Is it your current contemplation that you
23 will pursue your career with the State of Alaska and
24 retire there?
25    A. No.

Page 112

1     Q. What is your current thinking about your
2 long-term employment goals?
3     A. My current thinking about my long-term
4 employment is to become a part of law enforcement.
5     Q. Have you taken any classes for that?
6     A. I haven't taken any classes, per se, for it,
7 no.
8     Q. Do you have any plans to take law
9 enforcement classes or police science or anything like
10 that?
11    A. I do plan on going back to college to get a
12 criminal justice degree.
13    Q. Any idea how you're going to finance that?
14    A. It will probably be financed through V.A. to
15 a degree, because of disability.
16    Q. You have a disability from the V.A.?
17    A. Yes.
18    Q. What is the disability?
19    A. Hearing.
20    Q. Okay. And what percentage of your hearing
21 has been affected?
22    A. Ten percent.
23    Q. Ten percent. One ear or both ear?
24    A. One ear.
25    Q. Okay. I need to ask, did you get that from

31 (Pages 109 to 112)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 117

1    Q.   Okay.  Now, the next paragraph says, quote,
2  "All associates have a responsibility to maintain the
3  workplace free of harassment and to report such
4  misconduct when it occurs," end quote.  Do you concur
5  that as an employee, you had that responsibility to
6  stand up for your rights?
7    A.   Yes.  But I would also like to say with that
8  being said, while working for a manager, trying to
9  take care of a situation at a lower level with the
10 offending manager, I think should be important to know
11 that you are taking care of it.
12   Q.   Okay.  I'll move to strike the last comment
13 as not being responsive to the question.  But that's
14 fine.  We'll go ahead.
15        By the way, when you got the Employee
16 Handbook from Fred Meyer, did you ever sit down and
17 read it?
18   A.   Portions of it.  Not all of it.
19   Q.   And why did you only read portions of it?
20   A.   Because I was told that most of this doesn't
21 apply to loss prevention.
22   Q.   Who told you that?
23   A.   At the time, the hiring manager.
24   Q.   Does anyone ever suggest that these sections
25 on non-discrimination and prohibitions against

Page 118

1  harassment don't apply to loss prevention?
2    A.   Are you -- clarify the question again.
3    Q.   Did anyone ever tell you that the sections
4  in the Employee Handbook prohibiting harassment
5  because of race or color do not apply to the Loss
6  Prevention Department?
7    A.   No.
8    Q.   Were you aware that there was a procedure
9  for reporting a complaint about improper harassment by
10 a supervisor?
11   A.   Yes.
12   Q.   And do you think you timely and properly
13 complied with those reporting steps?
14   A.   Yes.
15   Q.   All right.  So you didn't reach a conclusion
16 in your mind that you were being improperly addressed
17 by your supervisor until such time as you filed the
18 written complaint with Kevin Ruoff; is that correct?
19   A.   Could you clarify that?
20   Q.   No.
21   A.   You stated "improperly"?
22        MR. DICKENS:  Let me have it read back.
23 Would you read that back, please?
24        (Record read.)
25        THE WITNESS:  No, that's not correct.

Page 119

1  BY MR. DICKENS:
2    Q.   When did you think you were being improperly
3  addressed or subjected to statements by Bryan Stewart?
4    A.   After trying to work out the issues at the
5  lower level with Bryan Stewart and seeing that the
6  situation wasn't getting any better, that's when I
7  felt.
8    Q.   All right.  If you look on the page that's
9  200125, that's about reporting a complaint.  And it
10 says, quote, if you believe you're being harassed by a
11 supervisor because of your race, end quote, the first
12 step was to clearly and firmly tell the person who was
13 harassing you that his behavior is unwelcome and
14 should stop at once.  Did you do that?
15   A.   Yes.
16   Q.   And when did you do that, in your mind?
17   A.   The first talk that we had, me and
18 Mr. Stewart had, in 2002.
19   Q.   So that was when in 2002?
20   A.   I'm not exactly sure.  I want to say around
21 August.
22   Q.   So shortly after you transferred to Muldoon?
23   A.   Shortly after.
24   Q.   So then you didn't think his behavior was an
25 issue with you such that you needed to go to the next

Page 120

1  step until what, March of 2004?
2    A.   It was a recurring experience that I felt
3  that I could try and discuss with Mr. Stewart.  And I
4  wanted to give him every opportunity to correct his
5  behavior.
6    Q.   So you gave him almost two years, right?
7        I'm sorry.  You have to respond audibly.
8    A.   Yes.
9    Q.   Now, the next step here is to write a
10 statement about the incident and what you did to stop
11 it.  And is that what you think you did in March of
12 2004?
13   A.   Yes.
14   Q.   All right.  So you're telling me Step 1, you
15 addressed in the summer of 2002.  And you didn't get
16 to the second step then until March of 2004.
17   A.   Yes.
18   Q.   Okay.  If you note on the next page after
19 this, it says, quote, "If you are uncomfortable
20 telling the person who is harassing you to stop, then
21 proceed to the following reporting procedure," end
22 quote.  You see that?
23   A.   No.
24   Q.   It's the very top left.
25   A.   Okay.

33 (Pages 117 to 120)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 121

1    Q.  See that?
2    A.  Yes.
3    Q.  So having this Employee Handbook, you knew
4  that you could have gone to someone else, either
5  management or Employee Relations, and broached your
6  complaint and concerns, right?
7    A.  Yes.
8    Q.  Okay.  And that did not occur until
9  March 2004, right?
10    A.  Correct.
11    Q.  Okay.  Did you ever, after filing your
12  initial complaint with Kevin Ruoff, go to the vice
13  president of Employee Relations with any complaint?
14    A.  No, I did not.  Because I felt Kevin Ruoff
15  would take care of it as he stated in the reply in his
16  e-mail.
17    Q.  And do you see in that same page under
18  Step 3, the second paragraph, quote, "Fred Meyer does
19  not tolerate any form of retaliation by supervisors
20  against associates using this procedure," end quote?
21    A.  Step 3?
22    Q.  Second paragraph.
23    A.  Yes.
24    Q.  Okay.  Would you concur that that's an
25  appropriate policy for a company like Fred Meyer?

Page 122

1    A.  Yes.
2    Q.  In your complaint, you are alleging
3  retaliation, are you not?
4    A.  Yes.
5    Q.  What is the retaliation that you were
6  alleging?
7    A.  I'm alleging retaliation that Kevin Ruoff
8  failed to follow up on my first initial complaint.
9  And that the following complaint, it was sent to Scott
10  Bringhurst, his boss.  Kevin Ruoff retaliated against
11  me on a incident that he clearly did not investigate
12  the facts and terminated me based off of the second
13  complaint to his boss.
14    Q.  Don't you see some inconsistency there?
15  Because shortly before Mr. Ruoff made the difficult
16  decision regarding the February 14 incident, he had
17  just named you the loss prevention specialist of the
18  year, hadn't he?
19    A.  I wouldn't say he named me the loss
20  prevention specialist of the year.  It was just he
21  gave me notice, because there -- if you look at what
22  he wrote, it was not saying that I was loss prevention
23  special -- he was just basically saying that two
24  individuals in Alaska were recognized for superior
25  work performance.

Page 123

1    Q.  Okay.  Whichever slant you want to put on
2  it.  But isn't it true that even under your
3  interpretation, you were recognized just shortly
4  before February 15, 2005 for having done an
5  outstanding job?
6    A.  Yes.  Because it was well-deserved.
7    Q.  Do you think that finding really good
8  loss prevention people is easy to do?
9    A.  No.
10    Q.  So a person who would like to have really a
11  good compliment of loss prevention specialists should
12  be very careful before he makes decisions to let them
13  go, don't you think?
14    A.  I would believe so.
15    Q.  The recognition of your contributions for
16  2004, how was that advertised within the company, if
17  it was?
18    A.  Could you clarify?
19    Q.  Sure.  You've just been talking about Kevin
20  Ruoff saying you were one of the two outstanding loss
21  prevention specialists in Alaska, right?
22    A.  Yes.
23    Q.  And how was that information, if it was,
24  made known to other people in the community or at Fred
25  Meyer?

Page 124

1    A.  Through e-mail.
2    Q.  So everyone in the company got a notice that
3  James Breland had done an outstanding job?
4    A.  Within Alaska.
5    MR. DICKENS:  Within Alaska.  All right.
6    Would you mark this section?
7    (Exhibit 3 was marked.)
8  BY MR. DICKENS:
9    Q.  Mr. Breland, I'm going to hand you what
10  we've marked as Exhibit 3 to your deposition.  And I'm
11  going to represent to you that that is selected
12  portions of the Fred Meyer Employee Handbook, revised
13  as of January 2002.
14    And it's similar language to Exhibit 2.  But
15  my question for you is, simply looking at a copy of
16  the first page and the material inside, did you also
17  get a copy of this handbook in addition to the one we
18  marked as Exhibit 2?
19    A.  Yes.
20    Q.  Did you read this one when you got it?
21    A.  No.
22    Q.  Why not?
23    A.  Probably because at the time I was a
24  temporary employee.
25    Q.  Well, between Exhibit 2 and Exhibit 3, do

34 (Pages 121 to 124)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 173

1  at the time by you?

2      A.  It was a true and accurate statement based

3  on dealing with Mr. Stewart over the time span that

4  changed my views.

5      Q.  Wait a minute.  Let me get you to answer the

6  question I asked.

7      A.  Okay.

8      Q.  At the time you wrote what I just quoted,

9  that Stewart was a decent person with some issues

10  concerning race but that he had not directly called or

11  addressed you in a derogatory manner concerning race,

12  was that a true and accurate statement at the time you

13  wrote this on March 22, 2004?

14      A.  Yes.

15      Q.  So at that point in time, you had worked

16  under Stewart's supervision since July of 2002?

17      A.  Yes.

18      Q.  Okay.  Next sentence, you go on to say,

19  quote, "I really feel that LPM Stewart tries and he's

20  genuinely a decent person that I do get along with

21  despite the fact he's made derogatory/inappropriate

22  comments around me," unquote.

23          Was that a true and accurate statement that

24  time?

25      A.  Where is that located?

Page 174

1      Q.  It's in the middle -- it's the second

2  sentence in the next paragraph.

3      A.  Yes.

4      Q.  Okay.  And you go on to say that the times

5  Stewart's made a derogatory or inappropriate comment,

6  your observation has been that he thought you were

7  someplace else and not within hearing distance.

8      A.  His observation was he thought I was out of

9  the office and not within hearing distance, right.

10      Q.  Now, as I read this, Mr. Breland, what I get

11  from this -- and I'm trying to understand if this is

12  what you're trying to say -- is that you and Stewart

13  don't have an issue as such because he's not

14  addressing you in a derogatory manner.  But when

15  you're not within earshot, he's making what you think

16  are racially inappropriate comments.

17      A.  Me and Stewart had issues regarding race,

18  just the overall general issue, because of things that

19  he would say about one's race.  And when we got into

20  arguments, he expressed that he doesn't consider me a

21  nigger and that he thinks I'm a good guy.  And

22  basically, we just had a good working relationship,

23  and that was it.

24      Q.  All right.  So he never called you

25  personally a derogatory term to your face, did he?

Page 175

1      A.  Indirectly.

2      Q.  Answer my question.  Did he directly?

3      A.  No.  He did not call me a nigger directly.

4      Q.  Okay.  And he didn't address you personally

5  in a derogatory manner concerning race, did he?

6      A.  Could you clarify that?

7      Q.  I'm just reading what you wrote here.  It

8  says he has not addressed me "in a derogatory matter

9  concerning race."

10      A.  Not concerning race.

11      Q.  Now, did Tony Bonini tell you he transferred

12  just because he got tired of the comments that Stewart

13  was making?

14      A.  Tony Bonini expressed that partially -- a

15  partial reason for transferring was because of his

16  comments and working with Mr. Stewart, yes.

17      Q.  What was the other reason?

18      A.  Because he was moving to the other side of

19  town.

20      Q.  He wanted a short commute?

21      A.  Yes.

22      Q.  That's when he took the job over with the

23  Abbott store?

24      A.  Dimond, I believe.

25      Q.  Dimond store.  All right.

Page 176

1      A.  Yes.

2      Q.  Well, Mr. Breland, after I read this -- and

3  I've read it several times now -- what were you asking

4  Mr. Ruoff to do?

5      A.  Basically, stop the harassment and comments

6  being made in the workplace.

7      Q.  Now wait a minute.  You just told me he

8  didn't address any comments to you.  You thought he

9  was a decent guy.  You guys got along well.  What's

10  the harassment of James Breland that we're concerned

11  about at this point in time, March 22, 2004?

12      A.  The hearing of constant racial remarks made,

13  even though not addressed to me, still offended me in

14  the workplace.

15      Q.  All right.  You want to point to where in

16  this document you asked Mr. Ruoff to take certain

17  action against Mr. Stewart?

18      A.  My personal opinion I think is at the end

19  here where I said I'll close with Mr. Ruoff.

20  "Mr. Stewart has a disease and the type of disease

21  that Mr. Stewart has for the type of job that we do

22  can be very detrimental to those who work for him and

23  around him. As an LPM you are responsible for

24  training, directing, and molding" loss prevention

25  specialists. "A new LPS can be very impressionable

47 (Pages 173 to 176)

Page 177

1  and with this job a person's view can be obscured when
2  being trained, directed or molded by someone with the
3  disease that LPM Stewart has. In our job we deal with
4  a variety of people from different nationalities,"
5  race -- religion, race, et cetera. This is where LPM
6  Stewart's view can be detrimental to the crew itself
7  which it has already affected, the perception of the
8  store and the people that work within it. The
9  customers that shop at the store, et cetera. It has a
10  domino effect especially concerning that we do
11  security. So I shouldn't have to be transferred or
12  inconvenience myself in order to have a pleasant work
13  environment.
14       At that point, I'm communicating to him that
15  there is a problem concerning race and that the
16  environment is hostile.
17       Q.  Well, I guess it depends on one's
18  perspective on it. You've gone to work every day.
19  You haven't told anyone that you're unable to go to
20  work at this point in time, right?
21       A.  Correct.
22       Q.  And the position hasn't been so unbearable
23  that you had to seek counseling at that point in time
24  either, correct?
25       A.  Correct.

Page 178

1       Q.  You just read the last paragraph. But I
2  want you to point to something that said: Mr. Ruoff,
3  here's what I want you to do. I want you to
4  investigate. I want you to suspend. I want you to
5  fire. I want you to transfer. I don't see anything
6  that you're suggesting beyond this is an issue. And
7  I'm just wondering if I missed something here.
8       A.  I think the whole write-up expresses the
9  issue.
10       Q.  Which is the inappropriate comments.
11       A.  Which should have been investigated. I
12  can't tell my superiors what to do when you get a
13  complaint.
14       Q.  All right. So it's your position that you
15  can apprise them of the problem, but then how they
16  address it is part of their responsibility; is that
17  what I understand you to be suggesting?
18       A.  Yes.
19       Q.  Okay. Now, do you think that when they
20  finally do act and do something that then you should
21  come forward and tell them they haven't done enough at
22  that point in time? Or are you simply apprising them
23  of the problem, you should accept what they've done
24  and move on?
25       A.  If a manager such as Mr. Stewart continued,

Page 179

1  after this complaint was filed with Kevin Ruoff,
2  making remarks in the workplace, then whatever they
3  did was not effective. And that was -- that's my
4  opinion in the whole situation.
5       Q.  So after you filed this -- I know you say it
6  goes on a while before it gets resolved -- but the
7  action taken ultimately with regard to this complaint
8  is that Bryan Stewart's transferred to another
9  location; isn't that right?
10       A.  I don't know the reason why he was actually
11  transferred, because he was transferred five to six
12  months after this complaint was filed.
13       Q.  But you told me earlier you believe he was
14  transferred after you made a second follow-up to
15  Mr. Ruoff's superior, Mr. Bringhurst.
16       A.  No. I communicated, if I'm correct, that I
17  believe -- my personal opinion was because of the
18  personal relationship that him and Mr. Johnson had at
19  the store.
20       Q.  This doesn't make sense in the context of my
21  question. Let me try it again.
22       A.  Okay.
23       Q.  Isn't it true that after you filed this
24  complaint, sometime later, a few months, Mr. Stewart
25  was transferred to a different store?

Page 180

1       A.  Are you asking me was he transferred because
2  of my complaint?
3       Q.  No, no. I'm just asking -- not the
4  reason -- isn't it a fact he transferred to a
5  different store?
6       A.  He was transferred to a different store.
7       Q.  Okay. And then a supervisor with whom you
8  had a prior good relationship, Ryan Krieger, became
9  the loss prevention manager at the Muldoon store.
10       A.  Correct.
11       Q.  Did you ever have any problems with
12  Mr. Krieger?
13       A.  No.
14       Q.  The supervisors for whom you worked, how
15  does he rate, top, bottom, just okay?
16       A.  Mr. Krieger?
17       Q.  Yes.
18       A.  I consider Mr. Krieger to be top.
19       MR. DICKENS: Would you mark that, please?
20  This is 21.
21       (Exhibit 21 was marked.)
22  BY MR. DICKENS:
23       Q.  Mr. Breland, for the record, what is
24  Exhibit 21?
25       A.  An OV to Kevin Ruoff.

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 197

1 been Saturday. So you were working Saturdays at that
2 time?
3    A. Yes.
4    Q. How long did it take you to prepare this
5 document?
6    A. About an hour.
7    Q. Okay. And what was the purpose of this
8 document?
9    A. It was a follow-up complaint to my
10 subsequent complaint in March of '04.
11    Q. Well, I'm a little confused here. In your
12 opening paragraph, you say, quote, "In April 2004 a
13 complaint of Mr. Stewart making racial slurs,"
14 et cetera, "was sent to you via office vision," end
15 quote. We've looked at the one of March 22, 2004. Is
16 that the one you meant or was there another one in
17 April?
18    A. Actually, I was referring to the March 22nd,
19 2004 complaint. Just off by a week.
20    Q. Okay. Now, something we hadn't discussed
21 earlier, but in your second paragraph, you said
22 Mr. Stewart read the complaint and then called you at
23 your day job to apologize. Is that the one where you
24 said you were at work and didn't want to talk about
25 it?

Page 198

1    A. Yes.
2    Q. What exactly did Mr. Stewart say when he
3 called?
4    A. I can't recall the exact words. But the
5 gist of it was he was upset about the wording, about
6 the wording concerning disease. And that he wanted to
7 apologize for making the racial slurs and
8 inappropriate racial comments.
9    Q. Did he actually say -- admit that he had
10 made racial slurs and inappropriate racial comments to
11 you?
12    A. Yes.
13    Q. All right. And is it your testimony that
14 Mike Johnson talked to you that next day and said that
15 Mr. Stewart had admitted to him he'd made racial slurs
16 and inappropriate racial comments?
17    A. Yes.
18    Q. Did you make a note of either your
19 discussion with Bryan Stewart on or about March 23,
20 2004 or your discussion with Mike Johnson about that
21 same time?
22    A. I did not make any notes concerning the
23 phone call from Bryan Stewart. And I didn't make any
24 notes concerning a meeting with Mr. Johnson.
25    Q. What did you and your supervisor at the

Page 199

1 State of Alaska discuss on April 15th, 2006 over the
2 lunch hour?
3    A. I didn't talk to my supervisor at lunch on
4 April 15th, 2006.
5    Q. How do you know?
6    A. Because I know I don't talk to my supervisor
7 at lunch. She's at lunch the same time I'm at lunch.
8    Q. What did you and she talk about at 3:00
9 o'clock that day?
10    A. We said bye to one another as I was leaving
11 for the day.
12    Q. That's it?
13    A. That's it.
14    Q. Other than knowing you didn't have lunch
15 with her that day and said goodbye at 3:00 o'clock,
16 have a recollection of any other discussions that day?
17    A. No.
18    Q. Okay. Did you ever file a complaint of
19 discrimination against your supervisor at the State of
20 Alaska?
21    A. Yes.
22    Q. Is that the current one or the one that was
23 resolved earlier?
24    A. The one that was resolved earlier.
25    Q. Why did you copy Scott Bringhurst on this?

Page 200

1    A. Because Kevin Ruoff did not address the
2 first complaint. And I felt that his supervisor
3 should get a copy of my follow-up complaint.
4    Q. Why didn't you address it earlier with
5 Mr. Ruoff? Why didn't you give Kevin a call? You
6 filed that initial one in March 2004. Why didn't you
7 call Kevin in May and say: Kevin, what's going on?
8    A. Because I had that one conversation with
9 Mike Johnson who stated that they could take care of
10 the issue.
11    Q. Then why didn't you go talk to Mike Johnson
12 in May and say: Mike, where are we? What's going on?
13    A. Because Mike Johnson said he would follow up
14 with me on the situation, but never got back to me.
15    Q. Then why didn't you initiate and say: Mike,
16 what's the follow-up? What have you done?
17    A. I left that up to Mike and Mr. Ruoff.
18    Q. Well, Mike Johnson's office was just down
19 the hall from the loss prevention office, wasn't it?
20    A. Correct.
21    Q. How many steps, ten?
22    A. One.
23    Q. One? One. Don't you think it would have
24 been easier to talk to Mike rather than to several
25 months later write this long letter to Kevin Ruoff and

53 (Pages 197 to 200)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 201

1  a copy to Scott Bringhurst?
2      A.  No.  Because Mike Johnson and Stewart had a
3  personal relationship that I believe clouded his
4  judgment.
5      Q.  All right.  Was the personal relationship,
6  which you describe in the last paragraph on this page,
7  the fishing and on occasions would hang out and go
8  house hunting?
9      A.  Are you asking me a question?
10      Q.  Yes.  Now, the last paragraph on the first
11  page.
12      A.  Okay.
13      Q.  The last paragraph on the first page, you
14  refer to Mike Johnson.  And what you say is, quote,
15  "an inappropriate relationship between the Store
16  Director and the Loss Prevention Manager.  Mr. Johnson
17  and Mr. Stewart befriended one another and would
18  hangout on occasions go house hunting or fishing which
19  in turn distorted Mr. Johnson's ability to be
20  impartial concerning this complaint," end quote.
21          So I'm asking you, is the hanging out on
22  occasion, going house hunting and fishing the
23  inappropriate relationship to which you're referring?
24      A.  Correct.
25      Q.  Can you tell me there's a Fred Meyer policy

Page 202

1  that managers should not associate with coworkers
2  outside the workplace?
3      A.  There is a loss prevention policy that
4  states that, yes.
5      Q.  Wait a minute.  I'm not clear.  Loss
6  prevention policy says who shouldn't do what?
7      A.  The loss prevention policy states that loss
8  prevention personnel within that particular store
9  should not and cannot be allowed to hang out with
10  workers in that particular store, from a store
11  director on down, no matter what.
12      Q.  Well, at those Christmas parties and other
13  events that you went to at Bryan Stewart's house, were
14  there any people there who were not from loss
15  prevention?
16      A.  No.  Everyone was from loss prevention
17  except for the girlfriends of all the LPs.
18      Q.  As I recall the girlfriends, some of them
19  were employees of the store in other departments.
20      A.  Some of them were employees of the store at
21  other stores, not that particular store.
22      Q.  In the middle of that last paragraph in the
23  first page is a word I've never seen before.  I don't
24  know if it's something I missed.  It's "silicate."
25  "Mr. Stewart would silicate the help of the RTS."  Is

Page 203

1  that simply a misspelling of "solicit" or something?
2      A.  Correct.
3      Q.  Oh, all right.  Okay.  Now, in the next
4  page, the last paragraph, you say that you felt an
5  independent agency should look into your complaint.
6  Who did you have in mind?
7      A.  Alaska Commission on Human Rights.
8      Q.  I don't see a reference to that in this
9  particular document.  Is there one I missed?
10      A.  No.  You asked the question, right, who was
11  I referring to?
12      Q.  Yes.
13      A.  And I'm just letting you know that that's
14  what I was referring to when I made the general
15  comment.
16      Q.  Did you so advise Mr. Ruoff at any time
17  that's what you meant?
18      A.  No.
19      Q.  Had you at this time filed a charge with the
20  Alaska Commission for Human Rights?
21      A.  No.
22      Q.  Did you tell anyone else at Fred Meyer that
23  you thought the Alaska State Commission for Human
24  Rights should look into the situation with Bryan
25  Stewart?

Page 204

1      A.  I don't recall telling anyone else.
2      Q.  All right.  As a result of this letter, what
3  happened?
4      A.  As a result of this letter, I had a meeting
5  with Mike Johnson.  And after the meeting with Mike
6  Johnson, Kevin Ruoff flew to Alaska.
7      Q.  When was that?
8      A.  Don't know -- are you asking me when I had a
9  meeting with Mike Johnson or when Kevin Ruoff flew to
10  Alaska?
11      Q.  Let's try the latter.  When did Kevin Ruoff
12  fly to Alaska?
13      A.  I believe at the end of November 2004.
14      Q.  Okay.  Now, the next page in this exhibit,
15  page 19 by your stamp number, looks like you got an
16  e-mail from Kevin Ruoff asking you to call him when
17  you got in.  Did you do that on November 3, 2004?
18      A.  Yes.
19      Q.  And what was that about?
20      A.  That he asked me about the complaint, the
21  follow-up complaint I had sent him via e-mail.
22      Q.  Did you and he have a discussion that day?
23      A.  It was a brief discussion of what he -- why
24  he felt the situation wasn't taken care of.
25      Q.  I'm sorry.  I wasn't clear.  That he said --

54 (Pages 201 to 204)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 205

1     A.  It was a brief discussion of why I felt the
2  complaint wasn't taken care of.
3     Q.  And what did Mr. Ruoff say?
4     A.  He stated that he did not know that the
5  situation wasn't taken care of.
6     Q.  Did he say what he was going to do?
7     A.  He did not.
8     Q.  Okay.  Next page, did you get a copy of that
9  e-mail from -- what is it -- Mike Johnson?
10    A.  I did.
11    Q.  Okay.  And now at this time, had Bryan
12 Stewart transferred to the Dimond store?
13    A.  Correct.
14    Q.  He'd been gone several months, hadn't he?
15    A.  Yes.
16    Q.  Okay.  So you filed a complaint in
17 March 2004.  Couple months later, Stewart transfers to
18 Dimond.  And then couple months after that, you're
19 still following up on the complaint.  Do I have that
20 sequence right?
21    A.  Yes.
22    Q.  So what was there to resolve after Stewart
23 had transferred?
24    A.  My complaint.
25    Q.  Well, I'm asking, what in your complaint did

Page 206

1  you think needed to be addressed once Stewart was out
2  of your store where you were working?
3     A.  That did not stop Mr. Stewart from making
4  the racial remarks and comments in the workplace.
5     Q.  Did you go over to Dimond and listen to him?
6     A.  No.
7     Q.  How do you know that he was doing it?
8     A.  The loss prevention personnel over there
9  spoke with me and stated that Mr. Stewart was still
10 making racist comments.
11    Q.  Okay.  Your issue had been addressed.  You
12 just thought what, something different should have
13 been done with Stewart besides transferring him?
14    A.  I don't believe my issue was addressed.
15    Q.  What was not addressed?
16    A.  Mr. Stewart, racist comments.
17    Q.  All right.  Wasn't that someone else's
18 problem at that point in time at the Dimond store?
19    A.  No, not necessarily.
20    Q.  I thought you said earlier that you weren't
21 going to seek to impose your opinion on what
22 management did in response to your March 22, 2004
23 complaint.
24    A.  When you say "impose my opinion" --
25    Q.  That's what you said.  I asked you if you

Page 207

1  were going to dictate what management did, and you
2  said no.  Now, are you telling me that's not right,
3  you wanted to dictate what management did?
4     A.  I'm not dictating what management did.  I
5  just didn't agree with the handling of my complaint.
6     Q.  Okay.  All right.  What's your best
7  recollection as to when Stewart went to the Dimond
8  store in 2004?
9     A.  When you're asking me for recollection, what
10 specific are you asking?
11    Q.  What is your best memory of the date when
12 Bryan Stewart transferred from the Muldoon store to
13 the Dimond store?
14    A.  August 2004.  I'm not sure what date.
15    Q.  Okay.  Did you meet then with Ryan Krieger
16 and Mike Johnson after your letter we marked as
17 Exhibit 25?
18    A.  Did I have a meeting with Mike Johnson and
19 Ryan Krieger?
20    Q.  Yes.
21    A.  Yes, I did.
22    Q.  And those last two pages talk about getting
23 together, the three of you, on Friday or Saturday.  Do
24 you know how quickly that meeting occurred?
25    A.  I believe it happened on Saturday, because I

Page 208

1  did not work on that particular Friday, or Fridays.
2     Q.  Okay.  Where did the meeting on Saturday
3  take place?
4     A.  The meeting took place in Mike Johnson's
5  office.
6     Q.  And who was present?
7     A.  Myself, Ryan Krieger and Mike Johnson.
8     Q.  And what was discussed?
9     A.  My complaint.
10    Q.  Just take me through it.  Tell me what you
11 said and what they said in response.
12    A.  I can't recall word for word.  But me and
13 Mr. Johnson talked about the March complaint.  And he
14 felt that he thought the issue was taken care of.  And
15 I explained that the issue was not taken care of.  And
16 he asked me why not.  And I explained why, which was
17 his personal relationship with Bryan Stewart.
18    Q.  Wait a minute.  Stewart's no longer in the
19 building.  So what issue is there with the personal
20 relationship between Mike Johnson and Bryan Stewart?
21    A.  The issue is when I first filed my
22 complaint, Mr. Johnson didn't take care of the issue.
23    Q.  Okay.  But now that's history.  He's gone.
24 So what is -- was your complaint as you express it to
25 Mr. Johnson about the personal relationship, as you

55 (Pages 205 to 208)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 209

1  understood it, between him and Bryan Stewart? Were
2  you just complaining to Mike Johnson that you didn't
3  act timely enough? Or was there something else you're
4  telling him at that time, in November of 2004?
5      A. Basically, if I recall right, I expressed my
6  displeasure with Mike Johnson and Kevin Ruoff about
7  the complaint and why I was displeased. And that
8  Mr. Stewart, although transferred, still continues to
9  make racist remarks in the workplace.
10     Q. That part I understand. Is that what you
11 told Mike Johnson at that time?
12     A. At that meeting?
13     Q. Yes. In November of 2004.
14     A. I believe so, yes.
15     Q. Okay. Let's see if I understand this. So
16 you're saying that the purpose of the meeting, you
17 wanted to say that I complained about this man and his
18 comments, he's transferred out of my area, but I still
19 think you as a company should take action because I
20 think he's still making these comments. Do I have
21 that correctly?
22     A. No. You don't have that correct.
23     Q. Then you use your words and you tell me what
24 it is you're trying to express to Mike Johnson during
25 this Friday or Saturday meeting, November 2004.

Page 210

1      A. Basically, I expressed to Mike Johnson that
2  he did not take care of the complaint with Mr. Stewart
3  that was filed back in March of 2004. I expressed to
4  him also that the reason why I felt he did not take
5  care of the complaint about the racial remarks and
6  issues concerning Mr. Stewart, which was the personal
7  relationship. And although they transferred him to
8  another store, he was still not dealt with in the
9  proper manner.
10     Q. Well, did you tell him what your opinion was
11 as to the proper manner?
12     A. I believe I expressed to a degree what I
13 felt should have been done.
14     Q. What? What did you tell him should have
15 been done?
16     A. Suspended.
17     Q. Suspended. Okay. Now we're back to again,
18 I asked earlier: Do you think that management should
19 be permitted to impose their own penalties? And you
20 said yes. Now, you're telling me -- you're
21 interposing your opinion as to what should have been
22 done; is that correct?
23     A. No. I'm not interposing my opinion. He
24 asked my opinion and I gave him my opinion.
25     Q. I see. So you're just telling him in

Page 211

1  response to his question what you think should have
2  been done.
3      A. Right. He asked what he thought -- he asked
4  me what I thought should have been done. And I gave
5  him my opinion.
6      Q. All right. And how long did you think
7  Mr. Stewart should have been suspended?
8      A. That I have no account for, what they should
9  have -- how long they should have suspended him.
10     Q. Did you suggest that there should be any
11 training or education done of Bryan Stewart?
12     A. I believe in my first complaint, I felt they
13 should give him some training, yes.
14     Q. Did you in this meeting with Mike Johnson
15 and Kevin Krieger in November express the view that
16 some additional training should be done for Bryan
17 Stewart?
18     A. I believe in that meeting I expressed to
19 Mike Johnson that I felt no training was given to
20 Mr. Stewart.
21     Q. Let me try my question again. Did you
22 express to Mike Johnson that you felt training should
23 have been given to Mr. Stewart?
24     A. In that meeting?
25     Q. Yes.

Page 212

1      A. I don't recall suggesting it in that
2  meeting.
3      Q. Okay. Isn't it true that at that meeting,
4  you told Mike Johnson that you thought that Bryan
5  Stewart should have some diversity training classes
6  and be required to attend?
7      A. In the meeting in November?
8      Q. Yes.
9      A. No. I don't recall saying that to Mike
10 Johnson.
11     Q. Okay. All right. Anything else you can
12 recall that was discussed that November meeting
13 between you, Mike Johnson and Ryan Krieger?
14     A. No.
15     Q. Did Ryan Krieger make any comments or was he
16 just there for observation?
17     A. Mr. Krieger was a witness. And he made --
18 he wrote a witness statement.
19     Q. All right. Did you see a copy of his
20 witness statement?
21     A. Yes.
22        MR. DICKENS: Would you mark that, please?
23        (Exhibit 26 was marked.)
24 BY MR. DICKENS:
25     Q. Mr. Breland, did you receive a copy of

56 (Pages 209 to 212)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 213

1  what's been marked as Exhibit 27 -- 26? Pardon me.
2       A.  From my counsel, yes.
3       Q.  Well, it's addressed to you.  Did you
4  receive a copy from Mike Johnson at the time?
5       A.  Yes, I believe so.  I think I might have
6  printed it off.
7       Q.  Now, looking at Exhibit 26, does this
8  refresh your recollection that you suggested that
9  Mr. Stewart be sent to a diversity training class?
10       A.  This still doesn't remind me of the comments
11  I made to Mr. Johnson.  I believe these are
12  Mr. Johnson's words.
13       Q.  Okay.  Would it surprise you that
14  Mr. Johnson's recollection of your meeting may differ
15  from yours?
16       A.  Yes, it would.
17       Q.  Did you ever see the statement that Kevin
18  Krieger (sic) made based upon what occurred that day?
19       A.  Are you talking about Ryan Krieger?
20       Q.  I'm sorry.  We got Kevins and Ryans.
21       MS. HOLEN:  And Bryans.
22       MR. DICKENS:  And Bryans.  Let me try that
23  again.  Let's strike that.
24       Q.  Would it surprise you, Mr. Breland, if Ryan
25  Krieger had a different recollection of the meeting

Page 214

1  than you did?
2       A.  No.  It wouldn't surprise me.
3       Q.  Did you see Ryan Krieger's statement after
4  the meeting summarizing what he thought occurred?
5       A.  Yes.
6       Q.  And how was it you happened to see that?
7       A.  How did I happen to see that?
8       Q.  Yes.  Did he provide you a copy or someone
9  else give you a copy?
10       A.  I believe he cc'd the statement to me.
11       MR. DICKENS:  Okay.  Would you mark that,
12  please?
13       (Exhibit 27 was marked.)
14  BY MR. DICKENS:
15       Q.  Mr. Breland, you've been handed what we have
16  marked as Exhibit 27 for the record.  Have you seen
17  that document prior to today?
18       A.  Yes.
19       Q.  Did you see it during the time you were
20  employed by Fred Meyer?
21       A.  Yes.
22       Q.  Were you given a copy of it by Mike Johnson
23  at that time?
24       A.  This document?
25       Q.  Yes.

Page 215

1       A.  No.
2       Q.  How did you get a copy of it then?
3       A.  Ryan Krieger actually cc'd it or Ryan carbon
4  copied it -- oh, no, not this.  Okay.  I'm sorry.  I'm
5  looking -- thinking about the wrong document.  I did
6  not see this -- this document, only through my
7  counsel.
8       Q.  So just to make sure we're clear for the
9  record, you didn't see this document during the time
10  you worked for Fred Meyer.
11       A.  Correct.
12       Q.  Okay.  Let's go over it.  First paragraph
13  says:  "Met with James and Ryan today regarding
14  incident." And the date is November 13, 2004.  Is that
15  a correct statement?
16       A.  Yes.
17       Q.  And did Mr. Johnson ask you if it was okay
18  to have Ryan present?
19       A.  Yes.
20       Q.  The third paragraph says you deny talking
21  with Mr. Johnson more than once.  And he says he
22  talked to you twice.  Thinking back on it, do you have
23  a recollection that you talked with Mr. Johnson only
24  once or twice?
25       A.  Mr. Johnson only talked with me once.

Page 216

1       Q.  All right.  He says that your last meeting
2  was final and that you thought that he was going to
3  get back to you.  Is that an accurate statement of
4  your differing recollections at that time as to what
5  the status was?
6       A.  No.  Mr. Johnson stated that he would follow
7  up with me in two weeks.
8       Q.  All right.  The next paragraph says that,
9  quote, "James repeatedly referred to Bryan as a
10  racist," unquote.  Did you make that comment to
11  Mr. Johnson?
12       A.  I believe my comments was I felt Mr. Stewart
13  was racist.
14       Q.  The next paragraph says, quote, "James
15  states that he feels Bryan was let off and the issue
16  was swept under the rug," unquote.  Did you state that
17  to Mr. Johnson at that time?
18       A.  Yes.
19       Q.  He goes on to say, quote, "I reminded James
20  of our conversation and we agreed that Bryan needed to
21  improve.  He did not want to see anything happen to
22  Bryan he just wants to see him improve," end quote.
23  Is that an accurate summary of what you said to
24  Mr. Johnson at that time?
25       A.  No.  I just told him that Mr. Stewart needed

57 (Pages 213 to 216)

BRELAND v FRED MEYERS STORE

Page 229

1    A.  Yes.
2    Q.  Okay.  Now, what happened to the Fred
3  Meyer's internal phones that day?  Don't you guys
4  normally carry a Fred Meyer phone kind of like a
5  walkie-talkie?
6    A.  Correct.
7    Q.  What happened?
8    A.  Ryan Krieger took one home with him.
9    Q.  So how were you communicating at that time
10 with Paul Kodiak?
11    A.  Cell phone.
12    Q.  Okay.  Had Paul Kodiak be absent from Fred
13 Meyer for a period of time prior to February of 2005?
14    A.  Yes.
15    Q.  For what?
16    A.  Military duty.
17    Q.  Where had he been?
18    A.  I believe he stated he went to Iraq.
19    Q.  How long had he been gone?
20    A.  I'm not sure.
21    Q.  What was the Fred Meyer policy for loss
22 prevention people who had been out away from the job
23 for a period of time?
24    A.  I believe at that time they did not have a
25 policy stating what -- if an individual was rehired,

Page 230

1  what the situation would be.
2    Q.  Wasn't an existing policy, then, that the
3  person who was rehired had to be retrained before they
4  could effect an arrest on their own?
5    A.  Not that I'm aware of.
6    Q.  Did you look at the manual when Paul Kodiak
7  came back to see if that was an issue?
8    A.  No.
9    Q.  We've already talked about the what, two
10 women, 19, 20 years old involved on February 14, 2005?
11    A.  Concerning the non-arrest?
12    Q.  Yes.
13    A.  Yes.
14    Q.  Didn't you ask Paul Kodiak to stop them?
15    A.  No, I did not.
16    Q.  What did you ask him to do?
17    A.  I didn't ask Paul Kodiak to do anything.
18    Q.  Did you tell Mike Johnson that you'd asked
19 Paul to do that?
20    A.  I did not tell Mike Johnson that I told Paul
21 to stop them.
22    Q.  Did you hear -- do you know if Paul Kodiak
23 told Mike Johnson that you'd asked him to stop those
24 two girls?
25    A.  I'm not sure what Paul Kodiak told Mike

Page 231

1  Johnson.
2    Q.  Were you told what Paul told Mike Johnson?
3    A.  Say it again.
4    Q.  Sure.  Did Mike Johnson tell you what he'd
5  gleaned from talking with Paul Kodiak?
6    A.  No, he didn't.
7    Q.  Okay.  Who went through the girls' purses
8  back in the LP office?
9    A.  I checked the girls' purses in the LP
10 office.
11    Q.  You found something?
12    A.  I was searching for weapons and
13 merchandise.
14    Q.  And did you prepare a report on the incident
15 with the girls?
16    A.  I did not prepare a report for that
17 particular incident, no.
18    Q.  Well, was there a report of harassment of
19 you and Paul Kodiak by two young women that you
20 prepared?
21    A.  The report I prepared was harassment
22 concerning me and an incident with a female customer.
23    Q.  One of those two women?
24    A.  One of those two women.
25    Q.  And what harassment did they do to you?

Page 232

1    A.  The young lady pursued me and then made some
2  comments, gave me the finger and followed me out of
3  the store.
4    Q.  What do you mean she pursued you?  You're
5  the loss prevention person.
6    A.  Correct.
7    Q.  So where is she pursuing you?
8    A.  Basically, what happened is four girls
9  entered the store.  Two of the girls -- actually, all
10 four girls go into the cosmetic section.  Two of the
11 girls that I was observing, one of the girls observed
12 me looking at her, became upset and then basically
13 walked towards me making comments.  I exited the
14 section I was in and left the store.  She followed me
15 out.  I went to my car.  She went to a white car.
16 Then she came back in the store.
17    Q.  Why did you go out in the parking lot?
18    A.  So I could basically make her think I was
19 not security.
20    Q.  And did she say anything to you outside the
21 store?
22    A.  She just called me some names.
23    Q.  What did she call you?
24    A.  Motherfucker.
25    Q.  Anything else?

61 (Pages 229 to 232)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 233

1    A.  That's basically it.
2    Q.  And did -- is that in the store or outside
3  the store?
4    A.  Outside the store.
5    Q.  Okay.  Then you went back in the store?
6    A.  Went back to the camera room.
7    Q.  Camera room.  Now, what did this woman say
8  to you, if anything, inside the store before you went
9  out in the parking lot?
10    A.  She was basically -- I cannot recall what
11  she was saying to me, because I was walking away,
12  trying to act like I didn't know her from the man in
13  the moon, and I walked out the door.
14    Q.  And didn't you tell me you prepared a report
15  on this?
16    A.  That is the report I prepared, harassment.
17    Q.  Harassment report.  Now, what report, if
18  any, was prepared on the stopping of the two girls,
19  the non-arrest apprehension?
20    A.  No report was prepared for that.
21    Q.  Okay.  Did you tell Paul Kodiak that you
22  were going to prepare a report on that?
23    A.  No, I did not.
24    Q.  Why did you not prepare a report on that?
25    A.  Because that was not my non-arrest

Page 234

1  apprehension.
2    Q.  Why do you say it was not yours?
3    A.  Paul Kodiak enacted the stop on his own.
4    Q.  Did you tell Paul Kodiak that you'd seen all
5  five elements justifying the stop?
6    A.  I explained to Paul Kodiak that I seen all
7  five elements, except I lost two seconds, five
8  seconds' observation, and the merchandise was gone.  I
9  think she has it.  I'm not sure.  That's what I
10  communicated to Paul.
11    Q.  Mr. Breland, are you telling me, testifying
12  under oath that you didn't tell Paul Kodiak, stop
13  them, and that's when he stopped them?
14    A.  Yes.
15    Q.  Okay.  Did you ever contend in a report or
16  state to anyone at Fred Meyer that you felt the girls
17  were harassing both you and Paul Kodiak?
18    A.  I never said that the girls was harassing me
19  and Paul Kodiak.
20    Q.  Were you present when the videotape was
21  reviewed?
22    A.  Yes.
23    Q.  And didn't the videotape support Paul
24  Kodiak's position and not yours?
25    A.  What was Paul Kodiak's position?

Page 235

1    Q.  What do you think the videotape showed?
2    A.  The videotape showed Paul going out and
3  making the stop, inviting them back to the office.  I
4  got to the scene.  We walked back to the office.
5    Q.  And you took over when the stop was made and
6  brought the people back to the LP office?
7    A.  I did not take over.  I assisted.
8    Q.  Assisted.  I see.  So you're the person in
9  charge.  Paul Kodiak has not been trained after
10  returning from Iraq.  And you're saying the stop was
11  Paul's; is that what I understand?
12    A.  Restate your comment.
13       MR. DICKENS:  Would you read that back,
14  please?  I usually try to do that earlier.
15       (Record read.)
16       THE WITNESS:  I'm not the person in charge.
17  We're LPs working it together.
18  BY MR. DICKENS:
19    Q.  All right.  Let's make sure I'm clear here
20  in what I'm asking you.  Are you denying telling Paul
21  Kodiak that you would handle the stop as a non-arrest
22  report and that you'd take care of it?
23    A.  Say that again.
24    Q.  Sure.  Are you denying that in this
25  situation on February 14, 2005, you told Paul Kodiak:

Page 236

1  I will write this up as a non-arrest stop and I will
2  handle it?
3    A.  I never told Paul Kodiak that I would write
4  this up as a non-arrest stop and that I would handle
5  it.
6    Q.  All right.  Were you thinking at that time
7  that you'd be in deep trouble if you had a second
8  non-arrest apprehension, because that would have been
9  two within 24 months and you'd be terminated?
10    A.  No, I was not thinking that.
11    Q.  Why weren't you thinking that?
12    A.  Because it was not my non-arrest
13  apprehension.
14    Q.  Okay.  Do you know if someone else had put
15  it differently the next day?
16    A.  I'm not sure what someone else could put it
17  in the next day.
18    Q.  All right.  So the next day you met with
19  Mike Johnson and Ryan Krieger.
20    A.  Correct.
21    Q.  And the subsequent phone call to Kevin
22  Ruoff, and that's the termination thing.
23    A.  Yes.
24    Q.  Okay.  What happened after you were told you
25  were being terminated based upon Kevin -- Ryan

62 (Pages 233 to 236)

Page 237

1  Krieger's call to Kevin Ruoff?
2      A.  I asked Ryan:  Why am I being terminated?
3      Q.  And he said what?
4      A.  For a non-reporting of a non-arrest
5  apprehension.
6      Q.  And that's consistently been the company's
7  position, has it not?
8      A.  Looks that way.
9      Q.  All right.  From what you're telling me, it
10  sounds as if simply you and Paul Kodiak had different
11  versions of who directed whom to do what and the
12  company believed Paul Kodiak instead of you.  Isn't
13  that what you see?
14      A.  What I see is that the loss prevention
15  manager and regional loss prevention officer did not
16  tell me or Paul Kodiak that he was in training.  So
17  Paul Kodiak enacted a stop, thinking that he was fully
18  able to make stops, which he did.  And I am being
19  blamed for Paul Kodiak's mistake.
20      Q.  Were you advised by anyway on February 15,
21  2004 that Paul's version of what took place was
22  different than what you were telling them?
23      A.  I was not advised of that.
24      MR. DICKENS:  Okay.  Would you mark this,
25  please?

Page 238

1      (Exhibit 31 was marked.)
2  BY MR. DICKENS:
3      Q.  Mr. Breland, do you recognize Exhibit 31?
4      A.  Yes.
5      Q.  Did you receive a copy of this?
6      A.  No.
7      Q.  Have you seen a copy of this prior to today?
8      A.  Yes.
9      Q.  Did you see a copy of it while still
10  employed by Fred Meyer?
11      A.  No.
12      Q.  When did you first see it?
13      A.  Through my counsel.
14      Q.  Okay.  So that was after the lawsuit was
15  started?
16      A.  Yes.
17      Q.  There's a summary here of what occurred.  It
18  says, quote, "Mr. Breland stopped" adult female
19  "Jennifer Ems for lipstick.  No merchandise found.
20  Ms. Ems released.  LPS Breland --" can't read the next
21  word.  It's something, a number -- "harassment
22  report - failed to report non arrest," end quote.
23      Isn't that what you were told at the time by
24  Ryan Krieger was the company's position?
25      A.  What are you referring to?

Page 239

1      Q.  The summary of what occurred.
2      A.  At the time of my termination, I was
3  informed I was terminated for failure to report a
4  non-arrest apprehension, and that was it.
5      Q.  Okay.  In the list of all prior recorded
6  discipline write-ups down below, you can see that
7  there was one listed here as April 9, 2003 and then
8  one on July 24, 2002.  Those are the ones we talked
9  about earlier?
10      A.  Yes.  Just that the 2003 says "Write-up -
11  suspension."  I was not suspended for that.
12      Q.  Okay.  Otherwise, it's correct?
13      A.  With the exception of the suspension
14  portion, yes, it would be correct.
15      Q.  So if the company had a good faith reason
16  for concluding that you had failed to report a
17  non-arrest and write it up and it's the second one
18  within 24 months, you understood that would be
19  contrary to LP policy, correct?
20      A.  Say that again.
21      Q.  Sure.  You knew you'd already been written
22  up once for a non-arrest apprehension.
23      A.  Yes.
24      Q.  And if as of February 15, 2005, Fred Meyer
25  had concluded that you had a second non-arrest

Page 240

1  apprehension or failure to write up a non-arrest, that
2  would be two violations within 24 months, wouldn't it?
3      A.  The February the 15th non-arrest
4  apprehension facts were incorrect.
5      Q.  That's not my question.  Did you understand
6  my question?
7      A.  You're saying that the two non-arrests would
8  equate to a termination within the 24-month period.
9      Q.  I'm saying that if Fred Meyer reasonably
10  concluded the February 14, 2005 situation was a
11  non-arrest apprehension, isn't it true that that would
12  be the second non-arrest apprehension within 24
13  months?
14      A.  It would be if it was reasonably concluded,
15  yes.
16      Q.  All right.  And that, under the loss
17  prevention policy, would be grounds for termination,
18  correct?
19      A.  Correct.
20      Q.  All right.  Mr. Breland, I've got some
21  documents here that look like they were prepared, To
22  Whom They May Concern, typed by you.  There's some
23  other documents that look like a timeline of
24  complaint.  Those all appear to have been prepared
25  after you left the employ of Fred Meyer.  Were they

63 (Pages 237 to 240)

BRELAND v FRED MEYERS STORE

JAMES BRELAND
6/27/2006

Page 249

1  supervisors apparently went through, they list all
2  prior recorded discipline write-ups here.  And one of
3  them is 7/24/02, improper conduct with customer.
4        Do you agree that you were disciplined for
5  that?
6     A.  No.
7     Q.  Was there any discipline write-up for that
8  event?
9     A.  There was no discipline write-up for that
10  event.
11     Q.  Okay.  Do you believe that Mr. Stewart's
12  racist comments and views adversely affected your job?
13        MR. DICKENS:  Objection.  Calls for an
14  opinion.  Go ahead.
15  BY MS. HOLEN:
16     Q.  You can go ahead.
17     A.  Yes.
18     Q.  How so?
19     A.  He would focus more on minority employees
20  and minority customers.  He had us focus more on
21  minority employees for DEs, for external theft.
22     Q.  And how about internal theft?
23     A.  Internal theft also with the employees.
24     Q.  Did you overlap with Stewart on weekends
25  when you were working weekends?

Page 250

1     A.  Yes.
2     Q.  What days would you work together over the
3  weekends?
4     A.  Saturday, Sundays.
5     Q.  Was that part of Stewart's regular schedule?
6     A.  Yes.
7     Q.  Did Kevin Ruoff ever make a remark to you
8  that he had dropped the ball in the Stewart
9  investigation?
10     A.  Yes, he did.
11     Q.  When was that?
12     A.  I believe it was a conversation on the phone
13  we had in December of 2004.
14     Q.  And what was the -- how did that
15  conversation come about?
16     A.  That conversation came about when he
17  expressed the punishment that he gave to Mr. Stewart.
18     Q.  What did he say the punishment was?
19     A.  That Mr. Stewart receive a first, final and
20  last warning letter.
21     Q.  And what did he say about dropping the ball?
22     A.  I then asked him:  Why wasn't Mr. Stewart
23  suspended?  And he basically stated that we failed to
24  document -- I dropped the ball and we failed to
25  document the incident.

Page 251

1        MS. HOLEN:  Okay.  I have nothing further.
2        MR. DICKENS:  I have nothing further either.
3  Thank you.
4             (Whereupon, the deposition was
5             concluded at 4:43 p.m.)
6  (Signature pending.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

66 (Pages 249 to 251)