APPENDIX II

EXCERPTS FROM DEPOSITION OF BRYAN STEWART

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2               FOR THE STATE OF ALASKA

3    _____

4    JAMES BRELAND,                    COPY

5          Plaintiff,

6      vs.

7    FRED MEYER STORES, INC.,

8          Defendant.
     _____/

9    CASE NO. A05-169 Civ. (JKS)

10

11

12   _____

           DEPOSITION OF BRYAN KEITH STEWART
13   _____

14

15

16            Pages 1 - 120; Inclusive

17            Monday, July 31, 2006

18                 1:05 p.m.

19

20

           Taken by Counsel for Defendant
21                     at
              Gruenstein & Hickey
22        1029 W. 3rd Avenue, Suite 510
              Anchorage, Alaska  99501

23

24

25

Page 9

1  transfer?
2     A.  The August -- from what I was told, they
3  believed, Supervisor Kevin Ruoff, that I had too good
4  a rapport with the store director, Mike Johnson.
5     Q.  And that was the sole reason you were given
6  for the transfer?
7     A.  No.  At that current time, we were going
8  through a remodel, which is a major 18-week, I
9  believe, headache, as I called it.  The store is just
10 utterly in chaos.  So I had to have people there
11 24/7, basically.  I was under a tremendous amount of
12 stress, and that played a particular role in it, as
13 well.
14    Q.  Who told you that, just what you said, that
15 the stress you were under played a big role?
16    A.  Kevin Ruoff.  I just felt my plate was
17 full.
18    Q.  Well, was it a transfer you sought or one
19 that you were required to make?
20    A.  Required.
21    Q.  Were you consulted about it by Mr. Ruoff
22 before making it?
23    A.  No.  Basically, he came into Anchorage,
24 called me into Mr. Johnson's office and basically
25 said:  Today's your last day at Anchorage East; you

Page 10

1  start at Dimond tomorrow.
2     Q.  What was your response to that?
3     A.  I was upset, because I had just purchased a
4  home in Chugiak.  So my drive time was, you know,
5  basically doubled.
6     Q.  Did you express that unhappiness to
7  Mr. Ruoff?
8     A.  Absolutely.
9     Q.  Tell me how you said it.
10    A.  I was -- I was, you know, definitely
11 visibly upset.  You know, I told him that I felt I'd
12 already done my time at Dimond.  Because Dimond is
13 very -- a slower store, in loss prevention's line of
14 work, as far as thievery goes, and I felt that
15 somebody else should go there and let me go to a
16 store I hadn't worked at.  Y'all excuse my term, but
17 I was pissed.
18        You know, like I said, my drive time was
19 doubled, so -- and that was just right when I was
20 closing on my house.  So it was just like
21 everything -- I purchased a home in Chugiak, because
22 it was 17 miles, and now it doubled to 36 miles, or
23 whatever it was.
24    Q.  Did Mr. Ruoff give you any specifics with
25 respect to why he believed you were under too much

Page 11

1  stress at the Anchorage East store?
2     A.  Well, that store is very active, in, you
3  know, shoplifting and, internally, with employee
4  stealing.
5         I did a fantastic job, but it was just,
6  that dealing with the remodel and trying to still
7  apprehend shoplifters and employees, it was just too
8  much.  And, to me, they were asking a lot more out of
9  me.  I thought I was doing a good job, but they kept
10 asking for more and more and more.  And I was just
11 like:  I can only do so much; I'm only one man.
12    Q.  I want to make sure that we kind of parse
13 this correctly here.
14        My question is, what did he tell you.
15 if anything; what specifics did he give you, in this
16 conversation in which he told you he was transferring
17 you, about why he thought you were under too much
18 stress?
19    A.  To the best of my recollection -- during
20 this remodel, you get a lot of parts and pieces, new
21 equipment coming.  And keep in mind, my office is
22 demolished; I have no office.  So I'm trying to store
23 these things strategically throughout the store, so I
24 can find them.
25        Well, I received a phone call from -- I

Page 12

1  believe his name was Tony Taylor, who was -- his
2  title, I guess, was a loss prevention project manager
3  for a remodel.  And he asked me if I received all the
4  Checkpoint stuff.  I said:  If you sent it, it's
5  here.  That was pretty much my answer.
6         Well, Checkpoint, who installs the
7  equipment and electronics came up.  I was unable to
8  locate one item out of, you know, 30 components that
9  was sent.  So, at that point, Checkpoint, from my
10 understanding, called Tony Taylor.  And basically, I
11 think, Kevin Ruoff returned -- he called me back
12 saying that, you know:  Corporate is mad at you; they
13 think you're a liar.  I'm like:  A liar; for what?  I
14 was missing one piece.  I said:  I'm sorry, my
15 plate's full.  And I said:  Kevin, we shouldn't even
16 be having this conversation over one piece of
17 equipment.  Which was later found a couple days
18 later; it was just wherever.  So that was part of it.
19    Q.  Mr. Stewart, I appreciate the background
20 information.  Maybe we will need to get into that
21 later.  I don't know.  But I want you to focus, as
22 much as you can now, on the conversation that you had
23 with Mr. Ruoff when he is transferring you.
24        What specifics -- well, I don't want to put
25 words in your mouth.  But what specifics did he cite

6 (Pages 9 to 12)

8deb453c-24a3-41ec-b63f-c6766e08d144

Case 3:05-cv-00169-TMB    Document 44-3    Filed 09/25/2006    Page 4 of 26
BRELAND v. FRED MEYERS STORES, INC.

BRYAN KEVIN STEWART
7/31/2006

Page 13

1  about your being under stress in that conversation?
2  And then, if I need to, I'll ask you about the
3  background in a minute.
4      A.  To the best of my recollection, he just
5  said: You're stressed out, and before you do
6  something you shouldn't do, you know,
7  temperament-wise, we're just going to get you out of
8  the environment.  And that was pretty much the gist
9  of the conversation.  It was very short and sweet.
10  And he told me if I needed to take the rest of the
11  day off, to do so.
12      Q.  Did he give you any specifics in this
13  conversation about why he believed that you had too
14  close a relationship with Mike Johnson?
15      A.  From my understanding, that -- I guess I'll
16  have to mention Mr. Breland -- that Mr. Breland had
17  made a statement or -- I don't know if it was written
18  or whatnot -- that me and Mr. Johnson were good
19  buddies, so to speak, and that we had allegedly went
20  house hunting and fishing all the time, and whatnot.
21  And I said: That's absolutely not true; we went
22  fishing one time.  But that was it.  I guess it was
23  just like a perception-type thing, but...
24      Q.  You didn't believe that you had too close a
25  relationship with Mr. Johnson?

Page 14

1      A.  Oh, no, sir.
2      Q.  And we'll get into that in a minute.
3      You were certainly aware, at this point in
4  time, of allegations that Mr. Breland had made with
5  respect to alleged racist remarks that you had made?
6      A.  Correct.
7      Q.  Did you not have an understanding that your
8  transfer was related to that?
9      A.  No, not at all.
10      Q.  What was your -- and when did you first get
11  your understanding, as to Mr. Breland having made
12  these allegations concerning alleged racist remarks
13  by you; when did you first learn of that?
14      A.  Basically, Store Director Mike Johnson
15  called me into his office.  He showed me a
16  written-type complaint from Mr. Breland.  I read it.
17  He sat down and interviewed me about it.  I said:
18  This is absolutely not true.  At that point, he said
19  he was going to interview Mr. Breland, and I thought
20  that was the end of it.
21      Q.  Okay.  My question was -- and I appreciate,
22  again, the comment, and we'll certainly get into it
23  later.  But when, in relation to the transfer was it,
24  if you can estimate, even in terms of weeks, days
25  months, what?

Page 15

1      A.  It was probably several weeks before.  I
2  don't know if it was a month or whatnot.  I know
3  it was in the summertime.
4      Q.  And did you, in fact, begin the work at the
5  Dimond store the day after?
6      A.  I believe so.
7      Q.  Were you ever terminated from any other
8  employment, other than at Fred Meyer?
9      A.  Yes.
10      Q.  Where was that?
11      A.  Chilkoot Charlie's.
12      Q.  When was that?
13      A.  May of 1999.
14      Q.  What were the circumstances?
15      A.  I believe it was excessive force.
16      Q.  Can you elaborate on that?
17      A.  Sure.
18      Basically, I worked for Chilkoot Charlie's
19  for, I guess, around two, two-and-a-half years.
20      Afterwards, after you, you know, us 10, 12
21  bouncers, we'd get off work, and the owners of
22  Chilkoot's had a house on the far corner of the
23  parking lot.  That's where the bands would stay.  We
24  went there, and, you know, we would party afterwards.
25      One of the owner's friends -- I think his

Page 16

1  name was Steve, came over.  He was very much
2  intoxicated.  He started some trouble, and I picked
3  him up and threw him off the balcony.  Never hit him.
4  He came at me.  I got him in a headlock and sat down.
5      That was probably a Saturday night.  I came
6  to work on a Thursday.  Duran Powell, who was one of
7  the co-owners, pulled me in the office and said:
8  That was excessive force; it was still on Chilkoot's
9  property; even though you weren't on the clock, we've
10  got to terminate you.  I said: Fine.
11      It was one of the best things that ever
12  happened to me, getting out of that place.
13      Q.  Were you terminated from any other
14  employment, other than Fred Meyer and Chilkoot
15  Charlie's?
16      A.  No.
17      Q.  When did you -- where were you born?
18      A.  East Liverpool, Ohio.
19      Q.  How old are you?
20      A.  Thirty.
21      Q.  Where did you grow up?
22      A.  Wellsville, Ohio.
23      Q.  Where is that, by the way?
24      A.  Where is it?
25      Q.  Where is it in Ohio?

7 (Pages 13 to 16)

8deb453c-24a3-41ec-b63f-c6766e08d144

Page 25

1  occasions that you've already described, perhaps at
2  your house for dinner or the fishing?
3      A.  No.
4      Q.  Have you seen the complaint that was
5  brought by the Plaintiff, James Breland, in this
6  case?
7      A.  Yes, sir.
8          (Off-the-record discussion.)
9          (Exhibit 72 marked.)
10  BY MR. GRUENSTEIN:
11      Q.  Okay.  Mr. Stewart, you have in front of
12  you now Exhibit 72, which is a copy of the complaint
13  filed by Mr. Breland in this case.  I want to draw
14  your attention to paragraph 9, and we'll go through
15  this pretty quickly.
16          You have, in fact, read this complaint
17  before, right?
18      A.  Yes.
19      Q.  So Plaintiff 9 allegations that Mr. Breland
20  heard you say, among other things, that black
21  customers and employees were -- well, let me start
22  over again.
23          He alleges that he heard you say at work --
24  or refer to black customers as "field niggers."
25          Is that accurate or not accurate?

Page 26

1      A.  Not accurate.
2      Q.  And he also alleges that he heard you say
3  at work that black customers should be given
4  watermelon and chicken.
5          Is that true or not true?
6      A.  Not true.
7          MR. ROSS:  Maybe, Counsel, you could
8  rephrase your question.  Because your question is, he
9  says that you said.  And then you say:  Is that true?
10  And, of course, it is true that he says my client
11  said it.
12          MR. GRUENSTEIN:  I understand your point.
13  I will --
14          MR. ROSS:  And you did that on the first
15  two.  And maybe, just to make it clear, you could go
16  through those again.
17  BY MR. GRUENSTEIN:
18      Q.  Did you say -- did you ever use the term
19  "field niggers" at work?
20      A.  No.
21      Q.  Did you ever refer to black customers as
22  people who should be given watermelon and chicken?
23      A.  No.
24      Q.  Did you ever refer to black customers as
25  "them bastards"?

Page 27

1      A.  No.
2      Q.  Did you ever say anything to the effect of,
3  "I am sweating like a runaway slave"?
4      A.  No.
5      Q.  Did you ever say, "I am tired like a rented
6  slave"?
7      A.  No.
8      Q.  Did you ever refer to Latinos as "fucking
9  wetbacks" --
10      A.  No.
11      Q.  -- or "spics"?
12      A.  No.
13      Q.  Did you ever refer to Asians as "slant-eyed
14  fuckers"?
15      A.  No.
16      Q.  Did you ever refer to African Americans as
17  "fucking niggers"?
18      A.  No.
19      Q.  Did you ever say something to the effect
20  of, "the white men are the ones that are
21  discriminated against because we have to hire the
22  fucking minorities"?
23      A.  No.
24      Q.  What was your understanding of
25  Mr. Breland's complaint regarding a racist remark,

Page 28

1  alleged racist remark, by you that led to Mr. --
2  well, to Mr. Ruoff talking to you about this matter?
3      A.  Initially, Mr. Ruoff didn't talk to me
4  about this.  It was Mr. Johnson.
5      Q.  I'm sorry.  Mr. Johnson.
6          What was your understanding from
7  Mr. Johnson about what Mr. Breland's allegation was,
8  at that time?
9      A.  Basically, like I said, that he had the
10  printed-up copy of Mr. Breland's complaint, which I
11  read, and he asked me if this was -- anything was
12  true.  And I said:  Absolutely not.  It was, you
13  know, that cut and dried, you know, that's not
14  tolerated in the workplace.  And I said:  Well, I
15  didn't do it.  And he said he was going to interview
16  James Breland.  And that was the gist of it.
17      Q.  There was no doubt in your mind, at the
18  time that Mr. Johnson had this conversation with you,
19  that these kinds of remarks would have been totally
20  inappropriate and against Fred Meyer's policy, right?
21      A.  Correct.
22      Q.  Had anybody, prior to Mr. Breland's
23  allegations — or hearing of Mr. Breland's
24  allegations through Mr. Johnson, ever alleged that
25  you had made racist remarks --

10 (Pages 25 to 28)

8deb453c-24a3-41ec-b63f-c6766e08d144

Page 29

1    A. No.
2    Q. -- at work?
3    A. No.
4    Q. What was your reaction?
5    A. I was upset. I was mad.
6    Q. How had your relationship been with
7  Mr. Breland prior to that, prior to hearing of these
8  allegations through Mr. Johnson?
9    A. Up until he left that letter on the desk, I
10 thought we had a very good working relationship. But
11 once I showed that letter to Mr. Ruoff -- and I don't
12 know if Mr. Ruoff counseled him, I don't know what
13 was said -- things definitely changed.
14   Q. What letter are you talking about?
15   A. The one that Mr. Breland had written and
16 left on the desk when I came into work the next
17 morning.
18   Q. What was the contents of that letter?
19   A. It was very derogatory in nature. The
20 terms: Fred Meyer's is ran like Bush-League
21 bullshit. It was basically about our policies and
22 procedures he didn't like. It was visibly disturbing
23 to me. To me, my interpretation was borderline
24 disgruntled employee.
25   Q. I'm not sure I'm familiar with this letter.

Page 30

1    Have you seen a copy of it recently?
2    A. Me? No.
3    Q. This was a letter written by Mr. Breland?
4    A. Correct.
5    Q. To whom?
6    A. It was directed towards myself and Kevin
7  Ruoff.
8    Q. Do you recall, at least, the approximate
9  time period?
10   A. Probably June or July of '04. It was
11 during inventory time. I know that, because
12 Mr. Ruoff was up helping supervise inventory.
13 That's -- that's all that I can remember of when.
14   Q. And tell me everything you can remember
15 about the contents. Was it a one-page letter, a
16 two-page letter?
17   A. A one-page. It was handwritten, not typed.
18   Q. Was it dated?
19   A. I don't remember.
20   Q. Was it signed?
21   A. I don't remember.
22   Q. To whom was it addressed?
23   A. I don't know if there was a formal heading
24 on it. But it was just -- it was directed towards
25 myself and Mr. Ruoff. Our names were mentioned,

Page 31

1  specifically.
2    Q. Give me the best of your recollection as to
3  what the contents of the letter was.
4    A. It was, you know, Fred Meyer handles it's
5  business like Bush-League bullshit; loss prevention
6  managers and regionals -- I can't remember exactly.
7  You know, I just remember it was this very derogatory
8  and degrading. Basically, you know, we don't know
9  "our ass from a hole in the ground," so to speak. He
10 didn't agree with the policies, and the loss
11 prevention manual should be rewritten type comments
12 in it, to the best of my recollection.
13   MR. GRUENSTEIN: Well, since, at least, I'm
14 not aware of the existence --
15   MS. HOLEN: We've been told, so far, that
16 it no longer exists.
17 BY MR. GRUENSTEIN:
18   Q. If you would then -- I mean, I don't want
19 to press you beyond your best recollection, on the
20 other hand, I want to get your best recollection. So
21 I want you to take your time and see if you can
22 recall any of the other contents of this letter.
23 Because I'm not sure, the way you related it, that I
24 would have any kind of real understanding of why he
25 was writing it or what he was trying to say.

Page 32

1    A. Like I say, this has been a couple years
2  ago. I showed it to Mr. Ruoff. And at that time,
3  the letter, I believe, went in his personnel file
4  that we keep in the loss prevention office; not the
5  one that human resources has, the one in the office.
6    Q. But, again, is this your best recollection?
7  Do you recall any of the details, or any of the
8  basis -- you know, any of the reasons why he was
9  writing such a -- apparently, such a sharp letter to
10 you as his supervisor?
11   A. One of the issues was, Fred Meyer's loss
12 prevention policy is that, if you stop somebody
13 shoplifting, who had not concealed the merchandise,
14 it's called a "wide-opening shoplift." It's
15 basically -- let's say somebody wheels a vacuum
16 cleaner outside and you stop them. In order --
17 unless they willfully admit to it, we have to consult
18 the regional loss prevention manager to get
19 permission to prosecute. That was one of the
20 problems he was having. He wasn't able to get ahold
21 of Kevin or whomever.
22   Q. As you may be aware, Mr. Breland asserts
23 that, prior to complaining to Mr. Johnson about your
24 alleged racist remarks, that he had brought the topic
25 up with you.

11 (Pages 29 to 32)

8deb453c-24a3-41ec-b63f-c6766e08d144

Page 53

1  first seeing Exhibit 75?
2      A.  What was my what?
3      Q.  How did you first come to see this?
4      A.  Mr. Johnson called me in his office.
5      Q.  And he let you read -- and he gave this to
6  you and let you read it?
7      A.  Correct.
8      Q.  Were you given a copy to keep?
9      A.  No.
10     Q.  Now, there are just a few things here I
11 wanted to ask you about.  Among the things that
12 Mr. Breland says about you is that:  LPM Stewart
13 lacks both education and knowledge concerning
14 diversity, equal opportunity, equal rights and
15 discrimination.
16         Do you agree with that?
17     A.  No.
18     Q.  Mr. Breland says:  During the span of
19 working for and with LPM Stewart, I find that he's a
20 decent person...
21         I assume you'd agree with that.
22     A.  I feel I'm a decent person.
23     Q.  All right.  And then he goes on and says:
24 ...with some issues concerning race.
25         Do you think you have any issues concerning

Page 54

1  race?
2      A.  Absolutely not.
3      Q.  He says:  LPM Stewart has not directly
4  called or addressed me in a derogatory manner...
5          I assume you would agree that -- you
6  believe that's a true statement?
7      A.  Yes.
8      Q.  Okay.  And then he continues:
9  ...concerning race, but I personally have heard him
10 make on quite a few occasions
11 derogatory/inappropriate comments concerning one's
12 race within the workplace.
13         Based on your previous answer...
14     A.  I disagree with that statement.
15     Q.  Then he continues, a little, in the next
16 paragraph, second sentence of the next paragraph:  I
17 really feel that LPM Stewart really tries and he's a
18 genuinely decent person that I do get along with
19 despite the fact that he's made
20 derogatory/inappropriate comments around me.
21         Okay.  And at this particular point in
22 time, I take it from your previous answers, you would
23 agree that you were getting along with Mr. Breland?
24     A.  Correct.
25         Now, if you look at the last paragraph on

Page 55

1  this -- in this document, please, Mr. Stewart, you'll
2  see Mr. Breland writes:  I'll close with this,
3  Mr. Ruoff; Mr. Stewart has a disease, and the type of
4  disease that Mr. Stewart has, for the type of job
5  that we do, can be very detrimental to those who
6  work, for him and around him.
7          I assume you would disagree with that?
8      A.  Correct.
9      Q.  Was this written -- based on your previous
10 answers, I assume the answer to this question is no,
11 but please correct me, if I misunderstand.  This was
12 written prior to your having any of the panic attacks
13 that you've just been describing?
14     A.  Oh, way, way before.
15     Q.  And you did understand, at the time you
16 were transferred from the Muldoon store -- by the
17 way, when we say "Muldoon store," it means the same
18 as Anchorage East, of course, right?
19     A.  Uh-huh.  Correct.
20     Q.  (Cont'd) -- that Mr. Breland did have
21 something to do with that, right?  That you were
22 being transferred, in part, because of what
23 Mr. Breland had said?
24     A.  Nobody made that comment to me, to the best
25 of my knowledge.

Page 56

1      Q.  Okay.  I thought you said that one of the
2  reasons that Mr. Ruoff gave was that Mr. Breland had
3  expressed that you were too close to Mr. Johnson.
4      A.  Oh, yes.  Correct.
5      Q.  So that Mr. Breland was, in part, somehow
6  responsible for your being transferred?
7      A.  I didn't feel that way.
8          (Exhibit 76 marked.)
9  BY MR. GRUENSTEIN:
10     Q.  Okay.  This is Exhibit 76.  It's a
11 memorandum to Mike Johnson from Kevin Ruoff, and it
12 begins with -- and it's dated April 16, '04.
13         Have you seen this document before?
14     A.  (Reviewing.)
15         MS. HOLEN:  If I could say, just for the
16 record, this is an exhibit to Ruoff's deposition,
17 too, Exhibit 69.
18         MR. GRUENSTEIN:  Thank you.
19         THE WITNESS:  Yes, I've seen this before.
20 BY MR. GRUENSTEIN:
21     Q.  How did you come to see it?
22     A.  It's my appraisal.
23     Q.  This is part of your appraisal?
24     A.  Correct.
25     Q.  Okay.  Who did your appraisal?

17 (Pages 53 to 56)

8deb453c-24a3-41ec-b63f-c6766e08d144

Case 3:05-cv-00169-TMB    Document 44-3    Filed 09/25/2006    Page 8 of 26
BRELAND v. FRED MEYERS STORES, INC.

BRYAN KEVIN STEWART
7/31/2006

Page 57

1    A.  Well, from my understanding, it's a
2  combination of Kevin Ruoff and Mike Johnson.  But, I
3  think, Mike Johnson actually gave it to me.
4    Q.  Mike Johnson was the store manager; Kevin
5  Ruoff was based in the State of Washington?
6    A.  Correct.
7    Q.  So was that your understanding, that you
8  really kind of had two bosses?  The store manager was
9  your boss?
10    A.  Correct.
11    Q.  And that would have been Johnson, of
12  course, right?
13    A.  Correct.
14    Q.  And then Ruoff, as the regional loss
15  prevention supervisor, right?
16    A.  Correct.
17    Q.  So in this memo to Johnson, Mr. Ruoff
18  writes that, "He" -- meaning you -- I'm on the -- or
19  actually, the third paragraph here -- "He needs to
20  continue to work on his professionalism and
21  communication, as well as setting the example with
22  his staff."
23        Did you know what he was -- what Mr. Ruoff
24  was referring to there?
25    A.  Yes.

Page 58

1    Q.  And that was what?
2    A.  I had -- I use a lot of foul language in
3  the workplace.
4    Q.  Such as?
5    A.  "Fuck."
6    Q.  So it was just a language problem, just
7  kind of a bad language problem, that he was referring
8  to there; is that correct?
9    A.  Correct.
10    Q.  Anything else?
11    A.  I think that was the big thing.
12    Q.  And then, with respect to number 4:  How
13  well did the employee develop his or her direct
14  reports.
15        And then the first sentence reads:  Bryan
16  had some struggles with keeping morale high.
17        It says "moral," but I'm sure it means
18  "morale."
19        Do you know what he was referring to there?
20    A.  I do not.
21    MR. GRUENSTEIN:  Why don't we take a few
22  minute break.  Okay?
23    (A recess was taken.)
24    MR. GRUENSTEIN:  Back on record.
25        So I found the first page to what is now

Page 59

1  Exhibit 74, and actually will remain 74.  But what
2  I'd like to do is just substitute this for 74.  Okay?
3    MS. HOLEN:  Okay.
4    MR. GRUENSTEIN:  Then we'll have a complete
5  document.
6    (Exhibit 74 re-marked.)
7  BY MR. GRUENSTEIN:
8    Q.  You've already seen this.  This is the one
9  we had the -- this is about, "By letting me do my
10  job," document.
11    A.  Yeah.
12    Q.  But go ahead and turn to the second page,
13  again.
14        Number 7 there reads:  If you are a
15  supervisor, what have you done to demonstrate your
16  commitment to hire and promote diverse associates in
17  conformance with Equal Opportunity policy?
18        And what did you write in response to that?
19    A.  "Refused to answer."
20    Q.  And why did you write, "Refused to answer"?
21    A.  I didn't feel that that was a question that
22  they could ask you.
23    Q.  Why did you feel that that's a question
24  that Fred Meyer, as your employer, could not ask you?
25    A.  It's my opinion.

Page 60

1    Q.  But why did you have that opinion?
2    A.  I just -- I just didn't feel that a
3  workplace can - I don't know - ask that verbatim of a
4  question.
5    Q.  You did understand that it was very
6  important to Fred Meyer, as your employer, that all
7  associates, all employees, be treated equally and
8  fairly?
9    A.  Absolutely.
10    Q.  And without — and with respect and
11  without -- well, and with respect, correct?
12    A.  Correct.
13    Q.  And without any discrimination with respect
14  to their race or ethnic identity, correct?
15    A.  Correct.
16    Q.  If you agreed with that policy, why would
17  you -- and you understood that that was an essential
18  policy that Fred Meyer had, correct?
19    A.  Correct.
20    Q.  You never had any doubt at all that Fred
21  Meyer was committed to Equal Opportunity hiring and
22  other employment -- fair employment practices, right?
23    A.  Fair employment practices, correct.
24    Q.  So then, if you agreed with Fred Meyer's
25  commitment to that, why would you have a problem

18 (Pages 57 to 60)

Page 65

1  black. I believe either Curtis [As spoken] or Jeff
2  was in the detention room right behind us."
3  Did I say Curtis? I meant Chris. "I
4  believe either Chris or Jeff was in the detention
5  room right behind us."
6  Who is Chris, do you know?
7  A. Loss Prevention Specialist.
8  Q. What's his last name?
9  A. Shill.
10  Q. Spell it.
11  A. S-h-i-l-l.
12  Q. And what about Jeff?
13  A. Last name?
14  Q. Yeah.
15  A. Satterfield.
16  Q. Was Mr. Kodiak's statement true?
17  A. Absolutely not.
18  Q. What was your relationship with Mr. Kodiak,
19  prior to March 20, 2006?
20  A. No relationship.
21  Q. Well, you supervised him, correct?
22  A. At one time, yes.
23  Q. Okay. So, as of March 20, 2006, you had no
24  supervisory relationship with Mr. Kodiak?
25  A. Yes, I did.

Page 66

1  Q. You did?
2  A. I did.
3  And I'm the one that originally hired
4  Mr. Kodiak in -- I believe, in October of 2003. He
5  worked for me at the Anchorage East store.
6  Q. How long did he work for you?
7  A. I believe, from like October to May. Then
8  he got deployed to the desert, because he's in the
9  Air Force.
10  Q. Had you had any personal problems with
11  Mr. Kodiak before the date of this memorandum?
12  A. No.
13  Q. But your testimony is he's making this up?
14  A. Damn straight.
15  Q. Do you know why?
16  A. Have no idea.
17  (Exhibit 79 marked.)
18  MR. GRUENSTEIN: This is Exhibit 79, and
19  was previously Exhibit 57 -- and is still Exhibit 57.
20  BY MR. GRUENSTEIN:
21  Q. This is a memo to you from Kevin Ruoff
22  dated November 22, 2004. "Subject: First, Last and
23  Final Notice - Harassment."
24  You're familiar with this document?
25  A. Yes.

Page 67

1  Q. And it bears the date at the bottom of
2  12/2/04, shows Mr. Mike Blewett's signature. And he
3  was the store manager at Muldoon -- I'm sorry -- at
4  Dimond, right?
5  A. Correct.
6  Q. And it indicates you refused to sign. Is
7  that correct?
8  A. Correct.
9  Q. Why did you refuse to sign?
10  A. Because I didn't do it.
11  Q. It was your understanding that by signing
12  it you were agreeing to the accuracy of the
13  allegations?
14  A. Yes.
15  Q. And that's the reason that you refused to
16  sign?
17  A. Correct.
18  Q. All right. Did Mr. Ruoff ever talk to you
19  about diversity training?
20  A. Yes.
21  Q. Tell me the circumstance, please.
22  A. I believe it's in my appraisal. It was,
23  like an objective to complete within the upcoming
24  year, which I went to, again, for the second time.
25  Q. So you went through diversity training

Page 68

1  twice?
2  A. Correct.
3  Q. When was the first time?
4  A. Probably in '98 or '99.
5  Q. Right after you were -- what were the
6  circumstances of the first diversity training?
7  A. It's part of your training, as a loss
8  prevention specialist. It's one of the requirements;
9  diversity, sexual harassment in the work place, all
10  the courses that you have to take.
11  Q. So the first time was routine and just an
12  ordinary requirement of your work; is that correct?
13  A. Correct.
14  Q. And the second time was when?
15  A. After this letter, I know. (Indicating.)
16  It was the next available class they had.
17  Q. Well, it was after, apparently, December
18  2nd, 2004, that you had the diversity training?
19  A. Correct.
20  Q. How long was it?
21  A. I don't recall.
22  Q. Where was it?
23  A. A hotel downtown. Barratt Inn, I think, or
24  something like that.
25  Q. Was it during the winter, the spring, do

20 (Pages 65 to 68)

8deb453c-24a3-41ec-b63f-c6766e08d144

Page 77

1  BY MR. GRUENSTEIN:
2  Q.  When you were employed by Fred Meyer, no
3  other supervisor ever gave you a reason to question
4  Fred Meyer's commitment to Equal Opportunity hiring
5  and other non-discriminatory employment practices,
6  with respect to African Americans or other ethnic
7  groups.
8  Fair statement?
9  A.  Fair statement.
10  Q.  And when you were employed by Fred Meyer,
11  you, in fact, had no reason, at any point in time, to
12  doubt Fred Meyer's commitment to Equal Opportunity
13  hiring and other fair employment practices, correct?
14  A.  Correct.
15  MR. GRUENSTEIN:  Thank you.
16  MS. HOLEN:  Are you done?
17  MR. GRUENSTEIN:  Yes.
18  MS. HOLEN:  Mr. Stewart, my name is Lee
19  Holen, and I represent Mr. Breland in his suit
20  against Fred Meyer.  So I'll have some questions for
21  you, too.
22  EXAMINATION
23  BY MS. HOLEN:
24  Q.  We looked at Exhibit 75, a little bit
25  earlier, which was also Exhibit 20.  That's the

Page 78

1  complaint that Breland filed against you, dated March
2  22nd, 2004.
3  A.  I don't have it.
4  Q.  Well, do you recall the complaint?
5  A.  Yes, ma'am.
6  Q.  Okay.  You indicated that Johnson called
7  you in, showed you the complaint, and then you
8  assumed -- you denied the allegations, and then you
9  assumed Johnson was going to go interview Breland?
10  A.  Yes, ma'am.
11  Q.  Did Johnson tell you he was then going to
12  go interview Breland?
13  A.  Yes.
14  Q.  Then did you hear anything more from
15  Mr. Johnson about Breland's complaint?
16  A.  No.
17  Q.  We know that there was another complaint
18  filed by Breland, in about November or September --
19  let's see October, November of that year, correct?
20  A.  Yes.
21  Q.  Did you see a copy of that complaint?
22  A.  No.
23  Q.  How did you come to learn that he had filed
24  the second complaint?
25  A.  Mr. Ruoff just showed up at the Dimond

Page 79

1  location one day and took me into the store
2  director's office, which was Mike Blewett, and
3  then -- saying that Mr. Breland had filed another
4  complaint, and so the investigation was reopened, I
5  guess, in that terminology.
6  Q.  So after the March complaint -- between the
7  time of the March complaint and when Ruoff showed up
8  at the Dimond location, you heard nothing more about
9  Breland's complaint?
10  A.  No, ma'am.
11  Q.  What -- did Johnson ever counsel you about
12  Breland's complaint?
13  A.  Just the initial counsel, when he invited
14  me into his office.
15  Q.  Okay.  And as I understand you to explain
16  that meeting, he was just questioning you about it.
17  A.  Correct.  He showed me the written
18  typed-out complaint, and then he questioned me, if I
19  had made those accusations [As spoken] in the
20  workplace.  I said:  Absolutely not.  And he said he
21  was going to, you know, look into it, talk to
22  Breland.  And that's just all I heard of it.
23  Q.  Okay.  So then tell me about the meeting
24  when Kevin Ruoff showed up at the Dimond location and
25  told you that he was reopening the investigation.

Page 80

1  What else did he tell you?
2  A.  I'm trying to think.  He didn't -- he
3  didn't really elaborate what the complaints were, to
4  me, just saying that the investigation had to be
5  reopened.  He interviewed me about that, again, and
6  he said he's going to continue the investigation, and
7  then when he gets a verdict or whatever, he'll let me
8  and Mr. Blewett know.
9  Q.  Did he tell you that there were any other
10  loss prevention specialists, or other Fred Meyer
11  employees, that had complained about you in addition
12  to Breland?
13  A.  No.
14  Q.  Was there anyone else present when Ruoff
15  showed up and talked to you about the reopening?
16  A.  Mike Blewett.
17  Q.  Blewett, okay.
18  How long did that meeting last?
19  A.  I don't -- I don't remember.  Less than an
20  hour.
21  Q.  Okay.  And then what did you hear next
22  about Ruoff's reopening this investigation about
23  Breland's accusations?
24  A.  As far as -- what do you mean, what did I
25  hear next?

23 (Pages 77 to 80)

8deb453c-24a3-41ec-b63f-c6766e08d144

**EXHIBITS**





# *Inside Your Handbook*

Welcome to Fred Meyer......................................................... 1
    A Message From Darrell Webb, President.............................. 1

Company History ............................................................... 2
Company Philosophy........................................................... 4
Company Values ................................................................ 5
    Customer Service.......................................................... 5
    Treating People Right..................................................... 6
    Continuous Improvement................................................ 6
    Loyalty........................................................................ 6
    Equal Employment Opportunities .................................... 6
    Development ................................................................ 7
    Diversity...................................................................... 7
    Inclusion ..................................................................... 7

Your Career at Fred Meyer.................................................... 8
    Getting Started............................................................. 8
    Taking the Next Step ..................................................... 10

Benefits ........................................................................... 11
    Time Off ..................................................................... 11
    Company Sponsored Plans.............................................. 14
    Discounts and Services .................................................. 16
    Rewards Program ......................................................... 17

Conduct ........................................................................... 19
    Business Ethics ............................................................ 19
    Sexual Harassment........................................................ 21
    Complaint Resolution..................................................... 23
    Alcohol and Drug Use.................................................... 24

    Dress and Appearance................................................... 26
    Solicitations ................................................................ 26
    Press Interviews ........................................................... 26
    Personal Telephone Calls ............................................... 27
    Telephone Etiquette...................................................... 27
    Electronic Mail............................................................. 27
    Internet Acceptable Use ................................................ 27
    Time and Attendance.................................................... 28
    Loss Prevention............................................................ 29
    Personal Weapons ........................................................ 30
    Violence in the Workplace .............................................. 30

Health and Safety .............................................................. 31
    Workplace Safety.......................................................... 31

Fred Meyer in the Community ............................................... 35
    The Fred Meyer Foundation ........................................... 35
    Fred Meyer Volunteers .................................................. 36
    Gold Star Club............................................................. 36
    Fred Bear ................................................................... 37
    Environmental Responsibility .......................................... 37

Resources and Information ................................................... 38
    Corporate Policy Handbook............................................ 38
    Web Resources ............................................................ 38
    Fred Meyer Television ................................................... 39
    Credit Union................................................................ 39
    Direct Deposit ............................................................. 40
    Direct Deposit Authorization Acknowledgement .................. 41
    Associate Handbook Receipt Acknowledgement .................. 41

*Values*

### Treating People Right

We believe that to do our jobs well, we have to treat each other right. No matter what your job, you deserve to be treated right by your co-workers and your supervisor. Likewise, you're expected to treat everyone you work with how you want to be treated. We're committed to creating a work environment based on mutual respect and dignity.

### Continuous Improvement

Fred Meyer built this company by always looking for ways to make stores better. Now that spirit of continuous improvement belongs to all of us. We believe that our associates are our greatest asset. That's why we have the I-Power program. It's a way you can share your ideas on how to improve Customer service, operations, and quality of work life.

Got a great idea? Just complete an I-Power form online. Your idea will be considered by company executives and may be put into practice. Whatever the decision, you'll get feedback on your idea.

### Loyalty

When you do your shopping, it makes sense to "spend it where you earn it." Shopping at Fred Meyer increases business, and that means greater job security and opportunities for you and your co-workers. As an added benefit, all associates get a 10% discount on most non-food merchandise (see page 16).

### Equal Employment Opportunities

Fred Meyer is an equal opportunity employer. We hire and promote our associates without regard to race, religion, color, sex, sexual orientation, disability, age, or national origin. In addition, Fred Meyer complies with applicable federal, state, and local non-discrimination laws.

It's our goal to be the employer of choice in every community where we do business. That's why we're committed to cultivating a diverse work environment where individual differences are respected. This policy applies to all terms and conditions of employment, including, but not limited to, hiring, placement, promotion, termination, layoff, recall, transfer, leave of absence, compensation, benefits, training, and development.

In business and personal conversations, associates should limit comments about the company to information that has been publicly released by the company. Non-public information about the company should be treated as confidential. No information about sales, earnings, competitive activities, systems, technology, proposed company developments or activities, or products should be disclosed; associates must adhere to practices designed to safeguard that information.

For more information, refer to corporate policy 4.1, Business Ethics.

### Violations

If Fred Meyer management has a reasonable basis to believe an associate has violated this policy, such violations will be met with disciplinary action, up to and including termination.

### Questions

Associates finding themselves in situations where they are uncertain of the intent of this policy, or how it applies to a specific situation, should ask their supervisor, the Vice President of Employee Relations, the Group Vice President of Human Resources or the President for clarification.

## Sexual Harassment and Other Forms of Harassment

Fred Meyer is committed to a workplace free from unlawful discrimination, which includes sexual harassment and other forms of harassment because of one's race, color, religion, gender, national origin, age, disability, or sexual orientation.

Any form of harassment undermines the company's insistence upon associate integrity, and is considered serious misconduct. No associate, either male or female, should be subjected to offensive conduct or innuendo, either verbal or physical, from co-workers, supervisors, Customers, or vendors.

All associates have a responsibility to maintain the workplace free of harassment and to report such misconduct when it occurs, just as any form of unlawful discrimination should be reported. For more information on company policy, refer to the sexual harassment policy posted at your location.

### What is sexual harassment?

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct if:

- Submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment
- Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual
- Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment

*Conduct*

**21**

*Conduct*

### Examples of sexual harassment

Examples of sexual harassment include, but are not limited to the following:

- Conditioning promotion, demotion, performance evaluations and the like upon submission to sexual favors
- Touching that is unwanted, uninvited, or offensive
- Displaying sexually suggestive or explicit material, pictures, or cartoons
- Relating sexually suggestive or explicit stories or "jokes"
- Making sexually suggestive or explicit gestures

### What are other forms of harassment?

Harassment because of one's race, color, religion, gender, national origin, age, disability, or sexual orientation is defined as verbal or physical conduct that does the following:

- Denigrates or shows hostility or aversion toward an individual because of his or her race, color, religion, gender, national origin, age, disability, or sexual orientation, or that of the individual's relatives, friends or associates.
- Has the purpose or effect of creating an offensive work environment, unreasonably interferes with an individual's work performance, or otherwise adversely affects an individual's work performance

### Examples of Other Forms of Harassment

Examples of such harassment include, but are not limited to the following:

- Making derogatory ethnic or racial statements, or belittling one's religion or religious practices
- Perpetuating stereotypes about one's age, gender, etc. ("You're too old to change your ways", "This is women's work")
- Refusing to assist an associate or Customer because of his or her race, gender, etc.
- Disparaging the sexual orientation of an associate, his or her co-workers, or a Customer

### Reporting a Complaint

If you believe that you are being sexually harassed by a co-worker, supervisor, Customer, or vendor, or if you believe you are being harassed by a co-worker, supervisor, Customer, or vendor because of your race, color, religion, gender, national origin, age, disability, or sexual orientation, you should take these steps:

- Firmly and clearly tell the person who is harassing you that his or her behavior is unwelcome and should stop at once. If possible, take a witness to this discussion.
- Write a statement about the incident and what you did to stop it, including dates, times, and places. This statement will be helpful if the harassment continues and the company needs to investigate.

# Conduct

**Note:** If you are uncomfortable telling the person who is harassing you to stop, then proceed to the following reporting procedure:

Report the incident to your immediate supervisor, another member of management, or the Employee Relations Department. Your report should be as specific as possible and include the following:

- The name of the person who is harassing you
- A description of the conduct
- The effect that conduct is having on your working conditions and work performance
- The names of any witnesses who could assist in the investigation

## Complaint Resolution

Misunderstandings or conflicts can arise in any organization. To ensure effective working relationships, it is important that such matters be resolved before serious problems develop. Most incidents resolve themselves naturally; however, should a situation persist that you believe is harmful to you or to Fred Meyer, you should follow the procedure described here to resolve your complaint.

To receive timely and fair consideration, it is important that all complaints be presented within 20 days of the occurrence. If your complaint is not resolved to your satisfaction, proceed to the next step within 10 days of the resolution made in the previous step.

**Step 1:**

Discuss the problem with your supervisor, the majority of concerns and problems can normally be resolved here. If, however, you don't believe a discussion with your supervisor is appropriate, proceed directly to Step 2.

**Step 2:**

If your problem is not resolved after discussing it with your supervisor or if you feel discussing the problem with your supervisor is inappropriate, request a meeting with your department manager (or Store Director). The manager will consider the facts, conduct an investigation, and may also review the matter with a member of Human Resources. You will normally receive a response regarding your complaint within five working days.

**Step 3:**

If you are not satisfied with your manager's decision and wish to pursue the complaint further, you may prepare a written summary of your concerns and request that the matter be reviewed by the Vice President of Employee Relations. After a full examination of the facts, the Vice President of Employee Relations will normally advise you of the decision within ten business days. The decision will be final.

Fred Meyer does not tolerate any form of retaliation by supervisors against associates using this procedure. The procedure should not be construed, however, as preventing, limiting or denying Fred Meyer from taking disciplinary action against any individual, up to and including termination, in circumstances where the company considers disciplinary action appropriate.



200126



"*Always strive to offer Customers the service, selection, quality and price that satisfies them, for by doing that we will serve our Customers well and continue to prosper and grow.*"
—Fred G. Meyer

# Employee Handbook





What's on your list today? You'll find it at

## FredMeyer

Fred Meyer Stores
3800 SE 22nd Avenue
Portland, Oregon 97202
(503) 232-8844

fredmeyer.com

EXHIBIT

M2874 1/02

## FredMeyer

200168

## Political contributions and involvement

The Company encourages all employees to vote and to participate fully in the political process. Such participation shall be entirely personal. The Company has established a political action committee (PAC), which operates in accordance with the rules of the Federal Election Commission and the laws of the appropriate state authority. Participation is entirely voluntary and coercion to contribute is prohibited.

In those states where the law permits, contributions to candidates or ballot issues may be made by the Company in moderation, but only with the approval of senior management and in strict compliance with public reporting regulations.

## Conflicts of Interest

The term "conflict of interest" describes any circumstance that could cast doubt on an employee's ability to act with total objectivity with regard to the Company's interests. Employees should avoid situations in which there is, or may seem to be, a conflict between the personal interests of the employee and the interests of the Company.

While it is impossible to anticipate every potential conflict, here are a few examples:

• Ownership in concerns with which the Company competes or with which it does business (other than modest investments in stocks listed on a recognized securities exchange or on NASDAQ)

• Buying, leasing, or selling property from or to the Company or near locations known to be of interest to the Company

• Accepting payments, services, or loans from, or rendering consulting services to, persons or concerns dealing, or contemplating dealing, with, or in competition with, the Company

• Similar activities or interests by members of your immediate family

• The active commitment of time devoted to the management of any other business enterprise that would take time away from the employee's normal work schedule

## Confidential information

As a publicly owned company, Fred Meyer is governed by strict securities laws regarding the dissemination of information about the Company to the public. The Company's ability to compete, moreover, depends upon protection of its confidential information and trade secrets. In business and personal conversations, employees should limit comments about the Company to information that has been publicly released by the Company. Non-public information about the Company should be treated as confidential. No information about sales, earnings, competitive activities, systems, technology, proposed company developments or activities, or products should be disclosed; employees must adhere to practices designed to safeguard that information.

For more information, refer to corporate policy 4.1, *Business Ethics*.

## Violations

If Fred Meyer management has a reasonable basis to believe an employee has violated this policy, it will be met with disciplinary action, up to and including termination.

## Questions

Employees finding themselves in situations where they are uncertain of the intent of this policy, or how it applies to a specific situation, should ask their supervisor, the Vice President of Employee Relations, the Group Vice President of Human Resources or the President for clarification.

# Sexual Harassment and Other Forms of Harassment

Fred Meyer is committed to a workplace free from unlawful discrimination, which includes sexual harassment and other forms of harassment because of one's race, color, religion, gender, national origin, age, disability, or sexual orientation.

Any form of harassment undermines the company's insistence upon employee integrity, and is considered serious misconduct. No employee, either male or female, should be subjected to offensive conduct or innuendo, either verbal or physical, from co-workers, supervisors, customers, or vendors.

All employees have a responsibility to maintain the workplace fee of harassment and to report such misconduct when it occurs, just as any form of unlawful discrimination should be reported.

For more information on Company policy, refer to the sexual harassment policy posted at your location.

## What is sexual harassment?

Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct if:

• Submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment

• Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual

• Such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment

## Examples of sexual harassment

Examples of sexual harassment include, but are not limited to the following:

• Conditioning promotion, demotion, performance evaluations and the like upon submission to sexual favors

• Touching that is unwanted, uninvited, or offensive

• Displaying sexually suggestive or explicit material, pictures, or cartoons

• Relating sexually suggestive or explicit stories or "jokes"

• Making sexually suggestive or explicit gestures

200185

## What are other forms of harassment?

Harassment because of one's race, color, religion, gender, national origin, age, disability, or sexual orientation is defined as verbal or physical conduct that:

- Denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, gender, national origin, age, disability, or sexual orientation, or that of the individual's relatives, friends or associates, and

- Has the purpose or effect of creating an offensive work environment, unreasonably interferes with an individual's work performance; or otherwise adversely affects an individual's work performance

## Examples of other forms of harassment

Examples of such harassment include, but are not limited to the following:

- Making derogatory ethnic or racial statements, or belittling one's religion or religious practices

- Perpetuating stereotypes about one's age, gender, etc. ("You're too old to change your ways," "This is women's work")

- Refusing to assist an employee or customer because of his/her race, gender, etc.

- Disparaging the sexual orientation of an employee, his/her co-workers, or a customer

## Reporting a complaint

If you believe that you are being sexually harassed by a co-worker, supervisor, customer, or vendor, or if you believe you are being harassed by a co-worker, supervisor, customer, or vendor because of your race, color, religion, gender, national origin, age, disability, or sexual orientation, you should take these steps:

- Firmly and clearly tell the person who is harassing you that his or her behavior is unwelcome and should stop at once. If possible, take a witness to this discussion.

- Write a statement about the incident and what you did to stop it, including dates, times, and places. This statement will be helpful if the harassment continues and the company needs to investigate.

*Note:* If you are uncomfortable with telling the person who is harassing you to stop, then proceed to the reporting procedure that follows.

- Report the incident to your immediate supervisor, another member of management, or the Employee Relations Department. Your report should be as specific as possible, including:

  - The name of the person who is harassing you
  - A description of the conduct
  - The effect that conduct is having on your working conditions and work performance
  - The names of any witnesses who could assist in the investigation

# Complaint Resolution



Misunderstandings or conflicts can arise in any organization. To ensure effective working relationships, it is important that such matters be resolved before serious problems develop. Most incidents resolve themselves naturally; however, should a situation persist that you believe is harmful to you or to Fred Meyer, you should follow the procedure described here to resolve your complaint.

To receive timely and fair consideration, it is important that all complaints be presented within 20 days of the occurrence. If your complaint is not resolved to your satisfaction, proceed to the next step within 10 days of the resolution made in the previous step.

**Step 1:**

Discuss the problem with your supervisor; the majority of concerns and problems can normally be resolved here. If, however, you don't believe a discussion with your supervisor is appropriate, proceed directly to step 2.

**Step 2:**

If your problem is not resolved after discussing it with your supervisor or if you feel discussing the problem with your supervisor is inappropriate, request a meeting with your department manager (or Store Director). The manager will consider the facts, conduct an investigation and may also review the matter with a member of Human Resources. You will normally receive a response regarding your complaint within five working days.

**Step 3:**

If you are not satisfied with your manager's decision and wish to pursue the complaint further, you may prepare a written summary of your concerns and request that the matter be reviewed by the Group Vice President of Human Resources. After a full examination of the facts, the Group Vice President of Human Resources will normally advise you of the decision within five working days. This decision will be final.

Fred Meyer does not tolerate any form of retaliation by supervisors against employees using this procedure. The procedure should not be construed, however, as preventing, limiting or delaying Fred Meyer from taking disciplinary action against any individual, up to and including termination, in circumstances where the Company considers disciplinary action appropriate.

200186

# Sexual Harassment and Other Forms of Harassment

### Scope and policy owner

This policy applies to all Fred Meyer Stores employees. Route all policy questions and suggested updates to the Group Vice President, Human Resources.

### Violation of this policy

Proven sexual harassment, or harassment because of an individual's race, color, religion, gender, national origin, age, disability or sexual orientation will result in discipline up to and including discharge.

### Philosophy

Fred Meyer is committed to a workplace free from unlawful discrimination, which includes sexual harassment and other forms of harassment because of one's race, color, religion, gender, national origin, age, disability or sexual orientation.

Any form of harassment undermines the company's insistence upon employee integrity, and is considered serious misconduct. No employee, either male or female, should be subjected to offensive conduct or innuendo, either verbal or physical, from co-workers, supervisors, customers or vendors

All employees have a responsibility to maintain the workplace free of harassment and to report such misconduct when it occurs, just as any form of unlawful discrimination should be reported.

### What is sexual harassment?

*Sexual harassment* is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical if:

- submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment,
- submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or
- such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Examples of sexual harassment include, but are not limited to the following:
- Conditioning promotion, demotion, performance evaluations and the like upon submission to sexual favors.
- Touching that is unwanted, uninvited or offensive
- Displaying sexually suggestive or explicit material, pictures or cartoons.
- Relating sexually suggestive or explicit stories or "jokes."
- Making sexually suggestive or explicit gestures.

### What are other forms of harassment?

*Harassment* because of one's race, color, religion, gender, national origin, age, disability or sexual orientation is defined as verbal or physical conduct that:

- denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, gender, national origin, age, disability or sexual orientation, or that of the individual's relatives, friends or associates, and
- has the purpose or effect of creating an offensive work environment, unreasonably interferes with an individual's work performance, or otherwise adversely affects an individual's work performance.

Examples of other forms of harassment include, but are not limited to the following:
- Making derogatory ethnic or racial statements, or belittling one's religion or religious practices.
- Perpetuating stereotypes about one's age, gender, etc. ("You're too old to change your ways," "This is women's work.")
- Refusing to assist an employee or customer because of his/her race, gender, etc.
- Disparaging the sexual orientation of an employee, his/her associates, or a customer.

### Reporting a complaint

If you believe that you are being sexually harassed by a co-worker, supervisor, customer or vendor, or if you believe you are being harassed by a co-worker, supervisor, customer or vendor because of your race, color, religion, gender, national origin, age, disability or sexual orientation, you should take these steps:

| Step | Action |
|---|---|
| 1 | Firmly and clearly tell the person who is harassing you that his or her behavior is unwelcome and should stop at once. If possible, take a witness to this discussion. |
| 2 | Write a statement about the incident and what you did to stop it, including dates, times and places. This statement will be helpful if the harassment continues and the company needs to investigate. *Note: If you are uncomfortable with telling the person who is harassing you to stop, then proceed to the reporting procedure below* |
| 3 | Report the incident to your immediate supervisor, another member of management, any person in the Human Resources Department, the President, General Manager, Distribution Manager or call the Kroger Helpline at 1-800-689-4609; TDD, 1-877-673-6803. Your report should be as specific as possible, including: <br> • the name of the person who is harassing you <br> • a description of the conduct <br> • the effect that conduct is having on your working conditions and work performance <br> • the names of any witnesses who could assist in the investigation. |

200032

### Investigating a complaint

All claims of harassment will be investigated promptly and will be handled professionally and as confidentially as circumstances permit. Your further participation in the investigation may be necessary, and you will be informed of the outcome. The Company will not tolerate reprisals or retaliation against persons reporting alleged harassment or anyone participating in the investigation of the alleged harassment.

# Employee Warning Notice

(Please Print)
To:

Last Name: **Breland**    First: **James**    Middle:

LOC: __0001P__    PR SECTION: __LPS__    Employee Number: __888508__

You are hereby notified that your employment performance is unsatisfactory in the following respects. Improvement must be made for you to continue your employment with Fred Meyer.

1. State exactly where, when and what employee did or said to incur this notice.    YES  NO

   Date(s) of infraction. __4/9/03__    __3/5__, 20 __03__    Prior verbal warnings? ☒ ☐

   _Failure to Follow company ~~~~~ policies which led to_
   _A NON-ARREST stop, error in judgement._

2. State exactly what performance is expected of the employee in the future and steps to be taken to improve or correct performance: _Must Follow All company policies, including those in section 400_
   _of the GP. manual. Mr. Breland will further re-read section 400 of the_
   _LP. Manual and send AN OV to his LPM And RLPM stating he has read_
   _and understands the policies._

3. (a) Is the employee being suspended without pay for this infraction? (circle one)   YES  (NO)

   (b) If YES – Give beginning date: ___N/A___    ending date: __N/A__.

4. State what form of discipline the employee may expect for failure to comply with this rule/standard in the future.
   _Disciplinary action For Any Future non-Arrest stops, error in_
   _judgement in the next 24 months will result in disciplinary action from_
   _suspension of employment without pay up to termination of employment._

5. State the employee's remarks after this notice was issued.
   _I disagree with ruling as error in judgement as the Loss Prevention_
   _policy manual states do not lose constant observation of the suspect_
   _all 5 elements were in play and followed. I wish the LP manual to_
   _be more specific to much gray area. I disagree too with the ruling._

It is our sincere desire that your performance attain a satisfactory level so no further action will be necessary.

Employee's Signature (optional): _____

Manager's Signature: _____    Title: __LPM__

Witness: _____    Today's Date: __May 30__ 20__03__

---

INSTRUCTIONS: PLEASE READ AND FOLLOW CAREFULLY.

1. This four-part notice is to be used for recording all details of an employee's failure to comply with part(s) of company policies, procedures and/or standards.
2. All areas of this notice must be completed as fully as possible. Lacking such completion may compromise the validity of this warning notice.
3. Review the Employee Responsibilities Form (M1398) with the employee and have him/her sign a new one and attach to the respective copies of this notice  DO NOT highlight, underline or mark beside any of the issues on the form. Marking on or altering the form may compromise its usefulness.

A. FIRST (white) copy to be sent immediately to Human Resources/04002 22-H.
B. SECOND (yellow) copy to be kept with supervisor's files.
C. THIRD (pink) copy to be given to employee.
D. FOURTH (goldenrod) copy to sent to your Regional Supervisor/District Manager. (Copy of M1398 not necessary.)

EXHIBIT
11
Breland

M1650  01/00

200349

## RLPM NON-ARREST APPREHENSION REVIEW FORM

Name: __James Breland__

Location: __00018 (AE)__  Date of Incident: __4-9-03__

LPIS Incident #: __884256512__

Follow-up

Was LPS/LPM interviewed regarding the Non-Arrest? Ⓨ / N.   ( phone )

Summary:

working w/ Supervisor LP. Mr. Breland
Lost organization of merchandise while
concealed

Findings:

Error in Judgement

List All Prior Non-Arrests:
1. None
2.
3.

List all Prior Recorded Discipline Write-ups:
None

Action Taken for This Non-Arrest Apprehension:
Write up, Re Read Section 400 —

Signature of RLPM: _____

Signature of LPM/LPS: __via Phone__

Date: __5-19-03__

EXHIBIT
8
Breland  6/27/06

From:FRED MEYER ZONE 4          425 672 5256          08/10/2005 14:47 #359 P.021



18/LPS

## APPREHENSION OF A SUSPECT

When you apprehend a suspect for shoplifting or any other crime, you are effecting an arrest. An arrest, by definition, is to deprive a person of his liberty by legal authority - taking custody of another for the purpose of holding or detaining him to answer a criminal charge. All that is required for an "arrest" is some act by you indicating your intention to detain or take a person into custody, and thereby, subject that person to your control and will. No formal declaration of arrest is required. If you hold a special police commission, you are given legal authority to arrest a person committing a criminal offense on our property. If you are not commissioned, you may effect an arrest as a private citizen. When you have restrained an individual's personal liberty or freedom of movement (however slight), an arrest has taken place.

1.    Prior to apprehending a suspect for shoplifting, the following criteria must be met:

   a.    <u>You must</u> observe the suspect enter the section.

   b.    <u>You must</u> observe the suspect remove the merchandise from the display and know exactly what that item is.

   c.    If the item is concealed, <u>you must</u> observe that concealment and know exactly where it is.

   d.    <u>You must</u> maintain continuous observation of the suspect and merchandise from the time he/she removes the merchandise from the display until he/she exits the store. Once concealed, observation of the concealment area must be continuously observed.

   e.    <u>You must</u>, for purposes of safety, have another employee follow you out of the store to act as a witness and to provide assistance, if necessary.

## Remember:

The golden rule of shoplifting apprehensions is:

## FOLLOW PROCEDURE, AND "IF IN DOUBT, LET IT OUT"

Acknowledgement of understanding:

I have read and understand the policy regarding the required elements to make a shoplift apprehension. I further understand all policies and procedures for making a shoplift apprehension within Fred Meyer as described in section #400 of the Loss Prevention Manual.

Printed Name _James Breiland_           Date _1/31/04_

Your Signature _Breiland_                 Date _1/31/04_

RLPM/LPM Acknowledgment of review:

I have reviewed this policy/procedure with the above listed Loss Prevention employee and am satisfied that the employee understands the policy/procedure.

Printed Name _Brian K. Stewart_          Date _1/31/04_

Your Signature _B K A_                    Date _1/31/04_

EXHIBIT 7a/L7/9
PERISCO 800-631-6989

1

From:FRED MEYER ZONE 1

*18/LPS*

To:        All Loss Prevention Employees

Subject:   Review / Discipline of Non-Arrest Apprehensions

<u>Review of Facts</u>:  The Regional Loss Prevention Manager will personally review the circumstances surrounding each non-arrest apprehension and non-policy apprehension, and the Loss Prevention person will be given an opportunity to explain, in their own words, all circumstances.

A.   The RLPM will follow up with each person making a non-arrest apprehension.  This should be in person, but can be done over the phone in remote stores. RLPM will need to review any available video of the non-arrest apprehension.  The Loss Prevention Manager will be involved in the review process if the non-arrest was by a Loss Prevention subordinate within his/her location.

During this review process, the Loss Prevention employee will not be involved in any type of shoplift surveillance, including use of cameras to aid other Loss Prevention employees in the apprehension or detection of theft.

B.   All non-arrest stops and final disciplinary action, will be discussed by the RLPM's on the next Regional Conference call (typically on Mondays of each week). This will ensure that each region is reacting in a similar fashion to the disciplinary actions taken.

Loss Prevention Manager (if a subordinate was responsible for the non-arrest) will present the situation to the RLPM's and Corporate LP staff.

C.   RLPM is to complete the RLPM NON-ARREST APPREHENSION REVIEW FORM. A copy of the form is to go into the employee's file with a copy to SXB.

The Store Director should be involved in the disciplinary process for any LPS or LPM. Follow up needs to occur within 7 days of the non-arrest stop.

<u>Disciplinary Action</u>: As with all disciplinary action, each case needs to be reviewed on a case-by-case basis, and the action taken appropriate for the persons involved and the judgment used.  Length of service, prior disciplinary action and overall judgment used needs to be taken into account.  As always, termination of employment is always an option when the judgment of the individuals involved and their actions, are so grievous and severe, that it places Fred Meyer at increased risk to civil liability.

The Loss Prevention person may appeal the decision for disciplinary action to the Loss Prevention Director or Human Resource Department.

The following disciplinary actions are the minimum that will be taken:

<u>Error in Judgment – Apparent Disregard for Corporate Loss Prevention Policy</u>

<u>1st within 24 months</u>:  Written warning including suspension of employment without pay (3 days for LPS / 7 days for LPM).  Re-read section 400 of the LP Manual and document that they have read and understand the policies within.  LPS/LPM will write a report to the RLPM relating the facts of the non-arrest, what went wrong, what should have occurred, and the liability they have put themselves and Fred Meyer in.

<u>2nd within 24 months</u>:  Termination of employment

A

19/LPS

## Error in Fact

**1st within 12 months:**  Verbal Warning

**2nd within 12 months:**  Written Warning

**3rd within 12 months:**  Suspension of employment for three days for LPS or First/Last/Final letter of warning for LPM.

**4th within 12 months:**  Termination of employment

Additionally, any of the following actions **will result in immediate termination of employment**:

   A.   The Failure to report any non-arrest stop within 1 hour of its occurrence.
   B.   Any non-arrest stop made before the Loss Prevention person has been released from Phase 2 training.
   C.   Any gross disregard of Policy and or any grave lack of judgment that causes a non-arrest apprehension.
   D.   Any continued or uncorrected lack of judgment / lack of fact which persists after re-training and education have been documented from previous incident.

## Remember:

The golden rule of shoplifting apprehensions is:

## FOLLOW PROCEDURE, AND "IF IN DOUBT, LET IT OUT"

Acknowledgement of understanding:

I have read and understand the policy on non-arrest apprehensions and the disciplinary guidelines.  I further understand the policies and procedures for making a shoplift apprehension within Fred Meyer as described in section #400 of the Loss Prevention Manual.

Printed Name _____JAMES   BREELAND_____   Date ___1/31/04___

Your Signature _____   Date ___1/31/04___

RLPM/LPM Acknowledgment of review:

I have reviewed this policy/procedure with the above listed Loss Prevention employee and am satisfied that the employee understands the policy/procedure.

Printed Name ___Brown  K .  Stewart___   Date ___1/31/04___

Your Signature _____R   K_____   Date ___1/31/04___

3