```
03/24/04  15:43        User F149885              Printer A5V0
                REPLY 03/24/04 09:27:11 F113022
            To: Kevin Ruoff                       F149885  - FMHOST
          From: Mike Johnson                      F113022  - FMHOST
          Date: 03/24/04
       Subject: Situation
     Reference: Your note of 03/24/04 08:39 attached below
-----------------------------------------------------------------------
```

I have talked with Bryan this morning about the discussed issues. Bryan is
very receptive. He is upset but very receptive to ideas.  I have a plan on
addressing this issue.  Call when you have time to talk and we can go over it.

Mike

```
------------------------------ ATTACHED NOTE ------------------------------
            To: Mike Johnson                      F113022  - FMHOST
            cc: Jennifer Carlson                  JC75514  - KROGERCO
          From: Kevin Ruoff                       F149885  - FMHOST
          Date: 03/24/04
       Subject: Situation
     Reference: Note from James Breland (F888508 - FMHOST) attached below
-----------------------------------------------------------------------
```

Mike

Some more from James.

Thanks,

Kevin



EXHIBIT
35
Johnson

```
------------------------------ ATTACHED NOTE ------------------------------
            To: Kevin Ruoff                       F149885  - FMHOST
          From: James Breland                     F888508  - FMHOST
          Date: 03/23/04
       Subject: Situation
     Reference: Your note of 03/23/04 07:58 attached below
-----------------------------------------------------------------------
```

Kevin

  I apologize for all the mispell words and the fact I didn't discuss this
long standing situation.  I was in between the thought of should I say
something or not. I kind of felt like LPS Bonini, If I transfer then I would
not have to deal with the derogatory/inappropriate remarks any longer but then
said to myself that, this wouldn't be right.  It wouldn't be fair to those
new LPS's coming after my transfer into a situation that was not corrected be-
cause no one said anything.
So I decided to say something but your right I probably should have brought the

topic up during your last visit the night we talked. Well to say the least
I've only heard the derogatory/inappropriate remarks on six occassions but
I'm sure if you decide to talk with LPS Bonini and LPM Becker they will
express to you that LPM Stewart uses those remarks along with other's on a
daily basis when those of his same race and gender are around. Again I'll say
I think LPM Stewart is a decent person and we do generally get a long pretty
good but I think a little education on these topics will go a long way and
hopefully he'll apply what he's learned and have a better understanding of
diversity, equal rights, tolerance, discrimination etc... I can't speak for
everyone but my feeling is that those who have worked for or with LPM Stewart
figured it was just easy to let it go because that's just how he (LPM Stewart)
is and didn't feel like getting into a confrontation, Kevin I think educating
LPM Stewart is the key.


                            Thanks jb


------------------------------ ATTACHED NOTE ------------------------------

          To: James Breland                            F888508  -  FMHOST
        From: Kevin Ruoff                              F149885  -  FMHOST
        Date: 03/23/04
     Subject: Situation
   Reference: Your note of 03/22/04 21:10 attached below
--------------------------------------------------------------------------
James

Thank you for your comments in this note. This is the first complaint that
I have received regarding Mr. Stewart and any comments that he has made or
with regards to his attitude. I wish you had discussed this with me in person
last week when I sat down with you to discuss your feelings about working at
AE and with Mr. Stewart.

I will follow up on your note, and will work towards changing the environment
of the LP department at AE. I would appreciate you keeping me aware of any
further issues or comments.

I further want you to know that I have no plans to transfer you out of AE, but
will work with you on any request you may present to transfer. As you are
aware, there is a lateral transfer to DA available if you are interested.

Again, please keep me appraised of any issues or problems at AE and/or with
Mr. Stewart.

Kevin
------------------------------ ATTACHED NOTE ------------------------------

          To: Kevin Ruoff                              F149885  -  FMHOST
        From: James Breland                            F888508  -  FMHOST
        Date: 03/22/04
     Subject: Situation

                                                              200087

---

my co-worker Tony Bonini who now works at Store 71/DA left because of the
derogatory/inappropriate remarks made by LPM Stewart on a daily basis. So I
like to say that all though Mr. Bonini is the same race as LPM Stewart he
did not have the same views. I feel LPM Stewart imposes his views and makes
derogatory/inapproapriate remarks in the presents of those of his same race
thinking that they may feel the same way he does.  Mr. Bonini is an example
that not those of the same race feel or have the same views as Mr. Stewart.

I've thought about this situation for sometime, at first I wanted to transfer
but why?  I'm not the one with the problem.Yes, the derogatory/inappropriate
remarks offend me but I shouldn't have to inconvience myself because LPM
Stewart creates a hostile work enviornment for employees with his racial view
and derogatory/inappropriate remarks.  I firemly believe that LPS Bonini woul
still be working at Store 18/AE if it was for this type of attitude displayed
by LPM Stewart.  LPM Stewart made it very uncomfortable for LPS Bonini to
work in that type of environment. I also believe that LPM Becker may have
address this problem in the pass but I'm not sure.

I'll close with this, I like LPM Stewart he's a decent person I think he mear
well.  Mr. Stewart and I get a long pretty good despite what I've just
express to you in this OV Mr. Ruoff.    Mr. Stewart has a disease and the type
of disease that Mr. Stewart has for the type of job that we do can be very
detrimental to those who work for him and around him.  As an LPM you are
responsible for training, directing, and molding LPS's.  A new LPS can be
very impressionable and with this job a person's view can be obscured when
being trained, directed or molded by someone with the disease that LPM Stewar
has. In our job we deal with a variety of people from different nationalitie
religion, race etc....    This is where LPM Stewart view can be detrimental to
the crew it self which it has already effected, the perception of the store a
the people that work with in it.  The customers that shop at the store etc...
It has a domino effect especially concerning what we do as security.  So I
shouldn't have to be transferred or inconvenience myself in order to have a
pleasant work environment.

I'll say again, I like Mr. Stewart and he's not a bad person to work for and
actually get a long pretty good depite all the remarks I've heard.  LPM Stewa
has a disease concerning race but I think knowledge is power and ignorance ca
be cured, education is the key to success and the will to succeed can only
make LPM Stewart a better person.

                              Sincerely

                              James Breland  LPS AE/18

200088

# FRED MEYER INCIDENT REPORT

INCIDENT#:0215439111                 TYPE: I-MINOR CUS COMPLAINT/INCIDENT PAGE:01

STORE LOC: DIMOND                    REPORTING PERSON: BRELAND, JAMES L
                                     RECORDING PERSON: BRELAND, JAMES L

DATE: 2002-07-02                     TIME: 18.21.12

DAMAGE AMT:              LOSS AMT:                    RECOVERY:

SUMMARY DESCRIPTION:
LPS FOLLOWS 2 JUVENILES ONE PLACES SOMETHING IN POCKET
NO STOP DUE TO MISSING ELEMENT. LPS FOLLOWS JUVENILES OUT ENTRANCE. JUVENILES
ENGAGE LPS VERBALLY, LPS RESPONSE W/WHATEVER GET LOST DON'T COMEBACK.

INJURY DESCRIPTION:
none.

PERSON INVOLVED
INVOLVEMENT: RECORDING EMPLOYEE
LAST NAME: BRELAND              FIRST: JAMES        MI: L  DOB:
ADDRESS: 2000 W DIMOND BLVD     CITY: ANCHORAGE           STATE: AK
ZIP:     99515-1400             PHONE:  907 267-6700
VEHICLE:                        IDENTIFICATION: FMID 00888508

PERSON INVOLVED
INVOLVEMENT: REPORTING PERSON
LAST NAME: BRELAND              FIRST: JAMES        MI: L  DOB:
ADDRESS: 2000 W DIMOND BLVD     CITY: ANCHORAGE           STATE: AK
ZIP:     99515-1400             PHONE:  907 267-6700
VEHICLE:                        IDENTIFICATION: FMID 00888508

*Lisa Church*

*907-229-0200*

*KITTY CHURCH*

*9430 STRATHMORE DR*
*ANCHORAGE 99502-1145*

*ended about until*
*if I could get in on it my...*
*Don't ever come back at*
*my place again or I'll...*
*hurt you.*



EXHIBIT
4/5

200370



Ryan S Krieger
02/19/2005 10:49 AM

To: Kevin Ruoff/OFS/FM/KrogerCo@KrogerCo
cc: Mike R Johnson/Stores/FM/KrogerCo@KrogerCo
Subject: Breland, James

Kevin,

This is my understanding of what occurred here at the Anchorage East location on 2-15-05.

My understanding of the incident is limited due to the fact of my noninvolvement, however the following points could be considered fact, since both witnesses (Kodiak and Breland) agree that they did occur. CCTV also shows the following to be true.
1) Two female juveniles exited the location thru the Apparel doors marked "B."
2) Breland had previously contacted Kodiak reference stopping the females.
3) Kodiak exited first and initiated contact, while Breland followed behind.
4) The females followed Breland around the corner of the building.
5) One female enters the Security Office behind Breland, Kodiak holds the Security Office door open.
6) The female sits in the corner chair placing her jacket on the bench, it looks as though Breland is searching thru her purse. Hard to tell since he has    his back to the camera.
7) The females exits the location thru the Employee Door. Breland and Kodiak return to the camera room portion of the Security Office.

It is possible that Mr Breland is concocting a story in an attempt to justify the incident. It is also possible that this event was the conclusion to a series of mishaps fueled by mis-communication.

The two females involved the incident were both known to Loss Prevention due to previous Loss situations. It is possible that these females utilized this incident to "teach" Breland a lesson.

Breland continues to state that he contacted Kodiak, stating that he (Breland) was going to make a stop, and that he needed a witness. Please remember that these two Agents were contacting each other via personal cell phones from within the store. It would be reasonable to state that this could have contributed to a lack of communication. In a high adrenaline state (during an arrest) it is easy to misunderstand, that coupled with the fact that most cell phones don't function well within the confines of a building could explain the difference in Brelands statement Vs. Kodiaks statement.

Neither Kodiak, Breland, nor myself understood that Kodiak was still in training. This is my mistake, I should have asked for clarification prior to Kodiak working his first shift (the night of this incident.) This could explain why Kodiak initiated contact prior to Breland.

Breland states that he felt that he had 24 hrs to report the bad stop. This is not correct procedure. However, as I stated during our previous conversation, several policy updates were placed into the manual while the outdated versions were never re-moved. This has since been remedied, however it is possible that this could have caused confusion.

As for the report, Breland states that he did not write the incident up as a Non-Arrest Apprehension as he was unsure as to how this situation should be handled. He stated that he had every intention of contacting me during his next work shift (the next day @ 1800Hrs) to confer with me on how the incident should be reported. Breland did not have any opportunity to confer with me, as he was called to the DIR office as soon as he


EXHIBIT
46
Krieger

entered the store. Breland was terminated at the conclusion of this meeting.

I am unsure if it is fair to terminate Breland and offer alternative punishment to Kodiak. Kodiak was acting under the pretense that he was able to make stops on his own. With that in mind, why should he be treated as a trainee acting under the guidance of a trainer? Also if Kodiak is in fact a trainee, shouldn't he be terminated for enacting an arrest prior to completion of Phase II training as per policy? Kodiak had 0 elements when he contacted the female outside the store, wouldn't that be an Error in Judgment?

Kevin, even if you tell me to make an arrest based on your observations, I know better than to take your word for it, doing so would be a violation of policy and could result in my termination based on my actions, not your direction.

My purpose is not to cause Kodiak to lose his job, it's to point out a bias in how this situation has been handled up to this point. The facts in this case are listed above, everything else is unknown. Based on the facts, it is not possible to determine intent. However one person has already lost his job based on the statement of others (Kodiak, customer) when his statement was not considered.

I do not believe that Breland is guiltless in this incident, I do believe that his termination was extreme, and possibly unfair after reviewing the facts. Mr Breland has stated that he is not begging for his job back, he just wants all the facts in the case to be reviewed and for punishment to be fair and consistent. Mr Breland has worked in his capacity since 2002. During this period he has 1 recorded Non-Arrest Apprehension, and well over 300 quality arrests. All that I ask is that all information be reviewed in this incident. Agent Breland is a quality LPS, if we are going to terminate his employment, please ensure that it is the best decision based on fact and policy.

Respectfully submitted,

Ryan Krieger
Loss Prevention Manager
Anchorage East Fred Meyer (18)

15 FEB 85

I Paul J. Kodiak Loss Prevention Specialist for Fred Meyer (Muldoon) was party and witness to the following incident during my shift (not exactly sure time) 2 females 1 black / 1 white observed circling junior dept. was Asked by LPS Breeland to take up observation. Continued to take observation of females. White female picked up Cosmetics. LPS Breeland came out to floor to take up observation of females I proceeded to the shoe department LPS LPS Breeland and I were on cell phone communicating. LPS Breeland said that he had concealment of makeup. LPS Breeland told me to go ahead & make the stop, I approached females outside of the store Identified myself as Loss Prevention to the white female and asked her to accompany back into the store to discuss the merchandise that she had. She stated she did not have anything. LPS Breeland took over at this point and asked her to come back to office (LP) gave back to the office LPS Breeland looked through her bag. did not recover what he stated that she had. LPS Breeland Apologized to female, He told me he was going to take care of the report.

Last Item

EXHIBIT
47
Krieger

Paul A Kodiak    15 FEB 05

# FRED MEYER INCIDENT REPORT

INCIDENT#:0959479033                    TYPE: I-HARASSMENT OF CUSTOMER/EMP.    PAGE:01

STORE LOC: ANCHORAGE EAST              REPORTING PERSON: BRELAND, JAMES L
                                       RECORDING PERSON: BRELAND, JAMES L

DATE: 2005-02-14                       TIME: 21.04.30

DAMAGE AMT:              LOSS AMT:                      RECOVERY:

---

SUMMARY DESCRIPTION:
LPS OBSERVES 2 F/A IN STORE FROM PRIOR LOSS, 1 F/A
STARTS FOLLOWING LP MAKING REMARKS AND THEN GIVES LP THE FINGER.   F/A
CONTINUES FOLLOWING LP, LP EXIT STORE FEMALE FOLLOWS  LP HAS CHOICE WORDS.

INJURY DESCRIPTION:
none.

---

PERSON INVOLVED

INVOLVEMENT: RECORDING EMPLOYEE
LAST NAME: BRELAND                FIRST: JAMES          MI: L  DOB:
ADDRESS: 7701 DEBARR ROAD         CITY: ANCHORAGE              STATE: AK
ZIP:     99504-1872               PHONE:  907 269-1700
VEHICLE:                          IDENTIFICATION: FMID 00888508

---

PERSON INVOLVED

INVOLVEMENT: REPORTING PERSON
LAST NAME: BRELAND                FIRST: JAMES          MI: L  DOB:
ADDRESS: 7701 DEBARR ROAD         CITY: ANCHORAGE              STATE: AK
ZIP:     99504-1872               PHONE:  907 269-1700
VEHICLE:                          IDENTIFICATION: FMID 00888508



To:        Bryan Stewart, DA 00071/LPM
           CC: Mike Blewett, DA 00071/DIR
               Mike Johnson, AE 00018/DIR
               Personnel File

From:      Kevin R. Ruoff, Z4 Regional Loss Prevention Supervisor

Date:      November 22, 2004

Subject:   First, Last and Final notice – Harassment


Bryan

This letter is to follow up on our conversation that we had with Mike Blewett on November 10, 2004. That conversation was a conclusion to the investigation that began on or about March 24, 2004 with a complaint from AE/LPS James Breland regarding racial slurs and remarks you have made in the workplace.

My investigation included interviewing several LPM's and LPS's in the Anchorage market. The result of the investigation showed that improper remarks of both racial and sexual nature may have been made by Mr. Stewart, comments that are inappropriate in the workplace.

Attached to this letter, please find a copy of the Fred Meyer policy regarding Sexual Harassment and Other forms of Harassment (FM Policy 4.2 dated 04/01) consisting of 4 pages (pages 4-13 through 4-16). I highly recommend you re-read and fully understand this policy, and discuss with either Mr. Blewett or myself if you have questions or need clarification. It will be assumed you understand and agree to adhere to this policy when you sign this document.

It is our desire that you be successful as an employee and a manger, and that you maintain a highly professional demeanor while at work. As discussed on November 10, 2004, this letter is your First, Last and Final notice regarding any violation of the Policy regarding Harassment. If you fail to comply with this policy it will result in termination of your employment.

Kevin R. Ruoff

I have received a copy of this letter, and I fully understand its contents and ramifications if I fail to comply with the Fred Meyer Policy regarding Harassment.

Refused to Sign
_____          12/2/04
Bryan Stewart – Signature         Date

_____          12/2/04
Mike Blewett – Signature          Date


E457

200516

# FRED MEYER INCIDENT REPORT

INCIDENT#:0959479033           TYPE: I-NON-ARREST APPREHENSION        PAGE:01

STORE LOC: ANCHORAGE EAST      REPORTING PERSON: BRELAND, JAMES L
                               RECORDING PERSON: BRELAND, JAMES L

DATE: 2005-02-14               TIME: 21.04.30

DAMAGE AMT:                 LOSS AMT:                    RECOVERY:

SUMMARY DESCRIPTION:
LPS OBSERVES 2 F/A IN STORE FROM PRIOR LOSS, 1 F/A
STARTS FOLLOWING LP MAKING REMARKS AND THEN GIVES LP THE FINGER.  F/A
CONTINUES FOLLOWING LP, LP EXIT STORE FEMALE FOLLOWS  LP HAS CHOICE WORDS.

INJURY DESCRIPTION:
none.

PERSON INVOLVED

INVOLVEMENT: RECORDING EMPLOYEE
LAST NAME: BRELAND            FIRST: JAMES           MI: L   DOB:
ADDRESS: 7701 DEBARR ROAD     CITY: ANCHORAGE              STATE: AK
ZIP:      99504-1872          PHONE:  907 269-1700.
VEHICLE:                      IDENTIFICATION: FMID 00888508

PERSON INVOLVED

INVOLVEMENT: REPORTING PERSON
LAST NAME: BRELAND            FIRST: JAMES           MI: L   DOB:
ADDRESS: 7701 DEBARR ROAD     CITY: ANCHORAGE              STATE: AK
ZIP:      99504-1872          PHONE:  907 269-1700
VEHICLE:                      IDENTIFICATION: FMID 00888508

PERSON INVOLVED

INVOLVEMENT: CUSTOMER
LAST NAME: EMS                FIRST: JENNIER         MI:     DOB:
ADDRESS:                      CITY:                        STATE:
ZIP:                          PHONE:  907 694-2204
VEHICLE:                      IDENTIFICATION:

FULL INCIDENT REPORT

Following report added by Kevin R. Ruoff:
Upon receiving a phone call from customers mother, investigation into this
complaint was conducted.  Investgation showed that the customer was brought
into the LP office, pockets and purse searched for lipstick, none was found.
Customer was released.  LPS failed to report the non-arrest stop.

Ex59                    200636



Sue McCoy
03/03/2005 10:27 AM

To: Karen E Bolin/Stores/FM/KrogerCo@KrogerCo, Michael
David/Stores/FM/KrogerCo@KrogerCo, Jimmie L
Brown/Stores/FM/KrogerCo@KrogerCo, Micheal S
Freeman/Stores/FM/KrogerCo@KrogerCo, Jason
Tanner/Stores/FM/KrogerCo@KROGERCO, David
Holm/Stores/FM/KrogerCo@KrogerCo, Eric
Bjorklund/Stores/FM/KrogerCo@KrogerCo

cc: Scott Bringhurst/OPS/FM/KrogerCo@KrogerCo, Kevin
Ruoff/OPS/FM/KrogerCo@KrogerCo, Chad
Lindstrom/OPS/FM/KrogerCo@KrogerCo, Susan
Perkins/OPS/FM/KrogerCo@KrogerCo, Becky
Kiewel/OPS/FM/KrogerCo@KrogerCo, Eric A
Morris/OPS/FM/KrogerCo@KrogerCo, Marlin
Baker/OPS/FM/KrogerCo@KrogerCo, Joe P
Kopelic/OPS/FM/KrogerCo@KrogerCo, Sandi C
Alcantara/OPS/FM/KrogerCo@KrogerCo, Nicole L
Smith/OPS/FM/KrogerCo@KrogerCo

Subject: REVISED Apprehension Policy Change (CORRECTED DATES) USE
THIS ONE! (Per SXB)

Effective 3/6/05 at: DN BN AN GY HY JC IL (Track Cam Stores) ONLY!

Our current policy requires that one individual have all five elements in a shoplift before an apprehension is allowed. This policy does not allow for any of the elements to be witnessed by one individual, then reacted to by a different individual.

Effective 3/6/05, we will be testing a change in this policy at the selected locations. The policy will still require the same elements, but will allow them to be observed by two individuals. One person MUST be observing the suspect from the camera system, and one person must be observing from the sales floor. The following conditions must exist:

1. Policy change is only effective at DN BN AN GY HY JC IL
2. All five elements must be met between the LP employee operating the camera system and the LP person working the sales floor.
3. All elements must be observed by no more than two LP employees maximum.
4. Both LP employees must be active in the observation of the suspect.
5. The LP person working the sales floor is responsible for the final decision to arrest, however, both parties will be held responsible for their decisions if a non-arrest occurs.
6. Report must be completed by both LP employees that were involved. Report will describe in detail each person's involvement.

Before you can initiate this change, each and every Loss Prevention employee at your location must understand the change completely and indicate that he/she understands by signing a hard copy of this e-mail. At that point, you can confirm with your Regional Loss Prevention Manager that this training has been completed. Intersection mail the signed copies of this e-mail to SCA 04002 31/A.

If you have any questions, give me a call.

I understand and agree to abide by this policy change. I also understand that all disciplinary policies/procedures set out to cover non-arrest and non-policy stops still apply.

Sign: Curtis R Braly          Date: March 09, 2005

Witness: Jimmie L. Brown 297393     Date: March 09, 2005

Ex60 200706

Mike:

✓ Please cover the attached w/
Bryan - have him sign it, then
you.

✓ Once completed - please put the
original in your Personnel file -
and give a copy of the entire
packet to ~~mt~~ Bryan.

✓ I will also need you to send a
copy of the entire packet to me, and
✓ Just ~~the~~ a copy of the top sheet to
Mr. JOHNSON @ AE.

Done                    Thank you!
MAB


200743   Ex 68

To:     Bryan Stewart, DA 00071/LPM
CC:  Mike Blewett, DA 00071/DIR
        Mike Johnson, AE 00018/DIR
        Personnel File

From:        Kevin R. Ruoff, Z4 Regional Loss Prevention Supervisor

Date:        November 15, 2004

Subject:     First, Last and Final notice – Harassment


Bryan

This letter is to follow up on our conversation that we had with Mike Blewett on November 10, 2004. That conversation was a conclusion to the investigation that began on or about March 24, 2004 with a complaint from AE/LPS James Breland regarding racial slurs and remarks you have made in the workplace.

My investigation included interviewing several LPM's and LPS's in the Anchorage market and the complaint that Mr. Breland made was supported. The specifics of the allegations are that you have used the term "field nigger" in referring to people of color, as well as making sexually suggestive remarks about women you were observing on CCTV. and sexually demeaning remarks about other women, some of whom you work with.

Attached to this letter, please find a copy of the Fred Meyer policy regarding Sexual Harassment and Other forms of Harassment (FM Policy 4.2 dated 04/01) consisting of 4 pages (pages 4-13 through 4-16). I highly recommend you re-read and fully understand this policy, and discuss with either Mr. Blewett or myself if you have questions or need clarification. It will be assumed you understand and agree to adhere to this policy when you sign this document.

It is our desire that you be successful as an employee and a manger, and that you maintain a highly professional demeanor while at work. As discussed on November 10, 2004, this letter is your First, Last and Final notice regarding any violation of the Policy regarding Harassment. If you fail to comply with this policy it will result in termination of your employment.



Kevin R. Ruoff

I have received a copy of this letter, and I fully understand its contents and ramifications if I fail to comply with the Fred Meyer Policy regarding Harassment.


_____          _____

Bryan Stewart – Signature                              Date


_____          _____

Mike Blewett – Signature                              Date


200744

**FredMeyer**

# 4.2 Sexual Harassment & Other Forms of Harassment

## (04/01)

## Statement

This policy is identical to *The Kroger Co. Policy Concerning Sexual Harassment and Other Forms of Harassment*.

## Scope

This policy applies to all Fred Meyer Stores employees.

## Policy owner

Route all policy questions and suggested updates to the Group Vice President, Human Resources.

## Violation of this policy

Proven sexual harassment, or harassment because of an individual's race, color, religion. gender, national origin, age, disability or sexual orientation will result in discipline up to and including discharge.

## Philosophy

Fred Meyer is committed to a workplace free from unlawful discrimination, which includes sexual harassment and other forms of harassment because of one's race, color, religion, gender, national origin, age, disability or sexual orientation.

Any form of harassment undermines the company's insistence upon employee integrity, and is considered serious misconduct. No employee, either male or female, should be subjected to offensive conduct or innuendo, either verbal or physical, from co-workers, supervisors, customers or vendors.

All employees have a responsibility to maintain the workplace free of harassment and to report such misconduct when it occurs, just as any form of unlawful discrimination should be reported.

200745



**FredMeyer**

## What is sexual harassment?

*Sexual harassment* is defined as unwelcome sexual advances, requests for sexual favors, and other verbal or physical if:

+ submission to such conduct is made either explicitly or implicitly a term or a condition of an individual's employment,

+ submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or

+ such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

## Examples of sexual harassment

*Examples* of sexual harassment include but are not limited to the following:

+ Conditioning promotion, demotion, performance evaluations and the like upon submission to sexual favors.

+ Touching that is unwanted, uninvited or offensive

+ Displaying sexually suggestive or explicit material, pictures or cartoons.

+ Relating sexually suggestive or explicit stories or "jokes."

+ Making sexually suggestive or explicit gestures.

## What are other forms of harassment?

*Harassment* because of one's race, color, religion, gender, national origin, age, disability or sexual orientation is defined as verbal or physical conduct that:

+ denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, gender, national origin, age, disability or sexual orientation, or that of the individual's relatives, friends or associates, and

+ has the purpose or effect of creating an offensive work environment, unreasonably interferes with an individual's work performance, or otherwise adversely affects an individual's work performance.

200746

**FredMeyer**

## Examples of other forms of harassment

*Examples* of such harassment include but are not limited to the following:

✦ Making derogatory ethnic or racial statements, or belittling one's religion or religious practices.

✦ Perpetuating stereotypes about one's age, gender, etc. ("You're too old to change your ways," "This is women's work.")

✦ Refusing to assist an employee or customer because of his/her race, gender, etc.

✦ Disparaging the sexual orientation of an employee, his/her associates, or a customer.

## Reporting a complaint

If you believe that you are being sexually harassed by a co-worker, supervisor, customer or vendor, or if you believe you are being harassed by a co-worker, supervisor, customer or vendor because of your race, color, religion, gender, national origin, age, disability or sexual orientation, you should take these steps:

| Step | Action |
|------|--------|
| 1 | Firmly and clearly tell the person who is harassing you that his or her behavior is unwelcome and should stop at once. If possible, take a witness to this discussion. |
| 2 | Write a statement about the incident and what you did to stop it, including dates, times and places. This statement will be helpful if the harassment continues and the company needs to investigate.<br><br>**Note:** If you are uncomfortable with telling the person who is harassing you to stop, then proceed to the reporting procedure below. |
| 3 | Report the incident to your immediate supervisor, another member of management, any person in the Human Resources Department, the President, General Manager, Distribution Manager or call the Kroger Helpline at 1-800-689-4609; TDD, 1-877-673-6803. Your report should be as specific as possible, including:<br><br>✦ the name of the person who is harassing you<br>✦ a description of the conduct<br>✦ the effect that conduct is having on your working conditions and work performance<br>✦ the names of any witnesses who could assist in the investigation. |

200747



**FredMeyer**

## Investigating a complaint

All claims of harassment will be investigated promptly and will be handled professionally and as confidentially as circumstances permit. Your further participation in the investigation may be necessary, and you will be informed of the outcome. The Company will not tolerate reprisals or retaliation against persons reporting alleged harassment or anyone participating in the investigation of the alleged harassment.

200748

```
6CXXFRP                          FRED MEYER, INC.                              Page -    3
                               Status Change Requests                         Date -   5/11/05

Function   :  PIA      Pay Increase for Employee              Status:  Pending
Employee # :  1085916  KOZIAK, PAUL J                         SSN # :   [Credourj]
Reason Code : 075      PIA-Credit Previous Experience

------------------- Requested Transfer / PIA ---------------    Current Employee Information ----------

Effective Date    : 05/01/05
Store/Location    :  18        Anchorage East                 18        Anchorage East
Payroll Section   : LPS        Loss Prevention Specialist     LPS       Loss Prevention Specialist
Contract          : 024600     Loss Prevention Alaska         024600    Loss Prevention Alaska
Job Type          : 302051 / 0020  Loss Prevention Specialist 302051 / 0010  Loss Prevention Specialist
Pay Rate          : 11.9800     Apprentice Step 2             11.4500    Apprentice Step 1
Apprentice Units  : 1,040.00    Hours                         769.02     Hours
Employee Status   : 3           Part-time Permanent           3          Part-time Permanent

**** Routing History ****************

Date & Time       By User                      Action          Chg     Sent to
05/02/05  8:00    149885  RUOFF, KEVIN R        Initiated               252286  BRINGHURST, JOSEPH S
05/09/05  8:59    252286  BRINGHURST, JOSEPH S  Apprv & Fwd to P/R      Vers-007  Payroll Team
                  Vers-007  Payroll Team        Pending

**** Comments ****************

Date & Time       By User                      Comments
05/02/05  8:04    F149885  RUOFF, KEVIN R       SCOTT:  PAUL WAS AT STEP 1 BEFORE HE WAS SHIPPED OFF WITH THE
                                                MILITARY.  WHEN WE HIRED HIM BACK, WE DID NOT GIVE HIM CREDIT FOR
                                                HIS PREVIOUS HOURS.  PLEASE APPROVE THIS BUMP TO STEP 2.  THANKS! KRR
```

16.89
.43
7.26 Retro

EX 70

200865



**Kodiak**
**<akkbears005@alaska.**
**com>**

03/20/2006 07:22 PM

To: Devin.lilly@fredmeyer.com
cc:
Subject: Bryan Stewart

On or about 17 Feb 06 while at Applebee's with my wife I received a telephone call on my cell from LPM Bryan Stewart at approximately 2300hrs. During the conversation Bryan stated that he heard from people that LPS Jeff Satterfield has a drinking problem and if it continues he will fire him.

On or about the week ending 4 Mar 06 A Racial comment not sure what the exact wording was but I believe the word Jigaboo was used, in reference to a black person was made by LPM Bryan Stewart in the camera room while we were observing a couple of black juveniles. I told him that my brother in law was black. I believe Either Chris or Jeff was in the detention room right behind us.

On or about the 6th, 7th or 8th of March 06 A comment was made to LPS personnel by LPM Stewart to stop wasting time with Juveniles that the adults are the one that we are to be concerned with. "Don't waste time with kids its small shit"

This statement is true and correct to the best of my knowledge

//signed//

LPS Paul Kodiak

*Ex 78*    **200760**



**Devin W Lilly**
04/03/2006 04:15 PM

To: Jodi Gorman/Stores/FM/KrogerCo@KrogerCo
cc: Michelle M Skommesa/Stores/FM/KrogerCo@KrogerCo
Subject: Bryan Stewart - AE/LPM - Termination

Jodi,
On 3/8/06, I was sent a note (currently retained in Stewarts file) from Michelle Skommesa, AE/DIR, detailing numerous complaints that Loss Prevention Specialist's Chris Shill, Jeff Satterfield and Paul Kodiak were making against Loss Prevention Manager Bryan Stewart. One of the complaints invloved the accusation that Bryan had used a racial slur back on 2/27, in the camera room of the LP office. This complaint was determined to be the most serious one against Bryan as there is currently a First, Last and Final warning in Bryan's file regarding the claim that other racial slurs and other derogotory comments were overheard by another LPS named James Breland back in November, 2004.

During my investigation, I spoke with all three of the Loss Prevention Specialists employed at store 018, Chris Shill, Paul Kodiak and Jeff Satterfield and discussed all the issues/complaints listed out on the note sent to be from Michelle Skommesa. My focus was primarily on the racial slur claim and the breach in confidentiality by Stewart regarding the suspicion of Jeff Satterfield calling in sick for work due to heavy drinking the night before work.

I first spoke with Kodiak on March 12th to discuss the complaints. Regarding the racial slur, Paul informed me that on 2/27, while working with Stewart in the camera room, he heard Stewart refer to some African American juveniles entering the A doors as "Jigaboos" by stating "We need to watch these jigaboos here" as they entered the store. Kodiak then stated back to Stewart at that time that "I'm not sure if you know or not, but my brother-in-law is black and I would appreciate you not making those comments". Regarding the breach of confidentiality, Kodiak informed me that Stewart called him the night of 2/17 and informed him that "he was coming back and was going to clean up the place", and that he knows that "Satterfield has as drinking problem and that if he comes to work drunk he was going to fire him".

I spoke with Satterfield on 3/11 to ask about what he had heard about a racial slur that was used by Stewart. Satterfield told me that he heard Stewart use the term "jigaboos" in reference to some black juveniles he observed entering the A doors. He then informed me that Kodiak told him that he has a black brother-in-law and to not make those comments.
Regarding the breach of confidentiality, I asked Satterfield if Kodiak spoke to him about Stewart planning on firing him. Satterfield said that Kodiak told him that "Stewart thinks you have a drinking problem and that if he finds you coming into work drunk, he was going to fire him".

I spoke with Shill about both the racial slur and the breach of confidentiality, and his explanation to me matched what Satterfield and Kodiak had told me. Shill wasn't around for either incidents, so his statement reflects what was told to him by Kodiak and Satterfield.

On 3/21, I contacted Terri Herndon (Fred Meyer Employee Relations) to discuss the Stewart case. I told Terri that I felt Stewart was probably going to deny everything, to which she stated "That's fine! He's denied this once before and it's even more suspicious that this has happened again and so it's not a big surprise that he would deny it again". Terri informed me that we need to sit him down and interview him about the claim, and then terminate him, even if he denies it. The decision to terminate was due to the previous First, Last and Final currently in his file regarding the use of a racial slur. Terri stated that we don't need to suspend pending further investigation.

On 3/22, Michelle Skommesa and I sat down Bryan Stewart at approximately 9:30am to discuss the racial slur claim as well as the breach of confidentiality. When asked why he thought we were here today, Stewart stated that he thought we were here to discuss what he wanted to accomplish as LPM in this store so Michelle has a good understanding of what his intentions are. I stated that this isn't what we're here for and that we needed to dicuss a more important and serious situation. Stewart appeared surprised at this. I asked Stewart if her remembers a conversation that took place on 2/27 with Paul Kodiak back in the

$Ex\ 80$

200762

2 H    Bryan Stewart

camera room. He said "no". I then went into more detail and asked him if he remembers making the comment of "We need to watch these jigaboo's" as some black juveniles were entering the store through the A doors. Again, Bryan looked surprised and stated "Are you kidding? I never made a comment like that!" I then asked Bryan why would Paul Kodiak make this up, to which he stated that "Paul and Breland (previous LPS that worked for Bryan Stewart who no longer works for us) are friends and just want to get me fired". I then asked him again about the racial comment made, to which he again stated that "Kodiak is lying and that he would never make a comment like that and has never used the word "jigaboo" in his entire life". I then asked Bryan if he remebers Kodiak making a statement back to him after he allegedly made the racial comment stating "I 'm not sure if you are aware of this or not, but my brother-in-law is black and I would appreciate it if you didn't make those comments". Stewart stated "No! I didn't even know that Kodiak even had a brother-in-law". I then told Bryan that I was concerned due to the fact that this is the second racial claim made against him in the past year and a half, and that this is very serious. Stewart again stated "I swear, I never made this comment. Go back and view video and take a look for yourself!

I then questioned Stewart about the breach of confidentiality regarding Jeff Satterfield. Stewart did admit that he called Kodiak on the night mentioned in Kodiak's above statement and discussed with him the fact that he felt like Satterfield was having a drinking problem, and that if he comes to work hung-over or drunk, he was going to fire him. I then stated to Stewart that he had no business telling Kodiak this information as this was discussed between him and I and was to remain confidential. Stewart understood this and stated that he was sorry for discussing this with Kodiak and takes full responsibility for it.

I then told Stewart that due to the current First, Last and Final in his file from back in 11/04 regarding a racial slur that he used, I had no other choice to suspend him pending further invesigation. I chose to suspend Stewart as I wanted to review video tape before making the decision to terminate. Stewart was very upset over this and continued to deny ever making this comment and swearing by it. I then asked for Stewart's key's, swipe card and any other Fred Meyer property that he possessed. He gave it all to myself and Michelle Skommesa. I told Stewart that I will need to do a little more investigating and make some phone calls. I told him that I would contact him as soon as possible. Stewart then left the building.

I went back to the LP office and pulled video tape on the day in question. In reviewing the video tape on 2/27, from 6:00pm to 8:00pm, the time that Kodiak and Stewart worked together, I was unable to find any one particular incident that I was able to positively identify as the incident in question, where Stewart could have possibly made the racial comment.
Note: The Anchorage East location has a large enough African American customer base that there were multiple incidents on video where the camera's picked-up observation of some African American customers.

I then contacted Paul Kodiak to discuss with him again about the racial claim. I told him that Stewart had denied the accusation vehemently and that Kodiak was lying because he and Breland were friends. Kodiak stated "Absolutely not! Breland and I haven't spoken since he was terminated from Fred Meyer because he has been trying to pin a bad stop on me". I then told told Kodiak about Stewart's reaction of not knowing that Kodiak even had a brother-in-law, to which Kodiak stated "He's lying and I would tell it to his face. He know's very good and well that I have a black brother-in-law".

At approximately 3:30pm, I went back to Michelle Skommesa's office to discuss with her in further detail about the results from viewing video and my second discussion with Kodiak. We then received a phone call from Scott Bringhurst asking us about Bryan Stewart. I had not yet discussed the suspension of Stewart with Bringhurst yet, but he was made aware of it as Stewart had proceeded to call a few people down at the Main Office in LP to discuss what happened.
Michelle and I discussed the results of our investigation with Bringhurst, including what was observed on video, and details of my conversation with Terri Herndon on 3/21. The decision was made to terminate Stewart at this time.

200763

At approximately 4:00pm, Michelle and I contacted Bryan at home to instruct him to come back down to the store so we could discuss his suspension. He told me that he couldn't because he was too drunk to drive. I then told him to come down to the store the next day (3/23) and meet us at 8:00am to discuss his suspension.

Bryan, Michelle and I met at 8:00am in the Directors office. Michelle and I informed Bryan that the decision has been made to terminate his employment with Fred Meyer. Again, Bryan continued to deny that this happened. I then informed him that he would need to contact Carl Wojciechowksi's office to discuss this with them if you have any questions or concerns. I then stated that this was out of our hands at this time.

Stewart was escorted back to the LP office by LPM Jimmie Brown to help him gather all his personal items. He was then escorted out of the store.

Let it be known that Bryan Stewart has contacted myself (several times), Nicole Smith and Chad Lindstrom since his termination, wanting to discuss this with each of us. We have all had to tell him that we can not discuss this case with him and to please stop calling us. At the time of his suspension, he had contacted Jimmie Brown, Fred Becker and Mike Blewett to discuss what happened. There may have been others that he has contacted to which I may not be aware of. Usually, these phone calls are placed after Stewart has become intoxicated at his residence.

Devin Lilly
Zone 7 Regional Loss Prevention Supervisor
Fred Meyer Stores
Office 907-267-6790
Mobile 907-301-1629
devin.lilly@fredmeyer.com

200764

$3$   $1B$

## Bryan Stewart Statement of Events

On March 8, 2006 I was approached by Jeff Satterfield and Chris Shill to discuss some complaints that they had about the LPM, Bryan Stewart. During our conversation the following items were brought up:

*Bryan making racial slurs on February 27 while watching the cameras at the "A" doors calling some black individuals entering the store "jigaboos" with Paul Kodiak in the office with him.

*Bryan had called Paul Kodiak outside of work on his cell phone making comments stating that one of his fellow LPS's, Jeff Satterfield, had a drinking problem and that he (Bryan) was going to terminate Jeff's employment if he called in sick or late due to drinking.

*Bryan was also very demanding when on the phone with the LPS's. He would demand that they return to the LP office instead of politely asking them to return when they were in the area. This was putting the LPS's on the defensive and worried about what they may have done wrong.

*Bryan stated that he refused to use his pager. The LPS's needed to call him on cell phone or home phone to get a hold of him in emergencies. On several occasions over the previous week, they had called these numbers regarding issues in the store and he did not return their phone calls. They had to call another LP Manager in the area to get an answer to their questions.

*Bryan had taken several extended lunches during the previous week and not used the employee entrance so it would be more difficult to track what time he left and returned.

I assured Jeff and Chris that I would address this situation and advised them not to talk to anyone else about the complaints above until I was able to contact Devin.

On March 8, I contacted Devin Lilly, Loss Prevention Regional Supervisor, by phone regarding the complaints listed above to seek advise as to how to handle them. I sent him an e-mail listing out the complaints and waited to hear back from him. At that time he began his investigation of the allegations above.

On March 22, Devin Lilly and myself sat down with Bryan Stewart to discuss the allegations. When Bryan was asked why he felt that he was brought into my office, he replied that the three of us were in the office to discuss his goals he had set as the LPM at the Anchorage East store. He wanted me to have a full understanding of what his intentions were. Devin informed him that we were not here to discuss that, but a more serious situation that had occurred in the store. Bryan appeared to be surprised and had no idea what could have occurred.

Devin began by asking Bryan if he remembered a conversation he may have had in the Loss Prevention camera room with Paul Kodiak on February 27. He stated "no". He was then asked if he remembered making the statement as some young black males entered the store "We need to watch these jigaboos". He became very defensive and stated that "the word jigaboo is not even part of my vocabulary". "Paul is making this up". When asked why Paul would make an accusation like

$Ex8$   200839

2B   Bryan Stewart

this, Bryan stated "Paul and Breland are friends and they are trying to get me
fired". (Breland is a former LPS that had worked with Bryan at another location
with Fred Meyer who is no longer employed with us.) Devin then asked if Bryan
recalled Paul replying to his statement about the jigaboos comment. Paul had stated
that his he was not sure if Bryan was aware or not, but that he his brother-in-law
was black and he did not like the comment that he had made. Bryan replied that he
had never heard or had this conversation with Paul Kodiak and he was in fact lying
to try to get Bryan fired.

Devin informed Bryan that he was concerned about this allegation because it was a
repeat complaint. Bryan had previously had a complaint filed against him in 2004
by another LPS, Breland, about making racial slurs. That claim had been
investigated and found to be substantiated. Bryan was issued a last and final
warning notice in November of 2004 about making racial slurs. Bryan told Devin to
go back and review the video tape of the date and time of the incident to find the
people he had made these comments about.

Devin then discussed the comments he had made regarding Jeff Satterfield to Paul
Kodiak. Bryan had stated to Paul the Jeff had a drinking problem and he was going
to fire him. Devin discussed with Bryan the fact that he had broken a confidential
conversation between himself and Devin. The conversation Devin and Bryan had
was regarding the fact that Devin had been in the loss prevention office when Jeff
had come in to change the tapes. Jeff had called in sick that day, but came by to
change the tapes. Devin thought that he may have had a hang over. Devin had
informed Bryan of this and told him to watch Jeff. Devin told Bryan that he was
concerned he, Bryan, had made these comments to Paul and that he had no business
discussing their conversation with anyone and he had breached confidentiality
between the two of them. Bryan apologized for making this indescretion and told
him it would not happen again.

Devin then informed Bryan that the current complaint was the same as that of the
one where he had been given a last and final warning in November 2004 regarding
making racial slurs. Due to this fact, he had no other choice but to suspend Bryan
pending further investigation. I then advised Bryan that it would be in his best
interest to not discuss this matter with anyone while it was under investigation so
that we could do our part to clear him of the allegations. We then asked Bryan for
his keys, swipe card and other Fred Meyer property he may have. We again
informed him that we would be continuing the investigation, and any findings would
be discussed with Fred Meyer Employee Relations and the VP of Loss Prevention,
Scott Jones. We would call Bryan as soon as possible to let him know the outcome
of the investigation. Bryan was then escorted out of the building.

Devin then went to the LP office to view the video tape from February 27 from
approximately 6:00 to 8:00 pm to find this incident that may have occurred between
him and Paul Kodiak. He informed me later that afternoon that he was unable to
find an exact incident due to the fact that the community around the Anchorage

From:EQL SES Case 3:05-cv-00169-TMB Document 14-5 Filed 05/23/2006 05:56 Page 25 of 26

3B  Bryan Stewart

East location was predominantly African American so there were numerous instances were several juveniles had of this race had entered the store. He also informed me that he had contacted Paul Kodiak again regarding the complaint filed and let him know of the statement that Bryan had made during the interview about Breland and Kodiak being friends and wanted to get him fired. Devin informed me that Paul had again stated that the incident happened and that Breland and him were no longer friends and had not spoken for quite some time. He also reaffirmed that Bryan did know he had a brother-in-law that was black.

While Devin and I were discussing his findings and conversation with Kodiak, Devin received a phone call from Scott Bringhurst regarding the suspension of Bryan Stewart. We had not discussed this with Scott yet as we were still in the investigation stage. When Scott was asked how he became aware of the situation, he stated that "Bryan had made a few phone calls to people at the main office". Devin and I began to discuss the complaint and our findings with Scott at this time. The conversation included all of our investigation with regards to what was stated, observed, and discussed with Terry Herndon and during the interview. The decision was made to terminate his employment.

Devin and I contacted Bryan at home at approximately 4:00 pm that day to have him return to the store so we could discuss his suspension. Bryan told Devin that he would not return to the store because he had been drinking all afternoon. He tried to get Devin to tell him the outcome over the phone and Devin refused. He set up an appointment for the next morning, March 23, with Bryan at 8:00 am to discuss it further. Bryan continued to try to have Devin tell him the outcome over the phone and Devin refused.

On March 23 at 8:00 am, Bryan, Devin and myself held our meeting in the director's office at the Anchorage East location. We informed Bryan that the decision had been made to terminate his employment with Fred Meyer. Bryan continued to deny the claims that were made against him. He was informed that the decision to terminate was made by the main office based on his last and final warning and the current claim. He had the option to contact Carl Wojciechowski's office to discuss the complaint resolution policy and file his claim.

Bryan was then escorted back to the Loss Prevention office by Jimmie Brown, Loss Prevention Manager at the Anchorage Fred Meyer, to collect his personal belongings. I then had my time and attendance operator input his time and submitted his termination. I then submitted all the paperwork to revoke any access he had to the computer systems, pass cards and alarms.

When Bryan's check arrived, I called him and let him know I would have it in my office and he could collect it from me when he returned his badge and the pager. He called me prior to arriving at the store and I met him outside with his check at which time he returned the above items. He informed me that he had secured

5

200841

4B  Bryan Stuart

another job at Alaska Sales and Service selling cars. I congratulated him and
wished him luck in his new career.

Michelle Skommesa
Store Sales Director
Anchorage East Fred Meyer
907-269-1700 Ext. 2622