UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

JAMES BRELAND,

                    Plaintiff,

          vs.

FRED MEYER STORES, INC.,

                    Defendant.

No. 3:05-cv-00169-TMB

MEMORANDUM DECISION
AND
ORDER
[Re: Motion at Docket No. 30]

## I.  MOTION PRESENTED

At Docket No. 30 defendant Fred Meyer Stores, Inc., ("Fred Meyer") has moved for summary judgment in its favor.  At Docket No. 44 plaintiff James Breland ("Breland") opposed the motion and at Docket No. 52 Fred Meyer replied.  The Court heard oral argument on February 12, 2007, and now enters its decision.

## II.  BACKGROUND/JURISDICTION

Breland was employed by Fred Meyer as a part-time Loss Prevention Specialist ("LPS") in Anchorage from January 4, 2002, until February 15, 2005, at which time he was terminated.[1/]  This lawsuit arises out of that employment and termination.  Breland's complaint raises four claims: (1) Hostile work environment (Title VII of the Civil Rights Act of 1964); (2) Retaliatory firing (Title VII); (3) Discrimination in the form of disparate treatment on the basis of race in violation of 42 U.S.C. § 1981; and (4) Wrongful termination in violation of public policy under state (Alaska) law.  Breland filed a complaint with the U.S. Equal Opportunity Commission, received a Notice of Right to Sue dated June 9, 2005, and timely commenced this action on July 18, 2005.  This Court has original jurisdiction over the federal civil rights claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367(a).

---

[1/] A Loss Prevention Specialist is a person commonly known as a store security officer. The function of an LPS is to detect and apprehend shoplifters.

The basic facts underlying this lawsuit are undisputed.

For a two-year period beginning in August 2002 Breland, an Asian-African-American, was supervised by Bryan Stewart ("Stewart"), a Caucasian, the Loss Prevention manager at the Fred Meyer Muldoon store. During this period Stewart made derogatory and inappropriate race-related remarks that, although not directed at him, Breland overheard. After attempting to resolve the situation with Stewart without success, on March 22, 2004, Breland sent an e-mail to Kevin Ruoff ("Ruoff"), the Regional Loss Prevention Manager, asking him to correct it.

In August 2004 Stewart was transferred to another store and no longer supervised Breland. On October 30, 2004, Breland sent a follow-up e-mail to Ruoff, copying Ruoff's supervisor, asserting that his March 22 complaint had not been sufficiently addressed. Breland did not claim in the e-mail there had been any further incidents in which Stewart made inappropriate racial remarks.

On February 14, 2005, Breland and another store LPS were involved in a "non-arrest apprehension," *i.e.*, a situation in which a customer is stopped on suspicion that the customer may be committing a theft (shoplifting) but no arrest is made because no theft has in fact occurred. The non-arrest apprehension was not reported in accordance with Fred Meyer policy. The following day Ruoff, after receiving a complaint from the mother of the customer, asked the store manager to investigate the incident. That investigation determined that Breland failed to report the non-arrest apprehension of the customer. Breland was terminated for violating the Fred Meyer immediate notice policy.

Breland's complaint is twofold: first, that Fred Meyer did not timely or properly respond to his complaint about Stewart; and second, he was fired in retaliation for complaining about Stewart as well as his subsequent complaint about the handling of his initial complaint by Ruoff.

### III. ISSUES PRESENTED

The Motion before the Court presents several issues.

1.    Do the facts establish that Breland was subjected to an abusive workplace environment, as determined subjectively and objectively, and, if so, did Fred Meyer take adequate remedial action?

2.      Was Breland's termination in February 2005 the result of his March 2004 Title VII complaint, *i.e.*, was there a nexus between the two events?

3.      Assuming the facts establish Breland's termination constituted a *prima facie* case of discrimination (disparate treatment) under 42 U.S.C. § 1981, did Fred Meyer show an independent non-discriminatory reason for his termination that was not pretextual?

4.      Did Breland's termination violate the public policy of the State of Alaska?

## IV.  STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if, when viewing the evidence in the light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment in its favor as a matter of law.[2]  Support and opposition to a motion for summary judgment is made by affidavit made on personal knowledge of the affiant, depositions, answers to interrogatories, setting forth such facts as may be admissible in evidence.[3]  In response to a properly supported motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue for trial.[4]  The issue of material fact required to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.  In order to show that a genuine issue of material fact exists a nonmoving plaintiff must introduce probative evidence that establishes the elements of the complaint.[5]  Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment."[6]  In ruling on a motion

---

[2] FED. R. CIV. P. 56(c); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (*en banc*); *Taylor v. List*, 880 F.2d 1040, 1044 (9th Cir.1989).

[3] FED. R. CIV. P. 56(e)

[4] *Id.*; *Henderson v. City of Simi Valley*, 305 F.3d 1052, 1055-56 (9th Cir.2002).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

[6] *Id.*, at 255.

for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences are drawn in his favor.[7/]  The moving party bears the burden of both production and persuasion.[8/]  There is no genuine issue of fact if, on the record taken as a whole, a rational trier of fact could not find in favor of the party opposing the motion.[9/]

## V.  DISCUSSION

The Court notes that the evidentiary base for both the motion and opposition is somewhat limited.  The motion is supported by the Declaration of Kevin Ruoff and attached documents, and excerpts from the deposition of Breland.  The opposition is supported by excerpts from the depositions of Breland and Stewart, numerous exhibits, Breland's affidavit, and the Affidavit of Lee Holen, counsel for Breland.

Numerous documents submitted by Breland as exhibits are not properly authenticated and ordinarily cannot support opposition to the motion.[10/]  However, in ruling on this motion, the Court will consider those unauthenticated documents relied upon by both sides,[11/] and, in the absence of an objection by Fred Meyer, deem the lack of authentication as having been waived.[12/]

The Affidavit of Lee Holen presents the Court with a more troubling issue.  The Holen affidavit states that she attended the depositions of Bonini, Kreiger, Becker, Johnson, Kodiak, and Ruoff, which were not transcribed.[13/]  Holen then sets forth her recollection of what each testified to the best of her information and belief.  The Holen

---

[7/] *Id.*

[8/] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986).

[9/] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

[10/] *White by White v. Pierce*, 797 F.2d 812, 815 (9th Cir.1986).

[11/] *See Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.,* 896 F.2d 1542, 1550-51 (9th Cir.1990) (unauthenticated document should not support a motion for summary judgment, but error harmless where both sides offer same document).

[12/] *See Townsend v. Columbia Operations,* 667 F.2d 844, 849 (9th Cir.1982), questioned but not abrogated in *Cristobal v. Siegel*, 26 F.3d 1488, 1494 (9th Cir.1994).

[13/] At oral argument Holen stated that the depositions were not transcribed due to cost concerns.

affidavit falls short of the requirement that the *facts* intended to be established are "made on personal knowledge, · · · admissible into evidence, and the · · · affiant is competent to testify to the matters stated therein."[14]   In neither his brief nor at oral argument did Breland cite any authority supporting the proposition that this Court may consider the Holen affidavit as to what the deponents testified as evidence of the facts to which the deponents testified.  Holen may competently testify as to what she heard; unfortunately she is unable to competently testify as to the facts that the testimony of the deponents would establish.  The rules specifically provide a mechanism for obtaining a continuance if necessary to obtain the evidence to oppose a motion for summary judgment,[15] the benefit of which was not sought in this case.[16]   Accordingly, in ruling on the motion the Court will not consider the Affidavit of Lee Holen as competent evidence of the facts sought to be established.

The Court also notes that the Declaration of James R. Dickens filed in reply to the opposition at Docket No. 53 suffers from the same infirmities.  The Court will not consider the Dickens Declaration to the extent that it, like the Holen Affidavit, recites his recollection of deposition testimony.

A.  *Hostile Workplace.*

Under Title VII of the Civil Rights Act of 1964, as amended, it is "an unlawful employment practice for an employer · · · to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."[17]   This prohibition encompasses the creation of a hostile work environment, which violates Title VII's guarantee of "the right to work in an environment

---

[14] FED. R. CIV. P. 56(e).

[15] FED. R. CIV. P. 56(f)

[16] Although Breland sought and obtained two extensions within which to file his opposition to the motion for summary judgment (Docket Nos. 37 and 42), neither was based on Rule 56(f).

[17] 42 U.S.C. § 2000e-2(a)(1).

free from discriminatory intimidation, ridicule, and insult."[18]  "Courts have long recognized that a workplace in which racial hostility is pervasive constitutes a form of discrimination."[19]

In order to survive summary judgment, Breland must show the existence of a genuine factual dispute as to whether 1) a reasonable Asian-African-American man would find the workplace so objectively and subjectively racially hostile as to create an abusive working environment; and 2) Fred Meyer failed to take adequate remedial and disciplinary action.[20]

It is undisputed that the language Stewart used was repugnant by any measure. However, offensive language alone does not create a hostile work environment.  The Ninth Circuit has established the following standard for making a hostile workplace determination.[21]

> In determining if an environment is so hostile as to violate Title VII, we consider whether, in light of all the circumstances, the harassment is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The Supreme Court has followed a middle path with regard to the level of hostility or abuse necessary to establish a hostile work environment. Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII. However, the harassment need not cause diagnosed psychological injury. It is enough if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.

> A plaintiff must show that the work environment was both subjectively and objectively hostile. Subjective hostility is clearly established in the instant case through McGinest's unrebutted testimony and his complaints to supervisors and to the EEOC.

> In evaluating the objective hostility of a work environment, the factors to be considered include the frequency of discriminatory conduct;

---

[18] *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

[19] *Woods v. Graphic Communications,* 925 F.2d 1195, 1200 (9th Cir.1991).

[20] *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1112 (9th Cir.2004).

[21] *Id.*, at 1112-13.

its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.

Viewed in the light most favorable to Breland, his hostile workplace claim fails to satisfy the objective hostility test.  On the frequency element, in his initial complaint to Stewart's supervisor (March 22, 2004), Breland states "LPM Stewart has not directly called or address[ed] me in a derogatory manner concerning race but I personally have heard him make on quite a few occassions [*sic*] derogatory/inappropriate concerning onces [*sic*] race with in the workplace."[22]  In his March 24, 2004, e-mail Breland states "I have only heard the derogatory/inappropriate remarks on six occassions [*sic*]."[23]  This equates to approximately one comment per quarter, hardly pervasive or frequent.  As the remarks were not addressed to Breland or, apparently, even with the intent that they be heard by Breland, they do not fall within the scope of being either physically threatening or personally humiliating.  On the other hand, that they were patently offensive, not only to Breland as a reasonable Asian-African-American man, but to most people regardless of race or ancestral lineage, is unquestionable and indisputable.[24]

The major deficiency in Breland's position is there is a paucity of evidence that Stewart's conduct significantly interfered with the Breland's ability to perform his job. Although he indicated in his initial complaint: "I figured I'd just transfer and not really for a lack of better term have to deal with Mr. Stewart" and "at first I wanted to transfer but why?"  Breland goes on to say:[25]

---

[22] Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opposition"), Exh. 20 (Docket No. 44-4 at 1).

[23] Opposition, Exh. 21 (Docket No. 44-4 at 3).

[24] "Nigger," "field nigger," "f***ing spicks," "f***ing native people"; referring to Asians as "gooks" and "slant eyed f***ers"; and referring to black employees as "chicken" and "watermelon." Declaration of James R. Dickens, Exh. A, Deposition of James Breland, 44:14–24 (Docket No. 32-1 at 15).

[25] Opposition, Exh. 20 (Docket No. 44-4 at 2)

> I really feel that LPM Stewart tries and is a decent person that I do get along with despite the fact he's made derogatory/inappropriate remarks around me.  I'll clarify around me, LPM Stewart I believe nows [*sic*] that what he is doing is wrong and by that I mean everytime he's made a derogatory/inappropriate remark Mr. Stewart assumed that I was on the floor at that time or he had no knowledge of me being in the office during the time he made the derogatory/inappropriate remark.

While Stewart's conduct was grossly offensive, both subjectively and objectively, Breland was not subjected to it on a regular or frequent basis, it was neither threatening nor personally humiliating to Breland, and there is no evidence that it interfered with Breland's job performance.  On the evidence presented in the record before the Court, viewed in a light most favorable to Breland, a rational jury could not find that Breland's workplace was so objectively and subjectively racially hostile as to create an abusive working environment.

Although perhaps unnecessary, the evidence in this case would not support a finding by a rational jury that Fred Meyer's subsequent actions were not adequate.  The facts are undisputed.  After receiving Breland's complaint, which was the first complaint he had received concerning Stewart, Ruoff delegated to the store manager, Mike Johnson ("Johnson"), as the senior on-site manager, review of Breland's claim.[26]  The parties agree that Johnson showed Breland's complaint to Stewart.  Breland also testified that shortly after Breland made his complaint Stewart apologized to him.[27]  Ruoff in his declaration indicates he and Johnson agreed that in light of Breland's complaint Stewart should be made to attend a diversity training class prior to his next review. This apparently never made into Stewart's personnel folder and, at least prior to December 2004, he never attended.  However, Stewart was transferred from the Muldoon store on August 15, 2004 and, from that point forward, no longer supervised Breland.[28]

---

[26] Declaration of Kevin Ruoff, ¶ 10 (Docket No. 32 at 4).

[27] Breland Deposition, 197:20–198:8 (Docket No. 31-2 at 26–27).

[28] There is some measure of dispute between the parties as to the reason for this transfer.  However, whatever the reason, it is irrelevant to the outcome.  From that point forward

(continued...)

In October 2004 Breland sent his follow-up e-mail to Ruoff.  In that e-mail, Breland does not mention any further incidents where Stewart made derogatory or inappropriate racial comments.[29]  In his deposition testimony, Breland does refer to three telephone conversations (described by Breland as degenerating into profanity-laced arguments) that he had with Stewart at a time when Stewart was intoxicated and off-duty.[30]  It is unclear from Breland's testimony but he may have been at the workplace when these telephone conversations occurred.  Although Breland's testimony as to the timing of these conversations is considerably less than definitive and precise, it appears one of them occurred prior to his March 2004 complaint, one possibly occurred after March 2004 but before Stewart's transfer in August, and the third occurred after Stewart's transfer from the Muldoon store.[31]  With respect to those incidents, Breland acknowledges he did not report these conversations "[b]ecause it was a discussion I felt that we had ironed out on top of, you know, he was intoxicated too."[32]  Accordingly, by Breland's own testimony, these three telephonic contacts did not constitute or contribute to a hostile workplace environment.

The gist of Breland's October 2004 e-mail, after recounting the history, was that he had heard nothing further and it appeared to him that because of a close relationship between the store manager (Johnson) and Stewart, the matter was being swept under the carpet.  Following Breland's October 2004 e-mail, Ruoff investigated the situation

---

[28]/(...continued)
there was no on-the-job contact between Breland and Stewart, which removed the source of Breland's claimed hostile workplace environment.

[29]/ Breland does refer to incidents where Stewart would ask two other minority employees to perform certain tasks (paint, move, and clean the LP office) but never ask a non-minority to do these tasks.  He also asserts that Stewart never asked a minority worker to apply for open positions but did ask a non-minority to do so.  This, at best, is of questionable or tangential relevance to the claim that Breland was subjected to a hostile work environment.

[30]/ Opposition, App. 1, Deposition of James Breland, 68:1–12 (Docket No. 44-2 at 1).

[31]/ Breland Deposition, 69:7–70:5  (Docket No. 44-2 at 12).

[32]/ Breland Deposition, 68:13–20 (Docket No. 44-2 at 11).

further and, in December 2004, Stewart was given a "First, Last, and Final" warning letter regarding violations of Fred Meyer harassment policy.[33/]

Breland claims evidence exists that Stewart continued his course of making derogatory and inappropriate remarks after Breland's complaint, both before and after Stewart's transfer from the Muldoon store until his termination in February 2006. Assuming that to be true, there is no evidence in the record, or even alluded to, that Stewart continued to make derogatory and inappropriate racial remarks directed towards Breland, in his presence, or overheard by him, between the time Breland complained and the time Stewart was transferred from the Muldoon store or thereafter. Whatever the shortcomings in the initial investigation and handling of Breland's complaint, and a rational jury could find they exist, particularly as to documenting and followup, there is no evidence that the hostile workplace condition as it affected Breland continued after the complaint. Nor, for that matter, does Breland appear to contend that it in fact continued as to him personally.

While the Court must agree that subsequent events show that the initial response was inadequate in correcting the overarching problem of Stewart's behavior, that is not the appropriate test. What the Court must focus on is the adequacy of the response in connection with the complaint voiced by Breland and the hostile workplace created for Breland by Stewart's conduct. In that context, the response by Ruoff and Johnson was effective. Breland offers no evidence that the delay in issuing the "First, Last, and Final" warning letter, even if inexcusable, would have altered the situation as it concerned Breland. Nor for that matter, was any delay in ultimately terminating Stewart, of which

---

[33/] Ruoff Declaration, ¶ 15 (Docket No. 32 at 5), Exh. 7 (Docket 32 at 24). Opposition, Exh, 57 (Docket No. 44-5 at 9). The "First, Last and Final" letter was the first formal disciplinary action taken as a result of Breland's complaint. The letter, in addition to the racial incidents complained of by Breland, also referred to sexist remarks by Stewart. Breland apparently contends that Stewart should have been, at least, suspended. Breland Deposition, 93:20–25 (Docket No. 31-2 at 16), 210:14-16 (Docket No. 31-2 at 30). Breland does not point to anything in either Fred Meyer policy or the law that suspension would have been appropriate or required under the circumstances the facts in this case establish.

Breland also complains have altered Breland's situation.  Breland's hostile workplace environment, to the extent it existed, ceased when he voiced his complaint.[34/]

Fred Meyer is entitled to summary judgment in its favor on the hostile work place claim.

B.  *Retaliatory Firing*.

To establish a *prima facie* case of retaliation under Title VII, Breland must show that three elements coalesce: 1)  he acted to protect his Title VII rights; 2) an adverse employment action was thereafter taken against him; and 3) a causal link existed between the two events.[35/]  Once Breland has established a *prima facie* case, the burden shifts to Fred Meyer to advance a legitimate non-discriminatory reason for the adverse action taken against Breland; however, Breland bears the burden of showing that such reason was pretextual.[36/]

It is undisputed, at least for the purpose of this motion, that the first two elements of a *prima facie* retaliation claim are met in this case.  Breland acted to protect his Title VII rights to be free of a hostile workplace and was subsequently terminated, unquestionably an adverse employment action.[37/]  Fred Meyer contests the causal connection between the termination action and the earlier complaint.  To establish

---

[34/] Although this was conceded at oral argument, counsel for Breland alluded to the greater societal interest in requiring employers to prevent conduct of this type in the workplace as creating a basis for finding the remedial action inadequate.  The Court agrees that there is indeed a greater societal interest involved.  Title VII of the Civil Rights Act of 1964, as amended, reflects this societal interest.  However, in the context of this case, the law is concerned with the injury suffered by Breland and providing him a remedy for that injury.  Nothing in Title VII grants authority to this Court to grant a remedy to Breland for injuries inflicted upon others.  In the context of punitive damages, the U.S. Supreme Court recently rejected the argument that compensation could be awarded for injuries suffered by or wrongs done to parties who are not before the court; remedial compensation is limited to that necessary to remedy the wrongs or injuries suffered by the party before the court.  *Philip Morris USA v. Williams*, 549 U.S. ___, ___, 127 S.Ct. 1057, 1063 (2007).

[35/] *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir.1994).

[36/] *Id.*, at 1464–65.

[37/] The Court notes that whether the workplace was, in fact, hostile, or sufficiently so as to constitute an abusive working environment, is irrelevant to the determination that his complaint in this case fell within the parameters of protected Title VII activity.  There is no authority that requires the complaint must prove to have been well-founded to be protected.

causation Breland must show "by a preponderance of the evidence that engaging in the protected activity was one of the reasons for [his] firing and that but for such activity [he] would not have been fired."[38]  Fred Meyer argues that there is no direct evidence of retaliatory motivation and the lack of temporal proximity between the protected act and the termination precludes a finding of causation.  Breland agues in opposition that there is both temporal proximity and circumstantial evidence that establish a causal connection.  The Court agrees that causation may be established by either temporal proximity *or* other factors; the lack of temporal proximity standing alone is insufficient to defeat Breland's case.[39]  The Court further agrees that the additional factors that show causation may be established by circumstantial evidence and does not read Fred Meyer's arguments to be to the contrary.

In a recent decision the Ninth Circuit discussed in detail the issue of temporal proximity, or timing between the adverse action and protected activity.[40]

> We have recognized previously that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity. *See Passantino v. Johnson & Johnson Consumer Prods., Inc.,* 212 F.3d 493, 507 (9th Cir.2000) (noting that causation can be inferred from timing alone); *see also Miller v. Fairchild Indus.,* 885 F.2d 498, 505 (9th Cir.1989) (prima facie case of causation was established when discharges occurred forty-two and fifty-nine days after EEOC hearings); *Yartzoff,* 809 F.2d at 1376 (sufficient evidence existed where adverse actions occurred less than three months after complaint filed, two weeks after charge first investigated, and less than two months after investigation ended). But timing alone will not show causation in all cases; rather, "in order to support an inference of retaliatory motive, the termination must have occurred 'fairly soon after the employee's protected expression.'" *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1009-10 (7th Cir.2000). A nearly 18-month lapse between protected activity and an adverse employment action is simply too long, by itself, to give rise to an inference of causation. *See id.* (finding that a one-

---

[38]/ *Ruggles v. California Polytechnic State Univ.,* 797 F.2d 782, 785 (9th Cir.1986) (quoting *Kauffman v. Sidereal Corp.,* 695 F.2d 343, 345 (9th Cir.1982) (per curium)).

[39]/ The Court notes that, with respect to his temporal proximity argument, the Ninth Circuit decision quoted by Breland, *Porter v. California Dept. of Corrections,* 383 F.3d 1018, 1029-30 (9th Cir.2004), was superceded by the opinion at 419 F.3d 995 (9th Cir.2005).

[40]/ *Villiarimo v. Aloha Island air, inc.,* 281 F.3d 1054, 1065 (9th Cir.2002).

year interval between the protected expression and the employee's termination, standing alone, is too long to raise an inference of discrimination); *see also Filipovic v. K & R Express Sys., Inc.,* 176 F.3d 390, 398-99 (7th Cir.1999) (four months too long); *Adusumilli v. City of Chicago,* 164 F.3d 353, 363 (7th Cir.1998) (eight months), *cert. denied,* 528 U.S. 988, 120 S.Ct. 450, 145 L.Ed.2d 367 (1999); *Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 511 (7th Cir.1998) (five months); *Conner v. Schnuck Markets, Inc.,* 121 F.3d 1390, 1395 (10th Cir.1997) (four months).

Breland's Title VII complaint predated his termination action by more than ten months.  This, under controlling Ninth Circuit precedent, is simply insufficient, standing alone, to support a finding of retaliatory motive on the part of Ruoff.  Although Breland also asserts that the termination by Ruoff was in retaliation for his copying his subsequent follow-up to Ruoff's superior,[41] which occurred less than four months preceding his termination, even if temporally proximate, is based upon nothing more than supposition or speculation.  Nothing in his subsequent (October 2004) e-mail involves any accusations or charges of Title VII, or any other, violations against Ruoff; it simply expresses dissatisfaction with the investigation into his earlier (March) complaint.  Thus, in the absence of some other evidence of a retaliatory motive, Breland's retaliatory termination claim must fail.

Breland's argument that other factors support causation also fails.  Breland points to no evidence in the record that even inferentially supports a finding of any animosity or ill-will against Breland by Ruoff, let alone that Ruoff had a retaliatory motive or animus.  Breland's argument on causation is that the reasons given for his termination were unsupported by the facts and Fred Meyer's policy.  In the context of his retaliatory firing claim, they are germane to a pretextual issue.  However, until Breland has first established his *prima facie* case, including the causal nexus between the protected activity and the adverse action, whether a legitimate, non-discriminatory basis for the adverse action existed does not enter the picture.  Moreover, even if pretext was considered in connection with this claim, Breland's argument would fail for

---

[41] Breland Deposition, 122:5–13 (Docket 31-2 at 19).

the same reasons discussed in Part V.C., below, in connection with his discrimination (disparate treatment) claim.

Fred Meyer is entitled to summary judgment in its favor on the retaliation claim.

C. *Disparate Treatment.*

"A person suffers disparate treatment in his employment  when he or she is singled out and treated less favorably than others similarly situated on account of race."[42]  Under the *McDonnell Douglas* framework,[43] to establish a *prima facie* case under Title VII, a plaintiff must offer proof: (1) that the plaintiff belongs to a class of persons protected by Title VII; (2) that the plaintiff performed his or her job satisfactorily; (3) that the plaintiff suffered an adverse employment action; and (4) that the plaintiff's employer treated the plaintiff differently than a similarly situated employee who does not belong to the same protected class as the plaintiff.[44]  The *McDonnell Douglas* framework is also applicable to employment discrimination claims under 42 U.S.C. § 1981.[45]  Fred Meyer, for the purpose of the motion at bar concedes that Breland has established a *prima facie* case.[46]

Once a plaintiff establishes a *prima facie* case, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's [termination]."[47]  If the defendant meets that burden, plaintiff must show that the reason was merely a pretext for intentional discrimination.[48]  The Ninth Circuit recently

---

[42] *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir.2006) (internal quotation marks and citations omitted).

[43] *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

[44] *Cornwell, supra*.

[45] *Id.*, 439 F.3d at 1028 n. 5.

[46] This concession notwithstanding, Fred Meyer offers evidence of a lack of disparate treatment, to which Breland responds, at least in part.  The Court, accepting the concession for the purpose of deciding the motion at bar, does not reach or decide any issue related to the *prima facie* case.  That is, the Court assumes, without deciding, that Breland has established a *prima facie* case.

[47] *McDonnell Douglas,* 411 U.S. at 802.

[48] *Texas Dep't. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253 (1981).

reviewed these principles applicable once a plaintiff has established a *prima facie* case.[49]

> Once a defendant presents legitimate non-discriminatory reasons, the presumption of discrimination "drops out of the picture," and the plaintiff has the new burden of proving that the proffered reasons were a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510-11, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Chuang,* 225 F.3d at 1127 (citation omitted). Although the inference of discrimination created from the *prima facie* case is gone, the evidence used in its establishment may be considered for examining pretext. *Id.* (citing *Reeves,* 530 U.S. at 146-47, 120 S.Ct. 2097) ("A disparate treatment plaintiff can survive summary judgment without producing any evidence of discrimination beyond that constituting his prima facie case, if that evidence raises a genuine issue of material fact regarding the truth of the employer's proffered reasons."); *see also Lowe v. City of Monrovia,* 775 F.2d 998, 1009 (9th Cir.1985), *amended by* 784 F.2d 1407 (1986) ("Once a *prima facie* case is established either by the introduction of actual evidence or reliance on the *McDonnell Douglas* presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the 'elusive factual question of intentional discrimination.' " (citation omitted)).
>
> Nevertheless, "when evidence to refute the defendant's legitimate explanation is totally lacking, summary judgment is appropriate, even though [the] plaintiff may have established a minimal *prima facie* case based on a *McDonnell Douglas* type presumption." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 890–91 (9th Cir.1994).

Fred Meyer argues that Breland was terminated for cause, *i.e.*, a violation of company policy for which termination is mandatory. Breland does not appear to dispute that if, in fact, Breland were properly terminated for violating company policy, such termination would be a legitimate non-discriminatory reason. However, Breland argues, termination for that reason was pretextual; specifically, the termination was based upon an improper or erroneous finding that he had violated company policy. For the reasons that follow, the Court disagrees with Breland.

---

[49] *Lindsey v. SLT Los Angeles LLC*, 432 F.23d 954, 962–63 (9th Cir.2005).

On Valentine's Day 2005 Breland was working with another LPS in which a customer was stopped on suspicion of shoplifting; a stop that did not result in an arrest. Fred Meyer written policy specifically requires that any non-arrest incident be reported within one hour.  That this report was not made is undisputed.  What is disputed is whether Breland was responsible for making the report.

Certain facts concerning the incident are not in dispute.  Breland was working the floor with Paul Kodiak ("Kodiak").  Breland observed a young female known to have been previously involved in shoplifting activities engaged in what Breland considered to be suspicious activity.  Breland communicated his suspicions to Kodiak by cell phone. When the suspect exited the store, Kodiak, who had exited first, stopped the suspect. Breland immediately came upon the scene.  The suspect was escorted by Breland and Kodiak into the Loss Prevention office where it was determined there was insufficient reason for arrest and she was released without further incident.  No non-arrest apprehension report was filed.[50]  However, Breland did file a "Harassment of Customer/Emp." report on an earlier incident involving the same suspect.[51]

The Fred Meyer RPLM Non-Arrest Apprehension Review Form prepared by Ruoff on February 16, 2005 states in the Summary:[52] "Mr. Breland stopped A/F Jennifer Ems for lipstick wo mdse found. Ms. Ems released.  LPS Breland wrote LP's 0959479033 harassment report – Failed to report non arrest."

In his declaration, Ruoff states with respect to the investigation into the incident and termination of Breland:[53]

> 16.    On February 15, 2005, I received a telephone call from a woman (Mrs. Julie Emms) who said that her daughter (Jennifer) improperly had been stopped and arrested the night before by two security officers at the Muldoon store. I spoke to the daughter as well. Jennifer Emms said that it

---

[50] It is undisputed the Fred Meyer's written policy provides that the failure to report a non-arrest apprehension within one hour will result in immediate termination of employment. Opposition, Exh. 33 (Docket 44-4 at 24).

[51] Opposition, Exh. 49 (Docket No. 44-5 at 8).

[52] Opposition, Exh. 18 (Docket 44-3 at 23).

[53] Declaration of Kevin Ruoff (Docket No. 32 at 6–8).

was the "Black male" who did the talking. My contemporaneous notes are attached as Exhibit 8. I was not pleased because there had been no telephone call or notice to me that there had been a non-arrest apprehension the evening before until I received the telephone call from the mother, Mrs. Emms.

17.    After my discussion with Mrs. Emms on February 15, 2005, I immediately called the Store Director, Mike Johnson, and the store LPM, Ryan Krieger, and asked them to investigate. When they called back, they gave me a report as follows:

(a)    First, they had interviewed the two loss prevention officers involved in the non-arrest apprehension the evening before on February 14, 2005, and they were James Breland and Paul Kodiak. Paul Kodiak is Caucasian.

(b)    Mr. Kodiak said that he and Mr. Breland had been observing two women, one black and one white, and Mr. Breland thought they had been stealing merchandise. Messrs. Kodiak and Breland were communicating by cell phone, and Mr. Kodiak's statement was that Mr. Breland told him he had all five required elements and to stop the women once they exited the store. See Exhibit 9 attached. Mr. Breland's statement, as relayed to me, was that he decided the women should be stopped, and he told Mr. Kodiak to do so.

(c)    Mr. Kodiak stated that the women were stopped just outside the Muldoon store entrance by him, and that within seconds Mr. Breland appeared and took over as the senior officer and asked the women to follow him back to the loss prevention office in the back of the store. See Exhibit 9. Mr. Breland denied being in charge of the incident, and also claimed that he did not ask the women to follow him back into the Loss Prevention office. Instead, Mr. Breland claimed that the two women were harassing him and followed him back to the Loss Prevention office on their own.

(d)    A videotape review of the non-arrest apprehension outside the store, and the subsequent retreat of the two women and Messrs. Kodiak and Breland to the Loss Prevention office, supported Mr. Kodiak's version that Mr. Breland was in charge and the women were following him at his direction.

(e)    In the Loss Prevention Office the videotape showed one woman giving her purse to Mr. Breland to examine, which he did and handed it back to her.

(f)    Mr. Kodiak said he asked Mr. Breland who was going to file the report, as Mr. Kodiak had just returned from a military tour in Iraq, and Mr. Breland said he would take care of it. See Exhibit 9.

(g)    The only incident report filed by Mr. Breland the evening of February 14, 2005, was alleged harassment by two female customers. A copy of Mr. Breland's report is attached as Exhibit 10. There was no report filed regarding non-arrest apprehension.

18.    After hearing the information relayed to me by Messrs. Johnson and Krieger, and confirming that Mr. Krieger also had not been called the evening before by Mr. Breland about the non-arrest apprehension, I concluded that there was a clear violation of the Loss Prevention policy requiring the reporting of any non-arrest apprehension within one hour of its occurrence. Per Fred Meyer Loss Prevention policy, the failure to do so results in immediate termination of employment.

19.    Given that the videotape and Jennifer Emms clearly supported Mr. Kodiak's version of events, and that Mr. Breland was responsible for the initial observation and filed the incorrect report, I concluded that Mr. Breland was responsible for the non-arrest stop and for the failure to timely report it. Furthermore, I concluded that Mr. Breland's explanation of the incident to me and others lacked credibility. For example, Mr. Breland told me the young woman had followed him to the loss prevention office, but they would have to have entered through two locked doors, and Mr. Breland could have stopped them at any time.  Mr. Breland denied searching Ms. Emms purse, yet such a search is clearly shown on the videotape.

20.    In a conversation on February 16, 2004, Mr. Breland admitted to me that he wrote up the incident as an harassment report rather than as anon-arrest stop in order to avoid being charged with a second non-arrest stop.  See my contemporaneous notes attached as Exhibit 11. A second non-arrest stop would have been subject to termination for a second non-arrest apprehension within 24 months, but we did not reach that issue because of the failure to timely report within one hour the non-arrest apprehension.

21.    Reluctant as I was to direct Mr. Krieger in this regard, I told him on February 15, 2006 [*sic*], that per policy, Mr. Breland was to be terminated immediately for failing to report the non-arrest apprehension within one hour of its occurrence the evening before.

There are two somewhat contradictory accounts of the events immediately preceding the incident and the incident itself: one by Kodiak and the other by Breland.

Kodiak Version.[54]/  He was asked by Breland to take up observation of the two females involved.  Breland then came onto the floor and took over observation and

---

[54]/ Opposition, Exh. 47 (Docket No. 44-5 at 7).

Kodiak proceeded to the shoe department.  Kodiak and Breland were in communication by cell phone.  Breland told Kodiak he had concealment and told Kodiak to go ahead and make the stop.  Kodiak approached the females outside the store, identified himself as a loss prevention officer to the white female and asked her to accompany him back into the store to discuss the merchandise she had.  The suspect denied having anything.  At this point Breland took over and asked her to come back to the LP office.  Breland then looked through the suspect's bag, did not recover what he stated to Kodiak she had, and apologized to the suspect.  Breland told Kodiak that he (Breland) would take care of the report.

    Breland Version.[55/]  Breland observed the suspect conceal a cosmetic in her hand under a jacket draped over the hand and forearm. Breland called Kodiak informing him of the situation via cell phone, informing Kodiak that he (Breland) would make contact with the suspect Breland believed may have taken cosmetics.  Breland also communicated that he was not sure, but believed she had the merchandise and needed Kodiak there as a witness.  The young ladies exited the location via exit "B" and once outside Kodiak stopped and identified himself as LP to the suspect.  As Breland was walking-up Kodiak invited the suspect back to the office.   At that point, the suspect noticed Breland, recognizing him from an earlier incident in the store became angry, was adamant about proving both Kodiak and Breland wrong, and insisted on going back to the office. At this time Breland told the suspect there was no need to go to the office. The suspect was shouting she wanted to show she didn't take anything, insisted they go back in the store and she would show Kodiak and Breland.  Breland continued to inform the suspect no need to, but she continued to follow shouting she did not take anything and she would prove it.  Breland proceeded back to the office to try and remove himself from the situation but she continued to follow shouting.  As Breland swiped in the employee entrance the suspect followed only after Kodiak invited her to the office. The suspect was let into the office only after her constant following, badgering and invitation.

_____

    [55/] Opposition, Exh. 32 (Docket No. 44-4 at 19).  This statement appears to have been prepared on the day of but after Breland was terminated.

Once in the office the suspect removed her jacket, pulled out the pockets on her pants, slammed the purse on the desk at which time she unzipped it and said search. Breland apologized and the suspect exited.

In his deposition testimony, Breland denied telling Kodiak that he would make the report.[56/]  He also denied that he directed Kodiak to make the stop.[57/]

Breland's principal argument on pretext is that he was terminated for Kodiak's stop, a stop that violated Fred Meyer policy; in effect being disciplined for the transgression of a co-employee, not his own.  The Court agrees that, under the facts of this case, the stop by Kodiak clearly violated policy.  Fred Meyer policy requires that the apprehending officer observe, either on the floor or via video camera, five elements,[58/] Kodiak clearly did not.  Kodiak, although indisputably the initial apprehending officer did not make the required non-arrest apprehension notification.  Yet, as Breland correctly points out, Kodiak was not disciplined.  Breland misses the point, while this may at least constitute evidence of disparate treatment, it is not evidence of pretext.  Breland also argues that he did not report the apprehension because he did not make the stop. Finally, Breland argues that he had 24 hours to make the report and he was terminated in less than 24 hours.[59/]  On the last point, Breland confuses the 24-hour "documentation" requirement with the one hour "reporting" requirement which appears in the same part of the manual.[60/]

Ruoff, after taking into consideration the statements of the apprehended individual, Breland, and Kodiak, and viewing the video tape, accepted Kodiak's version and rejected Breland's; most specifically that Breland was responsible for making the required report.  Although at the summary judgment stage Breland's burden is not high,

---

[56/] Opposition, Appendix 1, Deposition of James Breland, 233:21–23, 235:24–236:5 (Docket No. 44-2 at 26).

[57/] *Id.*, 233:24–234:14 (Docket No. 44-2 at 26); Opposition, Exh. 32 (Docket No. 44-4 at 20).

[58/] Opposition, Exh. 60 (Docket No. 44-5 at 11).

[59/] Opposition, Exh. 33 (Docket No. 44-4 at 25).

[60/] *Id.* (Docket No. 44-4 at 24).

he must still show that a rational trier of fact could, on all the evidence, find that Ruoff's explanation is pretextual and therefore his action was taken for impermissibly discriminatory reasons.[61]  To meet this requirement, Breland must introduce evidence, direct or circumstantial, of specific facts evidencing a discriminatory motive or that Fred Meyer's explanation is not credible.[62]   Breland points to no evidence, direct or circumstantial, that even remotely suggests a discriminatory motive.[63]   A proffered reason is not entitled to credence when there is evidence to support a finding that it 1) had no basis in fact, 2) was not the real reason, or 3) was insufficient to warrant the discriminatory action.[64]   Breland's argument concerning the basis for his termination can be distilled to a basic premise: "Ruoff should have believed my version of the events, not Kodiak's."  Breland has cited no authority for the proposition that a disciplinary action by an employer where that action was based on conflicting evidence presented to the employer constitutes a violation of either Title VII or § 1981 and independent research by the Court has not uncovered any such authority.  One can not say that the proffered reason has no basis in fact, was not the real reason, or that it was insufficient to warrant the action taken.  Nor does the evidence, direct or circumstantial, show that the proffered reason was internally inconsistent or otherwise unbelievable.

If this were a case in which there was no credible evidence to support the factual determination made by the employer, not only could a rational jury find the reason given was not credible but the Court likely would find so as a matter of law.  That is not the situation presented in this case.  In this case, based upon what he was told by the suspect, Kodiak's statement as to the incident, and his view of the video tape, as well as

---

[61] *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir.2003).

[62] *Warren v. City of Carlsbad*, 58 F.3d 439, 443 (9th Cir.1995).

[63] Breland testified that Ruoff admitted he "dropped the ball."  Breland Deposition, 250:7–25 (Docket 44-2 at 28).  Breland argues that this is evidence of pretext.  The Court disagrees.  While it may be evidence that the initial investigation of Breland's March complaint was not handled in the best possible manner, it does not provide any basis for finding a retaliatory motive or animus on the part of Ruoff.

[64] *See, e.g., Warfield v. Lebanon Correctional Inst.*, 187 F.3d 723, 729 (6th Cir.1999); *Johnson v. Nordstom, Inc.*, 260 F.3d 727, 732 (7th Cir.2004).

Breland's own statements, Ruoff accepted Paul Kodiak's version of the events.[65/]
Breland has not cited any authority that a court may, let alone must, review *de novo* the
factual basis for disciplinary actions taken by an employer. In the absence of controlling
authority to the contrary, this Court declines to adopt such a rule. In the context of
determining whether a proffered legitimate non-discriminatory basis for the action is
pretextual, this Court is of the opinion that as long as the decision is based upon
substantial evidence it is credible, *i.e.*, it is not unbelievable. The appropriate test is
whether a rational mind could reach the conclusion reached by the employer based
upon the facts presented to the employer; whether the Court or a rational jury would
come to a different conclusion based upon the same facts is immaterial.

The evidence in the record, viewed in the light most favorable to Breland, would
not support a finding that the reason for Breland's termination was not a legitimate non-
discriminatory reason or that the reason was pretextual. Fred Meyer is entitled to
summary judgment in its favor on the discrimination claim under 42 U.S.C. § 1981.

D. *State Law Claim*.

When interpreting state law, this Court is bound by the decisions of the state's
highest court. In the absence of a decision by the highest state court, this Court "must
predict how the highest state court would decide the issue using intermediate appellate
court decisions, decisions from other jurisdictions, statutes, treatises, and restatements
as guidance."[66/]

---

[65/] The Court has considered and rejects as being inconsequential the "errors" in Ruoff's
reasoning asserted by Breland, *e.g.*, incorrectly listing an incident as a prior disciplinary matter
in the RPLM Non-Arrest Apprehension Form (Opposition, Exh. 18) and incorrectly referring to
the report of the prior incident as referring to the incident at issue (Ruoff Declaration, ¶ 22). As
to this latter point, one could logically conclude from the first paragraph of Breland's February
15 statement [Opposition, Exh. 32 (Docket No. 44-2 at 19)] that the report of the earlier incident
related to the non-arrest apprehension.

[66/] *S.D. Myers, Inc. v. City and County of San Francisco*, 253 F.3d 461, 473 (9th
Cir.2001); *Paulman v. Gateway Ventures Partners III L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570,
578 (9th Cir.1998).

It is well settled in Alaska that the termination of an at-will employee that violates public policy is actionable in both contract and tort.[67]  Under Alaska law at-will employment contracts are subject to the covenant of good faith and fair dealing.[68]  The covenant can be breached objectively or subjectively. The objective prong of the covenant is breached when an employer fails to act in a manner that a reasonable person would consider fair, which includes treating similarly situated employees disparately, terminating employees on unconstitutional grounds, and terminating employees in violation of public policy.[69]  The subjective prong of the covenant is breached when an employer is motivated by the goal of depriving the employee of a benefit of the contract.[70]

Alaska law, like its federal counterpart, prohibits discrimination on the basis of race.[71] The Alaska Supreme Court has recognized that retaliatory firings for the exercise of protected rights violate public policy.[72]  In applying Alaska's anti-discrimination laws, the Alaska Supreme Court looks to federal Title VII cases for guidance.[73]  Under Alaska law, as under federal law, to establish a prima facie case of retaliatory firing, Breland must establish three elements: 1) engaging in a protected activity; 2) an adverse employment action; and 3) a causal connection between the two.[74]  Breland's *prima facie* claim under Alaska law suffers from the same infirmity as did his Title VII claim—causation.  Alaska follows the same close in time standard for

---

[67] *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 432 (Alaska 2004).

[68] *Pitka v. Interior Reg'l Hous. Auth.*, 54 P.3d 785, 789 (Alaska 2002); *ERA Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1139 (Alaska 1999).

[69] *Charles v. Interior Alaska Reg'l Hous. Auth.*, 55 P.3d 57, 62 (Alaska 2002).

[70] *Holland v. Union Oil Co. of Calif., Inc.*, 993 P.2d 1026, 1032 (Alaska 1999).

[71] AS § 18.80.220.

[72] *Kinzel, supra.*

[73] *VECO, Inc. v. Rosebrock*, 970 P.2d 906, 912 (Alaska 1999).

[74] *Id.*, at 918.

temporal proximity as does federal law.[75]  In establishing a *prima facie* case in a pretext case, Alaska apples the same three-part framework used under federal law.[76]

Breland's state law claim fails for the same reasons as do his Title VII and § 1981 discrimination claims.  Fred Meyer is entitled to judgment on the state (Alaska) law claim.

VI.  CONCLUSION and ORDER

Based on the foregoing, Defendant's Motion for Summary Judgment at Docket No. 30 is **GRANTED**.

IT IS ORDERED THAT the complaint on file herein is **DISMISSED**, with prejudice, Plaintiff James Breland to take nothing by way thereof, and judgment entered thereon in favor of defendant Fred Meyer Co.

The Clerk of the Court to enter judgment accordingly.

Dated:        March 22, 2007

     s/ Timothy M. Burgess
TIMOTHY M. BURGESS
United States District Judge

---

[75] *See, e.g., Mahan v. Arctic Catering, Inc.*, 133 P.3d 655, 662 (Alaska 2006); *Kinzel,* 93 P.2d at 433.

[76] *Mahan*, 133 P.3d at 660.